# Exhibit A



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

—————————————————————————————— x
:    Civil Action No. 07-7972 (PKC)
:
:    ECF Case
:
IN RE TARRAGON CORPORATION    :    **AMENDED CLASS ACTION**
SECURITIES LITIGATION    :    **COMPLAINT**
:
:
:    **DEMAND FOR JURY TRIAL**
:
—————————————————————————————— x

Plaintiff alleges the following facts upon knowledge, with respect to his own acts, and on

information and belief with respect to all other facts based on an investigation conducted by his

counsel, including, among other things, a review of filings made with respect to Tarragon

Corporation ("Tarragon" or the "Company") with the Securities and Exchange Commission

("SEC"), press releases, news and research reports about the Company, and upon other

information available to the public.

## INTRODUCTION

1.    This is a securities class action on behalf of all persons who purchased or

otherwise acquired the common stock of Tarragon between January 5, 2005 and August 9, 2007

(the "Class Period"), against Tarragon, certain of its officers, directors and control persons, and

Grant Thornton LLP, Tarragon's outside auditor, for violations of the Securities Exchange Act of

1934 (the "Exchange Act" or "1934 Act").

2.    Tarragon is a homebuilder and real estate developer. The Company operates two

distinct businesses: a homebuilding and real estate development business, and a real estate

services business. The homebuilding business focuses on developing, renovating, building and

marketing homes in high-density, urban locations and in master-planned communities. The real

estate services business provides asset and property management, leasing and renovation services to residential and commercial properties.

3.      During the Class Period, Defendants issued materially false and misleading statements regarding the Company's financial results and business operations. Such false and misleading statements first resulted in Tarragon having to issue a restatement of its financial statements, and thereafter, despite the restatement, resulted in Tarragon's continuing to report inflated recognized revenue and earnings. As a result of Defendants' false statements, Tarragon stock traded at artificially inflated prices during the Class Period.

## JURISDICTION AND VENUE

4.      Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

5.      Venue is proper in this District pursuant to §27 of the 1934 Act. Many of the false and misleading statements were made in or issued from this District.

## PARTIES

6.      Lead Plaintiff Paul Berger purchased Tarragon common stock as set forth in his certification previously filed with the Court and was damaged thereby.

7.      Defendant Tarragon is a Nevada corporation, which maintains its corporate headquarters at 423 West 55th Street, 12th Floor, New York, New York. Tarragon's securities are registered with the SEC pursuant to Section 12 of the Exchange Act and its common stock is publicly traded on the National Market System of the National Association of Securities Dealers ("NASDAQ-NMS" or "NMS").

8.      Defendant William S. Friedman ("Friedman") is, and at all relevant times was, Chairman of the Board, a director and Chief Executive Officer ("CEO") of Tarragon.

- 2 -

9.      Defendant Robert P. Rothenberg ("Rothenberg") is, and at all relevant times was, President, Chief Operating Officer ("COO") and a director of Tarragon.

10.      Defendant Erin D. Pickens ("Pickens") is, and at all relevant times was, Chief Financial Officer ("CFO") and Executive Vice President of Tarragon.

11.      Defendants Friedman, Rothenberg and Pickens are collectively referred to herein as the "Individual Defendants" and together with Tarragon are collectively referred to herein as the "Tarragon Defendants."

12.      Defendant Beachwold Partners, L.P. ("Beachwold") is a Texas limited partnership the business address of which is 423 West 55th Street, 12th Floor, New York, New York 10019. Defendant Friedman is the sole general partner of Beachwold and Lucy Friedman, defendant Friedman's wife, and their four children (Ezra H. Friedman, Tanya E. Friedman, Gideon Z. Friedman, Samuel N. Friedman) are Beachwold's partners. Beachwold jointly filed Schedules 13D with defendant Friedman with respect to their ownership interest in Tarragon. In addition, Beachwold has many other entangling business relationships with Tarragon. Defendant Beachwold is named as a defendant pursuant to Section 20(a) of the Exchange Act.

13.      Defendant Grant Thornton LLP ("Grant Thornton") is the U.S. member firm of Grant Thornton International, a global accounting, tax and business advisory organization, which maintains its national headquarters at 175 West Jackson Boulevard, 20th Floor, Chicago, IL 60604. Grant Thornton is being named as a defendant pursuant to Section 10(b) of the Exchange Act with respect to statements it made in its audit opinions on Tarragon's financial statements for the fiscal years ended December 31, 2004, 2005 and 2006 which, with Grant Thornton's consent, were included in the Forms 10-K filed by Tarragon with the SEC for those fiscal years. In

addition, Grant Thornton reviewed Tarragon's Forms 10-Q prior to their being filed with the SEC.

## CLASS ACTION ALLEGATIONS

14.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Tarragon common stock during the Class Period (the "Class"). Excluded from the Class are defendants, members of the immediate family of each of the Individual Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any defendant has a controlling interest or which is related to or affiliated with any of the defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

15.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Tarragon has over 28.6 million shares of stock outstanding, owned by hundreds if not thousands of persons.

16.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    whether the 1934 Act was violated by Defendants;

(b)    whether Defendants omitted and/or misrepresented material facts;

(c)    whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether Defendants knew or deliberately disregarded that their statements were false and misleading;

- 4 -

(e)    whether the price of Tarragon's common stock was artificially inflated; and

(f)    the extent of damage sustained by Class members and the appropriate measure of damages.

17.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

18.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests which conflict with those of the Class.

19.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OTHER RELEVANT EVENTS OCCURING DURING THE CLASS PERIOD

20.    On January 5, 2005, Tarragon issued a press release entitled "Tarragon Corporation Affirms 2004 Guidance and Releases 2005 Earnings Forecast." The press release stated in part:

> Tarragon ... reaffirmed its previous guidance for 2004, forecasting net income of $42 to $46 million, or approximately $2.40 to $2.60 per share, versus net income for fiscal 2003 of $31.2 million or $1.80 per share in each case on a fully diluted basis.
>
> Tarragon Corporation simultaneously announced its 2005 earnings guidance. Net income for fiscal 2005 is expected to be $75 to $80 million, or approximately $3.85 to $4.10 per share, fully diluted, based on projected total consolidated revenue of $475 to $525 million. Most of the growth in earnings and revenue is from closings that are included in the $400 million Homebuilding Division contract backlog. Homebuilding Division pretax net income is expected to range from $110 to $115 million. Homebuilding Division sales revenue, including revenue from unconsolidated joint ventures, is projected to be $700 to $750 million with a gross margin over 24 percent.

21.    On January 5, 2005, in reaction to this announcement, Tarragon's stock jumped $2.59 per share – a 22% increase over the previous day's close – to close at $14.59 per share on

high volume (all share and per share amounts are adjusted for the 3-for-2 stock split in February

2005).

      22.      On March 16, 2005, the Company issued a press release, which was also

subsequently attached as an Exhibit to a Form 8-K filed with the SEC by the Company on March

23, 2005, entitled "Tarragon Corporation Reports Record Results for 2004; Company Will

Expand Homebuilding and Strengthen Balance Sheet by Selling Substantial Portion of Rental

Portfolio." The press release stated in part:

> Tarragon ... announced today that its consolidated revenues for 2004 grew
> to $311 million, up 136 percent from revenues of $131.6 million in 2003.
> Increased revenue primarily reflects strong home sales, which grew, on a
> consolidated basis, from $56.3 million in 2003 to $220.5 million in 2004.

> The Company also reported record profits of $44.7 million, representing a
> 43 percent increase over 2003 net income of $31.2 million. Following the
> Company's 3-for-2 stock split that was effective February 10, 2005, and on a fully
> diluted per-share basis, earnings increased 41 percent year-to-year from $1.20 to
> $1.69. Income tax expense in 2004 was $15 million, while in 2003 there was no
> income tax due to the application of net operating loss carry-forwards.

> As a result of the growth in profitability of the Company's homebuilding
> business, Tarragon has adopted a strategic plan to sell a substantial portion of the
> assets in its rental portfolio (Investment Division). The Company will redeploy
> the capital now invested in these rental properties to support further expansion of
> homebuilding and to strengthen its balance sheet.

      23.      (a)      On March 16, 2005, the Company also filed with the SEC its Form 10-K

for fiscal year ended December 31, 2004 (the "2004 Form 10-K"), which included results for the

fourth quarter 2004, and the same financial results previously reported in the Company's press

release.

      (b)      The 2004 Form 10-K also stated that:

> The accompanying Consolidated Financial Statements of Tarragon
> Corporation, its subsidiaries, and consolidated partnerships and joint ventures have
> been prepared in conformity with accounting principles generally accepted in the
> United States of America ("GAAP").

- 6 -

(c)    The 2004 Form 10-K also included, as Exhibit 31.1, a certification by

Friedman made pursuant to the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Certification"),

stating that:

1. I have reviewed this annual report on Form 10-K of Tarragon Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal controls over financial reporting, or caused such internal controls over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely

to adversely affect the registrant's ability to record, process, summarize and report financial information; and

     b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

     (d)    Defendant Pickens signed a Sarbanes-Oxley Certification, which was

attached as Exhibit 31.2 to the 2004 Form 10-K, identical in form to that signed by Defendant

Friedman.

     24.    The 2004 Form 10-K also contained a statement from defendant Grant Thornton

representing that it had conducted an audit of Tarragon in accordance with Generally Accepted

Auditing Standards ("GAAS") and that the Company's financial results for the fiscal year ended

December 31, 2004, were reported in conformity with Generally Accepted Accounting

Principles ("GAAP"). Specifically, Grant Thornton addressed a letter dated March 15, 2005, to

Tarragon's stockholders and board of directors, which was included with its consent in the 2004

Form 10-K, stating that:

> We have audited the accompanying consolidated balance sheets of Tarragon Corporation and subsidiaries as of December 31, 2004 and 2003, and the related consolidated statements of income, stockholders' equity and cash flows for each of the three years in the period ended December 31, 2004. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

> We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States of America). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

> In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of Tarragon Corporation and subsidiaries, as of December 31, 2004 and 2003, and the consolidated results of

their operations and their consolidated cash flows for each of the three years in the period ended December 31, 2004 in conformity with accounting principles generally accepted in the United States of America.

As discussed in Note 1 to the consolidated financial statements, the Company adopted, Statements of Financial Accounting Standards No. 142, "Goodwill and Other Intangible Assets," No. 144 "Accounting for the Impairment or Disposal of Long-Lived Assets," and the fair value accounting method of No. 123 "Accounting for Stock-Based Compensation" in 2002 and No. 145 "Rescission of FASB Statements No. 4, 44, and 64, Amendment of FASB Statement No. 13, and Technical Corrections" in 2003, and Financial Accounting Standards Board Interpretation 46-R "Consolidation of Variable Interest Entities" in 2004.

We also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States of America), the effectiveness of Tarragon Corporation's internal control over financial reporting as of December 31, 2004, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated March 15, 2005 expressed an unqualified opinion on management's assessment of, and an adverse opinion on the effective operation of, internal control over financial reporting.

25.    On April 22, 2005, the Company agreed to purchase a 30% interest in Fenwick Tarragon Apartments, LLC from Felboa, Inc. ("Felboa") for a $967,000 promissory note secured by 55,402 shares of Tarragon common stock. Felboa had the right at the maturity of the promissory note on January 6, 2006, to either retain the common stock or to receive the $1 million and return the common stock.

26.    On May 11, 2005, the Company issued a press release reporting that for the first quarter ended March 31, 2005, the Company had a net income of $21.6 Million and raising guidance on 2005 earnings of $75 to $80 million which assumed $53 to $58 million of after-tax income from continuing operations (principally homebuilding activities) and $22 million in after-tax gain on sale of properties.

27.    (a)    On or about May 11, 2005, the Company filed with the SEC its Form 10-Q for the fiscal quarter ended March 21, 2005, including the financial results reported in its press

release. Revenues were reported to be $80,613,000, expenses were reported to be $66,357,000 and net income of $21,606,000 with $0.47 earnings per share.

(b)    The Form 10-Q contained the following representation concerning the preparation and presentation of the financial statements contained in the Form 10-Q:

> The accompanying Consolidated Financial Statements have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") for interim financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X.

(c)    In addition, the Form 10-Q contained as exhibits Sarbanes-Oxley Certifications signed by Friedman and Pickens that were identical in form to that contained in Tarragon's 2004 Form 10-K, as quoted above in ¶23.

28.    On July 18, 2005, Tarragon issued a press release announcing an offer to convert its outstanding 8% Senior Convertible Notes due 2009 purportedly in order to simplify its capital structure. Tarragon offered 81.6993 shares of common stock and $50 in cash for each $1,000 principal amount of convertible notes tendered.

29.    On August 9, 2005, the Company issued a press release entitled "Tarragon Corporation Reports Second-Quarter 2005 Results; Revenue Up by 51 Percent; Backlog Up by 75 Percent; Pipeline Grows to 7,000 Homes." The press release stated in part:

> Tarragon ... announced its second-quarter results and affirmed its guidance for 2005.
>
> Total revenues for the quarter ended June 30, 2005, increased to $85 million, 51 percent higher than second-quarter 2004 revenues of $56.1 million. Net income for the second quarter ended June 30, 2005, was $9.1 million, versus $17.2 million in the prior year's second quarter, which included an income tax benefit, gain on sale and other nonrecurring items of $12.7 million. Diluted earnings per share for the second quarter 2005 were $0.30 compared to $0.65 in the second quarter of 2004. Pre-tax earnings from continuing operations increased 43 percent to $13.2 million this quarter from $9.3 million in the second quarter 2004.

For the six-month period revenues were $164.1 million, up 55 percent over the prior period revenues of $106.1 million. The six-month net income was $30.7 million, up 60 percent over the prior year net income of $19.1 million, which also included the income tax benefit, gain on sale and other nonrecurring items mentioned above. Diluted earnings per share for the six-month period were $0.99 compared to $0.73 in the prior year.

\*      \*      \*

Company Affirms Guidance

Based on the current backlog and scheduled closings, as well as additional sales volume expected to be generated from its active communities, Tarragon affirmed its earlier Guidance of 2005 After Tax Income from Continuing Operations of $70 – $75 million dollars.

30.     On August 9, 2005, the Company filed with the SEC its Form 10-Q for the fiscal quarter ended June 30, 2005, which included: (a) the same financial results reported in its press release of the same date quoted in the immediately preceding paragraph; (b) a representation that the Company's financial statements had been prepared in accordance with GAAP identical to that quoted in ¶27 above; and (c) Sarbanes-Oxley Certifications signed by defendants Friedman and Pickens identical in form to those contained in Tarragon's 2004 Form 10-K, as quoted above in ¶23.

31.     On August 23, 2005, $54.25 million of Senior Convertible Notes were converted into 4,432,181 shares of Tarragon common stock pursuant to the terms of the revised offer to holders of the Senior Convertible Notes.

32.     On November 9, 2005, the Company issued a press release, attached as an Exhibit to a Form 8-K filed that day with the SEC, entitled "Tarragon Reports Record Results for Third Quarter 2005; Raises Full-year 2005 Estimate and Guides 2006 Earnings per Share from Continuing Operations with Growth of at Least 65 Percent Over 2005." The press release stated in part:

- 11 -

Tarragon ... announced its third-quarter results and raised its guidance for 2005.

Third-quarter Financial highlights:

* Fully diluted EPS reached $1.70 vs. $0.14 in the prior year

* Fully diluted EPS from continuing operations of $1.01 vs. $0.14 in the prior year

* Total consolidated homebuilding revenues of $243.4 million, representing a 328 percent increase over third quarter 2004

* Home deliveries of 1,160 at an average price of $243,000, resulting in sales of $281.0 million

* New orders of 962 homes worth $271.0 million, at an average price of $282,000

* Backlog value $540.0 million, up 51 percent over the previous year backlog of $357.0 million

* Total value of active developments increased to more than $2.3 billion, representing over 7,500 homes in 43 communities

* Additional future development pipeline of 8,600 homes in 24 communities

* Stockholders' equity as of September 30, 2005, of $291.3 million, up from $130.6 million one year earlier

2005/2006 Guidance:

* 2005 EPS from continuing operations of $2.27 - $2.42, up from $2.17-$2.32 (excludes estimated income from previously announced investment division capital redeployment program and the charge associated with conversion of senior convertible notes)

* 2006 consolidated homebuilding revenues of at least $1.0 billion and EPS from continuing operations of at least $4.00 representing an increase of more than 65 percent over 2005 revised guidance

2005 third-quarter net income was $50.5 million, or $1.70 per fully diluted share, compared to $3.9 million, or $0.14 per fully diluted share in 2004. Included in third-quarter 2005 net income is $22.4 million in after-tax gains on sale of investment assets. Total consolidated revenues for the quarter ended September 30, 2005, increased 264 percent to $260.1 million from third-quarter 2004 revenues of $71.5 million. Income from continuing operations increased more than seven-fold to $28.1 million this quarter from $3.8 million in the third quarter 2004. Third-quarter 2005 income from continuing operations included a one-time

- 12 -

charge of $7.2 million relating to the conversion of $54.25 million of senior convertible notes into common stock.

Net income for the nine-month period was $81.1 million, or $2.70 per fully diluted share, up 252 percent over the prior year net income of $23.0 million, or $0.87 per fully diluted share. Included in the 2005 net income is $31.4 million of after-tax gains on sales of investment assets compared to $2.7 million for the same period last year. For the nine-month period total consolidated revenues were $425.4 million, up 138 percent over the prior period revenues of $178.7 million. For the nine months ended September 30, 2005, income from continuing operations was up 143 percent to $47.8 million, or $1.67 per fully diluted share, from $19.7 million, or $0.74 per share, for the same period 2004.

Consolidated homebuilding revenue rose 328 percent to $243.4 million from third-quarter 2004 homebuilding revenue of $56.9 million. Total homebuilding revenue, including revenue from unconsolidated joint ventures, grew 442 percent to $308.5 million in the third quarter 2005, from $56.9 million in the third quarter of 2004. For the nine-month period ended September 30, 2005, consolidated and unconsolidated homebuilding revenue increased to $561.9 million, up 316 percent from $135.1 million in 2004.

Tarragon Chairman and CEO William S. Friedman commented, "Sales have continued at a strong pace in Florida, South Carolina and New Jersey. October was one of our strongest months ever with 429 new orders worth $92.0 million, despite lost selling days due to weather. Based on the strength of this quarter's results and our contract backlog which, as of October 31, stood at $600.0 million, we have raised our guidance for the year and set a floor to our 2006 earnings expectations of $4.00 per share, fully diluted."

*     *     *

Company Raises 2005 Guidance and Announces 2006 Guidance

Based on the current backlog and scheduled closings, Tarragon is raising its 2005 guidance of after-tax income from continuing operations to $73.0 - 78.0 million or $2.27 - $2.42 per fully diluted share, before income from the investment division capital redeployment program and costs associated with the conversion of its senior convertible notes in August 2005.

Tarragon also announced that it anticipates 2006 consolidated revenues in excess of $1.0 billion and income from continuing operations of at least $4.00 per fully diluted share.

33.     On November 9, 2005, the Company filed with the SEC its Form 10-Q for the

fiscal quarter ended September 30, 2005, which included: (a) the same financial results

previously reported in its press release; (b) a representation that the Company's financial

- 13 -

statements had been prepared in accordance with GAAP identical to that quoted in ¶27 above; and (c) Sarbanes-Oxley Certifications signed by defendants Friedman and Pickens identical in form to those contained in Tarragon's Form 10-K for 2004, as quoted above in ¶23.

34.    On November 16, 2005, Tarragon filed a Form 8-K with the SEC containing a slide presentation of a presentation defendant Friedman intended to make to professional investors at the Southwestern Showcase 2005 in Irving, Texas. The presentation projected 2005 after-tax income from continuing operations of $2.35 per share up 90% from 2004 and 2006 after-tax income from continuing operations of $4.00 per share on revenue of $1 billion. The presentation also contained a slides titled "Tarragon – Strong Growth and Momentum" showing increasing year-end common stock price for Tarragon and increasing income from continuing operations. A separate slide titled "Significant Growth in Sales Backlog" showed an increasing trend in the number of sales contracts and the aggregate amount of such backlogs. Another slide titled "Concentration in Markets with Pent-Up Demand" contained images of the 7 states in which Tarragon operated (Florida, New York, New Jersey, Connecticut, Texas, Tennessee and South Carolina) with a description of the number and type of pending projects in each state.

35.    On March 15, 2006, the Company issued a press release entitled "Tarragon Corporation Announces Record 2005 Financial Results – 2005 Net Income of $146 Million or $4.71 Per Diluted Share Up 231 Percent – Income From Continuing Operations of $3.36 Per Diluted Share, Up 173 Percent – Full-Year Consolidated Revenue Up 102 Percent – Total Homebuilding Sales Up 133 Percent – Board Authorizes Additional One Million Share Repurchase Plan – Company Announces $0.10 Per Share Dividend – 2006 Guidance of $3.70 to $4.20 Income From Continuing Operations Per Diluted Share." The press release stated in part:

> Tarragon … today announced record financial results for the year ended December 31, 2005.

- 14 -

Tarragon also announced an annual dividend of $0.10 per share, payable on May 1, 2006 to shareholders of record as of the close of business on April 10, 2006, and a one million share increase in share repurchase authorization.

Consolidated revenue for the full year 2005 was $571.9 million, up 102% from $282.9 million in 2004. Substantially all of the revenue increase was due to very strong homebuilding sales, which for the year totaled $504.7 million, up 129% from $220.5 million in 2004. Homebuilding sales, including revenue from unconsolidated properties, were $735.5 million in 2005, up 133% from $315.5 million in 2004.

Net income for 2005 was $145.8 million, or $4.71 per diluted share, compared to $44.7 million, or $1.65 per diluted share, in 2004.

"Tarragon has posted a record year with these solid financial results," said Chairman and CEO William S. Friedman. "Our focused growth strategy is gaining traction and we expect to continue that momentum in 2006, even as the unprecedented growth rates that our industry has enjoyed in the past few years begin to moderate. We continue to strengthen our balance sheet and take steps to allow investors to participate in our growth, including declaring a dividend and repurchasing shares in the market. We believe that the long-term industry fundamentals remain very strong, especially in our urban markets."

\*        \*        \*

2006 Guidance

The Company is issuing full-year 2006 earnings guidance of $3.70 to $4.20 in Income from Continuing Operations per diluted share. The Company anticipates additional income from the completion of the capital redeployment program.

36.    On March 16, 2006, the Company filed with the SEC its Form 10-K for fiscal year ended December 31, 2005 (the "2005 Form 10-K") which: (a) included results for both the entire 2005 fiscal year and the fourth quarter 2005, and reiterated the financial results previously reported; (b) repeated the representation made in the 2004 Form 10-K (*see*, ¶23 above) that Tarragon's financial statements had been prepared in accordance with GAAP; and (c) contained Sarbanes-Oxley Certifications signed by Friedman and Pickens identical in form to those contained in Tarragon's 2004 Form 10-K, as quoted above in ¶27.

- 15 -

37.    The 2005 Form 10-K also contained a statement from defendant Grant Thornton

stating that it had conducted an audit of Tarragon in accordance with GAAS and that the

Company's financial results for the fiscal year ended December 31, 2005, were reported in

conformity with GAAP.  Specifically, Grant Thornton addressed a letter dated March 15, 2006,

to Tarragon's stockholders which was included with its consent in the 2005 Form 10-K stating

that:

> We have audited the accompanying consolidated balance sheets of Tarragon
> Corporation and subsidiaries (collectively, the "Company") as of December 31,
> 2005 and 2004, and the related consolidated statements of income, stockholders'
> equity, and cash flows for each of the three years in the period ended December
> 31, 2005. These financial statements are the responsibility of the Company's
> management. Our responsibility is to express an opinion on these financial
> statements based on our audits.
>
> We conducted our audits in accordance with the standards of the Public Company
> Accounting Oversight Board (United States). Those standards require that we plan
> and perform the audit to obtain reasonable assurance about whether the financial
> statements are free of material misstatement. An audit includes examining, on a test
> basis, evidence supporting the amounts and disclosures in the financial statements.
> An audit also includes assessing the accounting principles used and significant
> estimates made by management, as well as evaluating the overall financial statement
> presentation. We believe that our audits provide a reasonable basis for our opinion.
>
> In our opinion, the consolidated financial statements referred to above present fairly,
> in all material respects, the consolidated financial position of Tarragon Corporation
> and subsidiaries, as of December 31, 2005 and 2004, and the consolidated results of
> their operations and their consolidated cash flows for each of the three years in the
> period ended December 31, 2005, in conformity with accounting principles generally
> accepted in the United States of America.
>
> As discussed in Note 1 to the consolidated financial statements, the Company
> adopted Financial Accounting Standards Board Interpretation 46-R "Consolidation of
> Variable Interest Entities" in 2004.
>
> We also have audited, in accordance with the standards of the Public Company
> Accounting Oversight Board (United States), the effectiveness of Tarragon
> Corporation and subsidiaries' internal control over financial reporting as of
> December 31, 2005, based on criteria established in Internal Control-Integrated
> Framework issued by the Committee of Sponsoring Organizations of the
> Treadway Commission (COSO), and our report dated March 15, 2006, expressed

- 16 -

an unqualified opinion on management's assessment of, and an unqualified opinion on the effective operation of, internal control over financial reporting.

38.    On May 10, 2006, the Company issued a press release entitled "Tarragon

Corporation Announces First Quarter 2006 Financial Results; – Net Income of $18.8 Million or

$0.59 Per Diluted Share." The press release stated in part:

> Tarragon ... today announced its financial results for the quarter ended March 31, 2006.
>
> Financial Results
>
> Consolidated revenue for the first quarter of 2006 was $98.9 million, up 23 percent from $80.3 million in the same period of 2005. The increase was due principally to consolidated homebuilding sales, which totaled $89.2 million, up 40 percent from $63.6 million in the first quarter of 2005. The increase in consolidated revenue was partially offset by a $7.0 million decrease in rental and other revenue, which resulted from the implementation of the Company's capital redeployment program announced in March 2005.
>
> Homebuilding sales, including revenue from unconsolidated properties, were $111.9 million in the first quarter of 2006, down from $120.0 million in the same period of 2005. In the prior-year quarter, 12 percent of homebuilding sales were derived from Northeast projects compared to 1.9 percent in the current quarter. Over the next two quarters, sales will commence at several projects in the Northeast representing more than $275 million in homebuilding revenue.
>
> Income from continuing operations of $11.5 million was equal to that of the first quarter 2005.
>
> Net income for the first quarter of 2006 was $18.8 million, or $0.59 per diluted share, compared to $21.6 million, or $0.70 per diluted share, in the first quarter of 2005, which included $10.3 million of after tax gains on sale of real estate compared to $7.3 million in the current quarter. Based on lower sales velocity in several markets in Florida, the Company increased its estimate of marketing and carrying costs on several of its developments. When estimates of project costs are revised, gross profit is adjusted in the period of change so that cumulative project earnings reflect the revised profit estimate. These adjustments decreased after tax net income in the first quarter of 2006 $5.1 million, or $0.16 per diluted share. Accordingly, overall margins are expected to expand in future quarters, provided current sales rates continue as expected.
>
> Tarragon Chairman and CEO William S. Friedman commented, "We are maintaining our guidance for the year and we expect that our results will be more robust during the second half as additional communities in the Northeast hit the

market and contribute to earnings. While less than 2 percent of our homebuilding revenue was derived from projects in the Northeast in the first quarter, we expect the Northeast market to contribute 27 percent of total 2006 homebuilding revenue and over 35 percent of gross profits. We expect this trend to continue into 2007 as our Northeast activities begin to mature."

\*        \*        \*

2006 Guidance

The company reaffirmed its 2006 guidance of $3.70 to $4.20 income from continuing operations per diluted share, based on current market and sales trends, as well as anticipated income from the completion of its capital redeployment program during 2006.

39.    On May 10, 2006, the Company filed with the SEC its Form 10-Q for the first quarter of 2006, which included: (a) the same financial results previously reported; (b) a representation that the Company's financial statements had been prepared in accordance with GAAP identical to that quoted in ¶27 above; and (c) Sarbanes-Oxley Certifications signed by Friedman and Pickens identical in form to those contained in Tarragon's 2004 Form 10-K for 2004, as cited above in ¶23.

40.    On August 9, 2006, the Company issued a press release entitled "Tarragon Corporation to Postpone Second Quarter Earnings Announcement and Conference Call; Company May Be Required to Consolidate Ansonia Partnership." The press release stated in part:

Tarragon … today announced that it is reviewing its earlier determination that it was required to treat Ansonia Apartments, LP (Ansonia) as an unconsolidated partnership for financial reporting purposes. The review relates only to the interpretation of existing accounting literature and does not involve new facts or circumstances.

Ansonia owns approximately 6,300 rental apartments primarily in Connecticut and Florida. Tarragon included summarized financial data from Ansonia's financial statements in notes to financial statements in the Company's 2005 Annual Report on Form 10-K.

- 18 -

> The Company is currently reviewing its accounting treatment of its
> investment in Ansonia with its independent accountants. If the Company
> concludes that it is required to consolidate Ansonia, the Company will be required
> to restate certain prior period financial statements. There would be no impact on
> income or revenue of the homebuilding division.

41.     This announcement was the first in a series of partial disclosures and revelations

concerning the truth about Tarragon's business operations, finances, business metrics and future

business and financial prospects.  Nonetheless, Tarragon's common stock continued to trade at

artificially inflated levels as this revelation, along with the ones made during the remainder of the

Class Period, was accompanied by denials and continued misrepresentations by defendants.

Upon this partial disclosure, Tarragon's closed down sharply to trade at $10.30 per share on

August 9, 2006 – a one-day decline of $1.67 per share or 14%.

42.     On August 23, 2006, the Company filed with the SEC a Form 8-K, signed by

defendant Pickens, elaborating on the August 9th press release disclosing that it failed to properly

consolidate Ansonia Apartments, LP ("Ansonia") in its reported financial results.  The Form 8-K

in Item 4.02 stated that:

> On August 21, 2006, the Audit Committee of the Board of Directors of the Company
> (the "Audit Committee"), in consultation with members of the Company's
> management and its independent accountants, Grant Thornton, LLP ("Grant
> Thornton"), determined that the Company will make a change to the historical
> accounting treatment of the Company's investment in Ansonia Apartments, LP
> ("Ansonia"). This change relates only to the interpretation of existing accounting
> literature and does not involve new facts or circumstances.
>
> Ansonia is a joint venture in which the Company owns a majority equity interest.
> Historically, the Company has applied the equity method of accounting for its
> investment in Ansonia. However, as a result of a review of the accounting for the
> investment in Ansonia by management and the Company's independent accountants,
> the Audit Committee has decided that the Company will consolidate Ansonia's
> operations with the Company's operations in accordance with FASB Interpretation
> Number 46 (revised December 2003), Consolidation of Variable Interest Entities.
> Accordingly, the Company will restate its financial statements and other financial
> information for the years and for each of the quarters in the years 2005 and 2004 and
> for the first quarter of 2006.

The effect of the change will be to increase the Company's assets by approximately $300 million and increase the Company's liabilities by approximately $400 million of primarily non-recourse debt of Ansonia. The change will also decrease the cumulative reported earnings of the Company and its investment division by about $75 million through March 31, 2006. However, there will be no impact on the Company's cash flow or the balance sheet or income statement of its homebuilding division, either as a result of the restatements or the change in accounting treatment of Ansonia.

In light of the restatement, the Company's stockholders should no longer rely on the Company's previously filed financial statements for the years and for each of the quarters in the years 2005 and 2004 and the first quarter of 2006. The Company intends to (1) file its Form 10-Q for the period ended June 30, 2006 on Thursday, August 24, 2006 and (2) file, as promptly as practicable, amendments to its other periodic reports that have previously been filed with the Securities and Exchange Commission for the periods beginning January 1, 2004 to reflect the restatements described in this Item 4.02.

The Audit Committee and management of the Company have discussed the matters disclosed in this item with Grant Thornton.

43.    On August 24, 2006, the Company issued a press release entitled "Tarragon

Corporation Announces Second Quarter 2006 Financial Results; Second Quarter Net Income of

$10.7 Million, or $0.34 Per Diluted Share, Up 22 Percent Over Second Quarter 2005 Net Income

of $8.8 Million, or $0.28 Per Diluted Share." The press release stated in part:

Tarragon ... today announced its financial results for the second quarter ended June 30, 2006.

Second Quarter Financial Results

Consolidated revenue for the second quarter of 2006 was $146.7 million, up 61 percent from $91.4 million in the same period of 2005. The increase was due principally to consolidated homebuilding sales, which totaled $122.3 million, up 77 percent from $69.1 million in the second quarter of 2005.

Homebuilding sales, including revenue from unconsolidated properties, were $143.1 million in the second quarter of 2006, up from $133.3 million in the same period of 2005.

Income from continuing operations was $8.4 million in the second quarter of 2006, compared to $8.0 million in the same period of 2005.

- 20 -

Net income for the second quarter of 2006 was $10.7 million, or $0.34 per diluted share, up 22 percent from $8.8 million, or $0.28 per diluted share, in the second quarter of 2005. Included in the second quarter of 2006 is a $2.7 million expense associated with the write off of costs incurred for projects that have been cancelled.

Six-Month Financial Results

Consolidated revenue for the first six months of 2006 was $260.8 million, up 47 percent from $176.9 million in the same period of 2005. Homebuilding sales, including revenue from unconsolidated properties, were $255.0 million in the first six months of 2006 compared to $253.4 million in the same period of 2005.

Income from continuing operations during the first six months of 2006 was $19.0 million compared to $19.4 million in the same period of 2005. Net income for the first six months of 2006 was down 6 percent to $28.6 million, or $0.90 per diluted share, compared to $30.4 million, or $0.98 per diluted share, in the comparable period of 2005.

Tarragon Chairman and CEO William S. Friedman commented, "Strong, higher-margin sales during the second quarter in our New Jersey communities, such as One Hudson Park in Edgewater and 1100 Adams in Hoboken, have helped to offset the weakness in many of our Florida condominium conversions, to produce revenue and net income that were substantially higher than the 2005 quarter. However, we expect the soft demand in the southeast markets, with lower margins resulting from increased carrying and marketing costs, to continue to apply pressure on our earnings. As a result, we are lowering our 2006 guidance for income from continuing operations per diluted share to $2.10 to $2.40. We expect net income, including discontinued operations, of $2.60 to $2.90 per diluted share.

Mr. Friedman continued, "Our outlook for 2007 remains solid because, in addition to completing the sellout of several profitable conversions from our rental portfolio, we expect significant profit from higher-margin properties now under construction, particularly in New Jersey. We believe our focus on unique waterfront developments meeting the demand from the growing number of non-traditional households and increased development of rental housing will help to insulate our operations from the conditions now impacting the broader market for residential real estate. Assuming a continuation of current market conditions, we expect net income in 2007 to at least equal that of 2006. Of particular importance, most of our condominium conversion sales are at communities where we have been selling for some time and have either paid off or substantially reduced the original acquisition financing. At June 30, the ratio of fully funded debt to total estimated sellout of our active conversions was 43 percent. Accordingly, each dollar of sales produces substantial free cash flow, giving us the financial

flexibility we need to run our business, pay down debt and take advantage of opportunities."

\*      \*      \*

2006 Guidance

The Company anticipates $2.10 to $2.40 of income from continuing operations per diluted share in 2006, based on current market and sales trends and the impact of the Ansonia consolidation.

44.    On August 24, 2006, the Company filed with the SEC its Form 10-Q for the second quarter of 2006, which: (a) included the same financial results previously reported; (b) contained a representation that the Company's financial statements had been prepared in accordance in GAAP identical to that contained in ¶23 above; and (c) contained Sarbanes-Oxley Certifications signed by defendants Friedman and Pickens identical in form to those contained in Tarragon's 2004 Form 10-K, as quoted above in ¶23.

45.    The August 24th Form 10-Q also contained the following disclosure concerning Tarragon's recognition of revenue from One Hudson Park, a condominium project the Company was developing in Edgewater, New Jersey:

> We use the percentage-of-completion method to recognize revenue on our mid-rise and high-rise condominium developments where construction typically takes eighteen months or longer to complete. One of the criteria for revenue recognition under the percentage-of-completion method is that construction must be beyond a preliminary stage. We believe that most developers use a measure of 25% to 50% of construction costs to conclude construction is beyond a preliminary stage. Prior to 2006, when 50% of estimated construction costs had been incurred, we concluded that construction was beyond a preliminary stage. In 2006, we began using 40% of construction costs for this measure. This change in accounting estimate resulted in commencing revenue recognition for One Hudson Park, for which 46% of estimated construction costs had been incurred as of June 30, 2006, and after the other requirements of revenue recognition under the percentage-of-completion method had been met. For the quarter ended June 30, 2006, we recognized homebuilding sales revenue of $22.2 million and gross profit of $6.5 million for this project.

46.    On September 30, 2006, Tarragon issued 616,667 shares of 10% cumulative preferred stock, liquidation value $12.00, and 668,096 shares of Tarragon common stock to

- 22 -

Rhodie LLC in connection with Rhodie's right to convert its membership units in Tarragon

Development Corporation into Tarragon securities.

47.    On November 9, 2006, the Company issued a press release entitled "Tarragon

Corporation Announces Third Quarter 2006 Financial Results; Net Income of $6.0 Million or

$0.19 Per Diluted Share for the Quarter Ended September 30, 2006 and $35.1 Million or $1.11

Per Diluted Share for the Nine Months Ended September 30, 2006." The press release stated in

part:

> Tarragon Corporation ... today announced its financial results for the third quarter
> and nine months ended September 30, 2006.
>
> Third Quarter Financial Results
>
> Consolidated revenue for the third quarter of 2006 was $119.2 million,
> compared to $265.3 million in the same period of 2005. Lower consolidated
> homebuilding revenue from condominium conversion closings in the Company's
> Florida markets from the year ago period accounts for the decrease.
>
> Homebuilding sales, including revenue from unconsolidated properties,
> were $104.7 million in the third quarter of 2006, compared to $308.5 million in
> the third quarter of 2005.
>
> Net income for the third quarter of 2006 was $6.0 million, or $0.19 per
> diluted share, compared to net income of $50.3 million, or $1.70 per diluted share,
> in the third quarter of 2005. Income from continuing operations was $2.8 million
> in the third quarter of 2006, compared to $28.2 million in the same period of
> 2005. Third quarter net income in 2005 included $22.4 million in after tax gains
> on sale of investment division properties, compared to $3.3 million in the third
> quarter of 2006.
>
> Certain comparative results for 2005 have been restated to reflect the
> consolidation of Ansonia Apartments LP, as announced on August 22, 2006.
> Ansonia was previously treated as an unconsolidated partnership for financial
> reporting purposes.
>
> Nine-Month Financial Results
>
> Consolidated revenue for the first nine months of 2006 was $379.0
> million, compared to $441.2 million in the same period of 2005. Homebuilding
> sales, including revenue from unconsolidated properties, were $359.7 million in

the first nine months of 2006 compared to $561.9 million in the same period of 2005.

Income from continuing operations during the first nine months of 2006 was $22.5 million or $0.71 per diluted share compared to $47.9 million or $1.67 per diluted share in the same period of 2005. Net income for the first nine months of 2006 was $35.1 million, or $1.11 per diluted share, compared to $80.7 million, or $2.69 per diluted share, during the same period of 2005. During the first nine months of 2006 the Company wrote off $5.0 million in costs related to deals no longer being pursued compared to $0.7 million in the first nine months of 2005.

Tarragon Chairman and CEO William S. Friedman commented, "Our third quarter results reflect the continued slow down in condominium conversion sales along with declining margins, particularly in Florida. However, as our condominium conversions slowly sell out, we are beginning to reduce debt and redeploy capital to higher-margin, new developments in New Jersey, Connecticut, Texas and Tennessee. In fact, during the first ten months of the year, we reduced debt associated with our condominium conversions by $164 million."

Mr. Friedman continued, "As a result of the continuing sales slowdown and lower margins, we are reducing our 2006 guidance for net income to $1.15 per diluted share and for income from continuing operations to $0.75 per diluted share. Going forward, our growing pipeline of high-density, in-fill developments, primarily in New Jersey and Connecticut will help offset market weakness in Florida and be a key driver of revenue and net income growth in 2008 and beyond."

48.     On November 9, 2006, the Company filed with the SEC its Form 10-Q for the third quarter of 2006, which: (a) included the same financial results previously reported; (b) repeated the prior representations that Tarragon's financial statements had been prepared in accordance with GAAP; (c) contained Sarbanes-Oxley Certifications signed by Friedman and Pickens in the same form as contained in Tarragon's 2004 Form 10-K, as quoted above in ¶23; and (d) incorporated by reference the disclosure made in the 2005 Form 10-K concerning the Company's utilization of the percentage-of-completion revenue recognition method.

49.     On March 19, 2007, the Company issued a press release entitled "Tarragon Corporation Announces Fourth Quarter and Year End 2006 Financial Results; Debt on

- 24 -

completed condominiums reduced by nearly 50 percent in 2006." The press release stated in

part:

> Tarragon ... announced its financial results for the fourth quarter and year ended December 31, 2006.

> Year End Financial Results

> Based on unaudited results, net income for 2006 was $9.8 million, or $0.31 per diluted share, compared to $88.5 million, or $2.93 per diluted share, in 2005. 2006 net income was adversely impacted by unusual items including impairment charges, write-offs and gross margin adjustments of $34.9 million after tax, or $1.23 per share. Of this $34.9 million, $26.3 million is reflected in cost of sales, resulting from market driven margin reductions and impairments. The margin adjustments were made to reflect price reductions, slower absorption and increased marketing costs on unsold units. $6.4 million, after tax, is included in general and administrative expense, resulting from the write-off of pursuit costs on development projects that did not go forward. Finally, $2.2 million of impairment charges, after tax, represent the write-down of land inventory and properties held for sale to current estimated market value. This compares to $3.2 million of impairment charges and other write-downs, after tax, recorded in 2005. Loss from continuing operations for 2006 was $2.3 million or $(0.12) per diluted share compared to income from continuing operations of $45.8 million or $1.60 per diluted share in 2005.

> The Company expects to report consolidated 2006 revenue of $544.9 million, an 8 percent decrease from $595.1 million in 2005, based on unaudited results. Homebuilding sales, including revenue from unconsolidated entities, decreased 31 percent to $508.2 million in 2006 from $735.5 million in 2005. Fewer condominium conversion closings in the Southeast market, which declined 34 percent from 2005, were the principal reason for the decline in revenue.

> Tarragon Chairman and CEO William S. Friedman commented, "We have finished a disappointing year for the homebuilding industry and for Tarragon. We have used this period of slow sales to develop new marketing strategies, to reduce debt and to pursue developments with multiple exit strategies that work either as rentals or condominiums. Tarragon's long-term plan is to focus on smart growth and redevelopment projects in areas of high demand."

> Fourth Quarter Financial Results

> The Company expects to report a net loss for the fourth quarter of 2006 of $25.1 million, or $(0.89) per diluted share, compared to net income of $7.8 million, or $0.26 per diluted share, in the fourth quarter of 2005. Included in the fourth quarter of 2006 net loss were unusual items including impairment charges, write-downs and gross margin adjustments of $23.6 million after tax, or $0.83 per

share. This $23.6 million includes $18.6 million from market driven margin reductions and impairments in cost of sales, $3.3 million from development pursuit costs written off to general and administrative expense and $1.7 million from impairment charges related to the write-down of land inventory and properties held for sale. No impairment charges or other write-downs were recorded in the fourth quarter of 2005. Loss from continuing operations was $25.6 million in the fourth quarter of 2006, compared to a loss of $2.9 million in the same period of 2005.

Based on unaudited results, consolidated revenue for the fourth quarter of 2006 was $163.8 million, an increase of 7.8 percent over consolidated revenue of $151.9 million in the same period of 2005. Homebuilding sales, including revenue from unconsolidated properties, declined 14 percent to $148.5 million in the fourth quarter of 2006, compared to $173.7 million in the fourth quarter of 2005. Florida sales represented 49 percent of homebuilding sales in the 2006 fourth quarter compared to 81 percent in the 2005 period.

50.    On April 2, 2007, the Company filed a Form 8-K with the SEC, announcing in

part:

On March 27, 2007, management and the Audit Committee of Tarragon Corporation (the "Company") concluded, after a review of the Company's consolidated statements of cash flows and applicable accounting standards and related guidance relating to the presentation of cash flows, that the Company's consolidated statements of cash flows should be restated to reclassify certain items among operating, investing and financing activities. In reaching its conclusion, the Company also reviewed the presentation of other companies in its industry.

Such conclusion was discussed with, and approved by, the Audit Committee of the Company's Board of Directors. Also, the restatement has been discussed with the Company's independent registered public accountants.

As a result of the foregoing, the Company intends to include in its Annual Report on Form 10-K for the year ended December 31, 2006 (the "2006 10-K") a restatement of the consolidated statements of cash flows for the years ended December 31, 2005 and 2004 included in that report. The previously filed consolidated statements of cash flows for the years ended December 31, 2005 and 2004 should not be relied upon.

51.    Subsequently, on April 2, 2007, the Company filed with the SEC its Form 10-K

for fiscal 2006 (the "2006 Form 10-K"), which: (a) included results for the fourth quarter of 2006

and for the entire year, and included the same financial results previously reported;

- 26 -

(b) represented that the Company's financial statements were prepared in accordance with

GAAP; and (c) contained Sarbanes-Oxley Certifications signed by Friedman and Pickens

identical in form to those contained in Tarragon's 2004 Form 10-K, as quoted above in ¶23.

52.     The 2006 Form 10-K also contained the following disclosure concerning

Tarragon's recognition of revenues from the sale of condominiums in its new developments:

> In November 2006, the FASB ratified EITF Issue No. 06-8, "Applicability of a
> Buyer's Continuing Investment Under FASB Statement No. 66 for Sales of
> Condominiums" (EITF 06-8). EITF 06-8 provides guidance in assessing the
> collectibility of the sales price, which is required to recognize profit under the
> percentage-of-completion method pursuant to SFAS No. 66. EITF 06-8 states
> that an entity should evaluate the adequacy of the buyer's initial and continuing
> investment in reaching its conclusion that the sales price is collectible. The
> continuing investment criterion in paragraph 12 of SFAS No. 66 would be met by
> requiring the buyer to either (1) make additional payments during the construction
> term at least equal to the level annual payments that would be required to fund
> principal and interest payments on a hypothetical mortgage for the remaining
> purchase price of the property or (2) increase the initial investment by an
> equivalent aggregate amount. If the test for initial and continuing investment is
> not met, the deposit method should be applied and profit recognized only once the
> aggregate deposit meets the required investment test for the duration of the
> construction period. EITF 06-8 will be effective for the first annual reporting
> period beginning after March 15, 2007, and early adoption is permitted.
> Accounting for sales of condominiums not consistent with EITF 06-8 would
> require a cumulative effect adjustment to retained earnings in the period of
> adoption. Although we have not yet assessed the impact on our financial position,
> results of operations and cash flows, *we believe we may be required, in some
> cases, to collect additional deposits from the buyer in order to recognize revenue
> under the percentage of completion method*. If, in these cases, we were not able
> to meet the requirements of EITF 06-8, we would be required to delay revenue
> recognition until the aggregate investment tests described in SFAS No. 66 and
> EITF 06-8 have been met. (Emphasis added).

53.     In truth and in fact, the need to collect additional deposits or payments from

prospective condominium purchasers was not a mere possibility. Instead, the relatively small

deposits placed on new condominium units in projects such as One Hudson Park were

insufficient to demonstrate a commitment on the part of those prospective purchasers to actually

follow through with the proposed purchases and revenue should not have been recognized in

connection with such projects under the percentage of completion method.

54.    On May 11, 2007, the Company issued a press release entitled "Tarragon

Corporation Announces Financial Results for First Quarter of 2007; Spin-off of Homebuilding

Business on Track." The press release stated in part:

First Quarter 2007 Consolidated Financial Results

The Company reported consolidated revenue for the first quarter of $150.4 million, compared to $114.2 million in first quarter of 2006. The loss from continuing operations was $4.4 million in the first quarter of 2007, compared to income from continuing operations of $11.4 million in the same period of 2006.

Net loss for the first quarter of 2007 was $4.2 million, or ($0.16) per diluted share. This compares to net income of $18.5 million, or $0.58 per diluted share for the first quarter 2006.

The first quarter 2007 results included $4.4 million in impairment charges and $5.5 million in depreciation expense. The financial results for the first quarter of 2007 also included $400 thousand in pre-tax gains on sales of properties, while results for the 2006 period included gains of $11.7 million, pre-tax.

"Our business model of pursuing hard to develop opportunities in high barrier to entry markets is being validated in this difficult real estate market. Income from our core developments in the Northeast and the sale of new, or recently renovated rental communities is expected to more than offset losses in our legacy condominium conversion properties in Florida," said Tarragon Chairman and Chief Executive Officer William Friedman. "Meanwhile, the Florida condominium conversions, even at today's reduced prices and sales rates, are contributing cash to rapidly reduce debt and to enhance our ability to pursue new opportunities, especially for rental and mixed use developments in the Northeast. This approach positions the Company favorably for the planned spin-off of our homebuilding business later this year."

Total consolidated debt reduction, before new borrowings, during the first quarter of 2007 was $65 million, including over $23 million related to completed condominium conversion projects. By year-end 2007, Tarragon presently expects to repay approximately $125 million of consolidated debt on condominium conversion communities, $130 million on newly built, for-sale developments and $165 million on rental apartment developments.

"We build and renovate rental communities to sell at a profit. In 2007, we expect to sell five rental communities for over $300 million. Proceeds from these

sales will put both our Homebuilding and Real Estate Services businesses in a stronger position to respond to new opportunities," said Mr. Friedman.

Homebuilding Business Financial Results

The Company's Homebuilding business sales, including revenue from unconsolidated properties, were $130.5 million for the first quarter of 2007, compared to $111.9 million in the first quarter of 2006. Homebuilding net loss for the first quarter of 2007 was $1.1 million as compared to net income of $10.9 million for the first quarter of 2006. The decrease was primarily driven by margin reductions in Florida condominium conversion projects over the past year and impairment charges of $4.4 million in the first quarter of 2007 compared to none the same period a year ago. Mr. Friedman commented, "Our goal for 2007 is to reduce debt on our condominium conversion properties and to access our capital now invested in these assets for other opportunities. To keep sales moving, especially in Florida, we are aggressively pricing our homes. These sales will comprise a substantial portion of the results of our homebuilding operations for much of 2007. However, as the year progresses and we dispose of much of our existing condominium conversion inventory, we expect to see a return to more normal margins and have significantly improved our balance sheet, both in terms of liquidity and debt. So as difficult as it may be to our current earnings, it is the right path to long-term stability and profitability for our homebuilding business."

Real Estate Services Business Financial Results

The Real Estate Services business had rental revenue of $26.6 million in the first quarter of 2007 compared to $22.7 million in the same period of 2006. Net operating income for the first quarter of 2007 was $13.8 million compared to $10.7 million in the first quarter of 2006. Real Estate Services' first quarter 2007 net loss was $3.1 million, after pre-tax depreciation expense of $5.5 million, compared to first quarter 2006 net income of $7.5 million after pre-tax depreciation expense of $3.4 million. First quarter 2006 results included pre-tax gains on sale of real estate of $11.7 million compared to pre-tax gains of $400 thousand the first quarter of 2007. There was $14.7 million of interest expense in the first quarter of 2007 compared to $5.4 million in the year ago period. This increase was primarily due to the transfer of several properties from the Homebuilding business to the Real Estate Services business at the end of 2006. In addition, $5.7 million of interest was capitalized in the first quarter 2006 compared to none in the current quarter.

Homebuilding Business Operations

Sales, Orders and Backlog

In the first quarter of 2007, the Company's homebuilding business wrote 283 net new orders totaling $84.7 million at an average sale price of $299,000, compared with 461 net new orders totaling $105.1 million for the same period in

2006 at an average sale price of $228,000. The Company delivered 353 homes in the first quarter 2007 for $83 million, at an average price, excluding land development, of $244,000, compared with 663 homes for $156.3 million, with an average price of $241,000, in the first quarter of 2006.

At the end of the first quarter of 2007, the backlog was $245.7 million representing 647 homes compared with $376.1 million at the end of the first quarter of 2006 representing 1,592 homes. The average contract price, excluding land development, was $437 thousand at March 31, 2007 compared to $289 thousand at March 31, 2006 as a result of an increase in Northeast contracts included in backlog. As of March 31, 2007, 55 percent of the backlog value is derived from contracts written in the Northeast, up from 18 percent a year ago.

Active For Sale Projects

At March 31, 2007, Tarragon's active for-sale communities (including backlog) totaled 3,811 homes in 33 communities, representing approximately $1.3 billion in projected revenue, compared to 7,948 homes in 44 communities representing about $2.4 billion in projected revenue at March 31, 2006. The $1.3 billion of active, for-sale developments as of March 31, 2007 is comprised of 45 percent new mid- and high-rise buildings, 30 percent condominium conversions and 25 percent new low-rise developments. These communities are currently expected to generate gross margins of 19 percent, 8 percent, and 21 percent, respectively. Overall, a 16 percent average gross margin is anticipated on homes in the active communities. Included in our gross margin are marketing and selling costs and development overhead representing approximately five percent of homebuilding revenue.

Active For Rent Projects

The homebuilding business continues to build rental communities and currently has eight projects, representing 2,561 apartment homes, in various stages of development. Five of these communities comprising 1,631 apartment homes are expected to remain with the homebuilding business following the proposed spin-off and three representing 930 apartments will be owned and operated by the Real Estate Services business, to be renamed Sage Residential Services post spin-off

\*      \*      \*

Spin-Off of Homebuilding Division

Tarragon has filed a proxy statement with the Securities and Exchange Commission related to the proposed pro rata, tax-free spin-off of its Homebuilding business as an independent, publicly traded company. The transaction, which is subject to shareholder approval, is expected to be completed in the third quarter of 2007. Tarragon will continue to operate the Real Estate Services business, which provides asset and property management, leasing and

- 30 -

renovation services to residential and commercial properties. Following the spin-off, Tarragon will change its name to Sage Residential, Inc. Tarragon's Homebuilding business will be renamed Tarragon Corporation after the spin-off. Tarragon believes that the spin-off will, among other things, provide both businesses with direct and differentiated access to financing and the capital markets, allow each company to grow through acquisitions appropriate to its business and provide each company with the opportunity to align management incentives with the performance of its business. If the spin-off is consummated, Tarragon stockholders will hold a proportionate interest equal to their current ownership interest in Tarragon in two separate companies: the Tarragon Corporation Homebuilding business, which will have substantially reduced debt and higher book value as a result of its separation from the Real Estate Services business due to its high level of fixed rate, non-recourse debt, and Sage Residential, which will operate the Real Estate Services business and hold the assets and associated debt. Although Sage Residential will reflect a negative book value as a result of historical-based accounting and depreciation, its net asset value, based on the current estimate of the fair market value of the assets of the Real Estate Services business, is expected to approximate $6 per diluted share, assuming 30 million shares outstanding.

55.    On May 11, 2007, Tarragon filed with the SEC a Form 12b-25, Notification of Late Filing, with respect to its Form 10-Q for the fiscal quarter ended March 30, 2007. The reason given for the delay was that Tarragon and Grant Thornton were still in the process of reviewing the Company's financial statements.

56.    Later on May 11, 2007, Tarragon did, in fact, file its Form 10-Q with the SEC for the fiscal quarter ended March 31, 2007. The Form 10-Q: (a) repeated the financial results made in the Company's press release announcing its financial results for the fiscal quarter; (b) repeated the representation concerning the Company's financial statements having been prepared in accordance with GAAP (*see* ¶27 above); (c) repeated the representation concerning the impact of ITF 06-08 on the Company's reported financial results (*see* ¶52 above); and (d) contained Sarbanes-Oxley Certifications signed by defendants Friedman and Pickens substantially identical in form to those previously filed with respect to the Company's SEC filings (*see* ¶23 above).

57.    On June 29, 2007, Tarragon held a brunch at One Hudson Park celebrating the

topping-off of the building, which defendant Friedman attended and discussed the importance of

the development.

58.    On July 11, 2007, Tarragon filed a Form 8-K with the SEC attaching a copy of a

press release dated July 10, 2007. The press release stated, in relevant part, that:

> Tarragon . . . today announced that it wrote 342 net orders at its condominium
> conversion properties in the second quarter of 2007 totaling $57.6 million at an
> average sale price of $168,000, compared with 174 net orders totaling $32.7 million
> for the first quarter in 2007 at an average sale price of $188,000. Tarragon delivered
> 308 condominium conversion homes in the second quarter of 2007 representing
> $53.7 million in sales compared to 264 conversion homes representing $47.8 million
> in the first quarter of 2007.
>
> Overall, in the second quarter of 2007 Tarragon delivered a total of 442 homes
> representing over $115 million in sales, compared to 353 homes representing $83
> million in the first quarter 2007. Tarragon wrote a total of 353 net orders totaling
> $64.7 million in the second quarter of 2007 compared with 283 net orders totaling
> $84.7 million for the first quarter of 2007.
>
> For the calendar year, Tarragon presently expects to reduce consolidated debt on
> condominium conversion communities by over $100 million, and unconsolidated
> conversion debt by $22 million, while repaying $130 million in debt on newly built,
> for – sale developments and $190 million on rental apartment developments.
>
> At the end of the second quarter, the Company's non-cancelable contractual backlog
> was $195 million, or 558 homes, compared to $246 million, or 647 homes, at the end
> of the first quarter of 2007.
>
> Tarragon Chairman and Chief Executive Officer William Friedman commented, "We
> are very pleased that, despite the continuing avalanche of negative publicity about
> the real estate market in Florida, our sales efforts produced nearly double the rate of
> sales in our Florida conversion communities during the second quarter compared to
> the first. The increase is due to value pricing, promotions and the latent demand for
> quality housing in the growing markets where we are selling homes. In addition, over
> the first six months of 2007 we have repaid $70 million of consolidated and
> unconsolidated conversion-related debt, putting us ahead of our $125 million target
> for the year. We expect to maintain this aggressive sales approach as we execute our
> strategy to improve our balance sheet before, and after, the spin-off of our
> homebuilding business."

59. On July 25, 2007, Tarragon filed a Form 8-K with the SEC attaching a press

release of the same day. The press release stated, in relevant part, that:

> Tarragon . . . today commented on unusual trading activity in its common stock that
> has occurred over the past two days and that has resulted in significant price
> volatility. Tarragon's policy is not to respond to specific rumors or speculation in the
> market; however, there has been no material change to the Company's business
> outlook, financial position or any other aspect of its business that would account for
> such trading activity.
>
> Tarragon Chairman and Chief Executive Officer William Friedman commented
> further, "We recently announced a sequential quarterly sales increase of nearly 100%
> in our Florida condominium conversion communities, demonstrating that we're
> continuing to manage the challenges we face in that market. We're also making
> excellent progress toward our 2007 debt reduction goals and expect to reduce
> consolidated and unconsolidated debt on condominium conversion communities by
> approximately $125 million and $130 million in debt on newly built, for-sale
> developments. Over the next few quarters, we expect to close sales of over $600
> million of completed rental properties which are expected to generate over $450
> million in debt repayment and approximately $150 million in net cash proceeds as
> we execute our strategy to improve our balance sheet before, and after, the spin-off
> of our homebuilding business."

60. Then, on August 9, 2007, at noon Eastern Time, the Company issued a press

release entitled "Tarragon Will Delay Filing Its Second Quarter Form 10-Q; Company Seeks to

Address Liquidity Issues; Expects to Record Significant Impairment Charges." The press release

stated in part:

> Tarragon Corporation today announced that the filing of its Quarterly
> Report on Form 10-Q for the quarter ended June 30, 2007 will be delayed beyond
> the Securities and Exchange Commission's filing deadline of August 9, 2007 in
> order to provide additional time for Tarragon to finalize its evaluation of property
> impairment charges and other write-downs necessitated by the recent decision to
> sell certain properties under current adverse market conditions. Tarragon currently
> expects to record impairment charges in excess of $125 million.
>
> Tarragon is currently experiencing liquidity issues caused by the sudden
> and rapid deterioration in the real estate credit markets. This has resulted in
> Tarragon being unable to complete approximately $50 million in financing
> transactions that had been under negotiation and were expected to close in August
> 2007.

Tarragon's business has been adversely affected by the continuing and accelerated deterioration of the homebuilding industry in the markets in which Tarragon operates, and in the Florida market in particular. These conditions have led to declines in new home sales, increased use of sales discounts and other incentives and increased interest and other carrying costs, and have adversely affected Tarragon's gross margins from homebuilding sales as well as its overall liquidity situation. Tarragon has also incurred additional lease-up and debt service costs associated with apartment properties that had been targeted for conversion into condominiums but that it subsequently decided to operate as rental properties.

These factors, combined with the inability to obtain anticipated loan modifications and additional financing, have materially affected Tarragon's liquidity, including the ability to repay existing indebtedness as it becomes due and meet other current obligations, and raise doubt about Tarragon's ability to continue as a going concern. In addition, Tarragon currently is not in compliance with a financial covenant contained in its existing subordinated debt and, after the property impairment charges and other write-downs discussed above are recorded, Tarragon will not be in compliance with certain net worth maintenance and other financial covenants contained in this and other debt agreements. Tarragon has not made its August 2007 debt service payments as well as certain other vendor payments, and Tarragon is seeking deferral of such payments while it continues to negotiate to obtain debt and/or equity financing. Tarragon also currently owes approximately $37.0 million under its unsecured line of credit with affiliates of William S. Friedman, Tarragon's chief executive officer and chairman. Tarragon and Mr. Friedman have agreed that no further advances will be made under this credit line.

Notwithstanding these issues, Tarragon believes that its real estate portfolio and development platform currently have significant equity value in excess of existing indebtedness. Accordingly, Tarragon's board of directors has formed a special committee of independent directors to evaluate strategic and financial alternatives that may be available to Tarragon and its stakeholders. The special committee is retaining Lazard to act as a financial adviser to Tarragon in evaluating its alternatives. Alternatives to be considered are expected to include all available forms and sources of financing, property sales and other strategic transactions. However, if Tarragon is unable to obtain sufficient liquidity to fund its operations in the near-term, it may be necessary for Tarragon to undertake such other actions as may be appropriate in the light of its current liquidity situation. Tarragon does not intend to comment further publicly with respect to the exploration of strategic and financial alternatives unless a specific transaction or course of action is authorized by its board of directors.

Tarragon previously filed a preliminary proxy statement with the SEC related to the proposed pro rata, tax-free spin-off of its homebuilding division as an independent, publicly traded company. Due to current market conditions and the related impact on Tarragon's financial condition, Tarragon has decided to

> postpone the spin-off of the homebuilding business as it concentrates on addressing its existing financial requirements.

61.     Also, on August 9, 2007, Tarragon filed a Form 8-K with the SEC disclosing, among other things, that the filing of its quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2007, would be delayed beyond the SEC's filing deadline of August 9, 2007 in order to provide additional time for Tarragon to finalize its evaluation of property impairment charges and other write-downs and that Tarragon expected to record impairment charges in excess of $125 million.

62.     On August 9, 2007, Tarragon's stock collapsed $1.88 per share to close at $0.94 per share, a one-day decline of 67% on volume of 18 million shares, 23 times the average three-month volume.

63.     The true facts, which were known by defendants but concealed from the investing public during the Class Period, were as follows:

   (a)     In violation of GAAP, the Company had failed to consolidate an unprofitable variable interest entity into its consolidated financial statements;

   (b)     In violation of GAAP, the Company had failed to properly account for its statement of cash flows by failing to properly classify its cash inflows and cash outflows as operating, investing and financing activities;

   (c)     In violation of GAAP, the Company had failed to timely take property impairment charges and other write-downs;

   (d)     In violation of GAAP, the Company was recognizing revenue on the percentage-of-completion method when it lacked a reasonable assurance that persons making initial deposits for purchases of condominiums would follow through on their initial commitments;

- 35 -

(e)     Due to the deterioration in the real estate credit markets, the Company was experiencing liquidity issues due to inability to obtain loan modifications and additional financing and there was serious doubt about Tarragon's ability to continue as a going concern;

(f)     As the Company was experiencing a massive downturn in its business, Tarragon would not be able to remain in full compliance with all of its debt covenants and was, in fact, as of June 30, 2007 no longer in compliance with certain covenants; and

(g)     With respect to statements made in July 2007, given the increased volatility in the homebuilding industry and the real estate credit markets, the Company had no reasonable basis to make projections about its 2007 results. As a result, the Company's projections issued during the Class Period about its 2007 results were at a minimum reckless.

## POST-CLASS PERIOD DISCLOSURES

64.     On August 22, 2007, *The Record – Hackensack* carried an interview with defendant Friedman in an article titled "Ailing Builder Bets on NJ." That article quoted defendant Friedman as stating that:

> The market in New Jersey has been our friend; The market in Florida has been from hunger. Market conditions have been very slow for two years and constantly getting worse. At the time, the Florida slowdown started, it represented 80 percent of our business. Now it's down to less than 50 percent.

*     *     *

> A big difference in the two markets is that Tarragon's New Jersey projects make financial sense either as rentals or condominiums. But the Florida condominium projects – super luxury apartments – can't be profitable as rentals.

65.     On August 23, 2007, Tarragon filed a Form 8-K with the SEC disclosing that on August 17, 2007, the Company received notices of default and acceleration from National City Bank ("National City") relating to a loan made to a wholly owned subsidiary of the Company and acceleration notices from Fannie Mae related to four promissory notes issued by four other

wholly owned subsidiaries of the Company. Each of the notices stated that these obligations have been accelerated, including accrued interest, expenses and approximately $75.1 million of outstanding principal under the National City loan and approximately $13.4 million, in the aggregate, of outstanding principal under the promissory notes issued to Fannie Mae.

66.    On or about December 24, 2007, Tarragon filed with the SEC its Form 10-Q for the fiscal quarter ended June 30, 2007, which had previously been scheduled to be filed by August 15, 2007. The Form 10-Q, among other things, disclosed that:

(a)    Tarragon did not pay August 2007 debt service as scheduled and received notices of default and acceleration from certain of its lenders. Tarragon had restored its good standing on loans from General Electric Capital Corporation ("GECC") and Fannie Mae. However, with respect to several loans including a $157.1 million senior credit facility from Barclay's Capital Real Estate, Inc., the Company continued to be in default;

(b)    Tarragon had not paid certain loans that have matured since June 30, 2007, and was seeking extensions of the maturities from these lenders;

(c)    Tarragon had received notices of default, as guarantor, from the lenders of three unconsolidated entities because August 2007 and September 2007 debt service payments were not made timely;

(d)    Tarragon, as of June 30, 2007, was not in compliance with financial covenants for debts totaling $342.5 million and, of that amount, $77.2 million has been satisfied through the sale of properties securing the debt;

(e)    Tarragon had recorded a $17.9 million allowance for estimated customer defaults in June 2007 with respect to customer defaults on the Company's One Hudson Park development;

- 37 -

(f)     Eighteen (18) buyers at One Hudson Park had defaulted after June 30,

2007 on units with a total purchase price of $16.3 million; and

(g)     The default rate for high-rise and mid-rise condominium developments had

accelerated from 2.4% for the full year 2006, to 42.9% for the second fiscal quarter of 2007

ended June 30, 2007 to 316% for the third fiscal quarter of 2007.

67.     On December 24, 2007, the Company also filed its Form 10-Q for the quarter ended

September 30, 2007. The Form 10-Q disclosed that:

> In July 2007, we began experiencing increased buyer defaults at One Hudson Park. Deposits required for projects in this product-type have typically been 5% to 20% of the purchase price, which we concluded were sufficient to motivate buyers to comply with their contractual obligations. At One Hudson Park, where buyers were required to make deposits of up to 10% of the purchase price, revenue has been recognized on the percentage of completion method on firm contracts that meet the requirements established in SFAS No. 66, "Accounting For Sales of Real Estate" ("SFAS 66"), including the conclusion that sale prices are collectible. Recent changes in the credit markets have made it more difficult for buyers to obtain suitable financing, resulting in five buyers defaulting subsequent to September 30, even though they made significant nonrefundable deposits (ranging from $32,000 to $163,000). The allowance for estimated losses due to potential customer defaults takes into consideration these five defaults, as well as an estimate of expected future defaults under firm contracts existing at September 30, 2007. The allowance of $7.7 million was recorded as a reduction to homebuilding sale revenue.

## TARRAGON'S FALSE FINANCIAL
## REPORTING DURING THE CLASS PERIOD

68.     In order to inflate the price of Tarragon's stock, the Tarragon Defendants caused

the Company to falsely report its results for fiscal 2004 through August 9, 2007 by improper

accounting entries, which inflated the Company's reported net income and manipulated the

Company's reported cash flows. The Company subsequently has admitted that its financial

statements for fiscal 2004, 2005 and the first three quarters of fiscal 2006 should not be relied

upon.

69.    Tarragon included its false financial statements and results in press releases and in its SEC filings. The SEC filings represented that the financial information presented therein was a fair statement of Tarragon's financial results and that the results were prepared in accordance with GAAP.

70.    These representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information a "fair representation" of Tarragon's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

71.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

**Failure to Consolidate Unprofitable Variable Interest Entity**

72.    Tarragon overstated its income during the Class Period by failing to consolidate its unprofitable variable interest entity Ansonia into its consolidated financial statements in violation of GAAP, making the statements reporting earnings based upon that improper consolidation (¶¶ 20, 22, 23, 26, 27, 29, 30, 32, 33, 35-39, above) materially false or misleading and causing all statements during that period of time projecting future revenues and earnings to be lacking in a reasonable basis.

73.    Prior to the enactment of FASB Interpretation Number ("FIN") 46(R) in December 2003, a company would consider whether or not to consolidate another entity into its consolidated financial statements based solely on financial control. If the company controlled the entity through voting interest (*i.e*, by owning more than a 50% interest), then consolidation would generally take place. With the enactment of FIN 46(R)[1], a company is required to assess its equity investments to determine if they are "variable interest entities" and to decide whether to consolidate the variable interest entity based on factors other than strict voting control. Variable interests may arise from financial instruments, service contracts, guarantees, leases or other arrangements with the entity. A company will consolidate the entity if it determines it is the primary beneficiary of the entity and the risks associated with the entity are not properly dispersed amongst the other owners. A company is the primary beneficiary if it will absorb a majority of the entity's losses or returns.

74.    If an investment in which a company owns more than a 20% interest does not qualify as a variable interest entity, then a company may treat the entity as an equity investment for accounting purposes. Under the equity method a company records its initial investment at the original cost. Thereafter, the company will record its proportionate share of the operating income or loss from the investment each period thereby increasing or decreasing its cost basis in the investment. When a company's investment balance reaches zero, the company will discontinue recording its shares of the loss except to the extent that the company has guaranteed any of the investment's obligations. APB No. 18, ¶¶6(b) and 19.

---

[1]    FIN 46(R) is effective for all non-special purpose variable interest entities for the first interim or annual period ending after March 15, 2004. In the case of Tarragon, it applied to the Company's results for the quarter ending March 31, 2004 – the Company's first quarter 2004 results.

75.    Tarragon has numerous investments in partnerships or joint ventures. Tarragon adopted FIN 46(R) as of January 1, 2004, for all of its partnerships and joint ventures formed before February 1, 2003. Upon the adoption of FIN 46(R), Tarragon consolidated seven partnerships and joint ventures into the Company's consolidated financial results which had previously been unconsolidated. Tarragon was not required to take any charges upon consolidating any of these seven variable interest entities as none of the entities' assets were less than their liabilities. Nevertheless, despite its adoption of FIN 46(R), Tarragon failed to consolidate Ansonia into its financial statements.

76.    In December 1997, Tarragon formed Ansonia with Ansonia LLC in order to acquire and reposition or renovate older suburban apartment properties in central and eastern Connecticut. Tarragon was the general partner of Ansonia while Ansonia LLC was its limited partner. The principals of Ansonia LLC are:

- Richard Frary – Frary has been a member of Ansonia LLC since 1997. He joined Tarragon in April 2004 as a director.

- Joel Mael – Mael has been a member of Ansonia LLC since 1997.

- Defendant Rothenberg – Rothenberg has been a managing member of Ansonia LLC since 1997. He joined Tarragon in September 2000 as its COO and a director.

- Saul Spitz – Spitz has been a member of Ansonia LLC since 1997. He joined Tarragon in September 2000 as its Executive Vice President of Acquisition.

- Eileen Swenson – Swenson has been a member of Ansonia LLC since 1999. She joined Tarragon in September 2000 as President of Tarragon Management, Inc.

77.    In 1997, Tarragon obtained a 70% interest in the partnership due to its initial contribution to Ansonia. The outside partners did not make any monetary contributions to Ansonia at the outset but obtained a 30% interest in the partnership subject to their obligation to pay Tarragon 30% of the amounts contributed to the partnership by the Company plus interest.

In August 2001, the outside partners – most of whom were officers and/or directors of Tarragon by this point – met their obligation to pay Tarragon 30% of the amounts it contributed plus interest through a contribution of $232,000 cash and the issuance of notes totaling $5.3 million. The notes, which were payable from 30% of Ansonia's net cash flow, were fully paid in 2002. In November 2005, Tarragon contributed additional properties into Ansonia in exchange for an increase in its interest from 70% to 89.44%.

78.    Here, in violation of GAAP, Tarragon failed to consolidate Ansonia's unprofitable results into its own despite the fact that it was the limited partnerships' primary beneficiary. Given its general partnership interest in Ansonia of almost 90% and the fact that the remaining limited partnership interest in Ansonia was held primarily by individuals who were directly or indirectly related to Tarragon as officers and/or directors of the Company, Tarragon should have consolidated Ansonia into its financial statements. Had it consolidated Ansonia, as it was required to do under FIN 46(R), Tarragon's financial results would have been harmed.

79.    As a result of its restatement, Tarragon was forced to record a $16.8 million charge for a change in accounting principle in its fiscal year 2004 results upon adoption of FIN 46(R) to take into account the difference between the assets of Ansonia and its liabilities at the time. Further, Tarragon was forced to record unprofitable results for the partnership into its fiscal year 2005 and first quarter 2006 results.

80.    Tarragon restated its financial statements for fiscal years 2004 and 2005 and for the first quarter of 2006 due to this accounting violation. The chart below demonstrates the material impact this violation had on Tarragon's financial results during the Class Period:

**Effect on Tarragon's Financial Statements**

| (in thousands except EPS) | FY04 | FY05 | 1QFY06 |
|---|---|---|---|
| Net Income as Originally Reported | 44,708 | 145,791 | 18,828 |
| Net Income as Restated | 29,518 | 88,498 | 18,474 |
| | | | |
| Diluted EPS as Originally Reported | $1.65 | $4.71 | $0.59 |
| Diluted EPS as Restated | $1.09 | $2.93 | $0.58 |
| | | | |
| *Overstatement in Reported Net Income* | *15,190* | *57,293* | *354* |
| *% Overstatement in Reported Net Income* | *34%* | *39%* | *2%* |

**Failure to Properly Account for Its Statement of Cash Flows**

81.    During the Class Period, Tarragon failed to properly account for its Statement of Cash Flows by failing to properly classify its cash inflows and cash outflows into the proper categories as operating, investing or financing activities.

82.    Under both GAAP and SEC Regulations, a statement of cash flows is considered to be an integral part of a full set of financial statements and is required to be disclosed on a periodic basis along with a company's balance sheet, income statement and statement of changes in stockholder's equity. FASB Statement of Financial Accounting Standard ("SFAS") No. 95, *Statement of Cash Flows*, ¶1; FASB Statement of Financial Accounting Concepts No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, ¶13; and Article 3 and Article 10 of Regulation S-X [17 C.F.R. §210.3-02 and §210.10-01(c)(3)].

83.    The primary purpose of a statement of cash flow is to present information concerning a company's cash inflows and outflows during a given period. It shows the amount of cash generated and used by a company in a specified period. SFAS No. 95, ¶4. Cash inflows or cash receipts relate to the cash received by the company from its ongoing operations and from

external investment sources. Cash outflows or cash disbursements relate to business expenses or investments made by the company. In its statement of cash flows, a company is required to classify cash inflows and cash outflows as resulting from (i) its investing transactions, (ii) its financing transactions or (iii) its operating activities based upon the nature of the activity. SFAS No. 95, ¶¶6 and 14.

84.    The statement of cash flows, along with the related footnote disclosures, should provide investors with information to assess the following:

- the enterprise's ability to generate positive future net cash flows;

- the enterprise's ability to meet its obligations, its ability to pay dividends, and its needs for external financing;

- the reasons for differences between net income and associated cash receipts and payments; and

- the effects on an enterprise's financial position of both its cash and noncash investing and financing transactions during the period.

SFAS No. 95, ¶¶6 and 45-47.

85.    Here, Tarragon failed to properly classify its cash inflows and outflows by failing to account for them in the proper category as operating, investing or financing activities. Tarragon restated its financial statements for fiscal years 2004 and 2005 and for the first, second and third quarters of 2006 due to this accounting violation.

**Improper Recognition of Revenue Under the Percentage-of-Completion Method**

86.    Tarragon's reported revenues and earnings were also inflated during the Class Period because it recognized revenue under the percentage-of-completion method (¶¶ 43-45, 47-49, 51-52, 54, 56) when there did not exist a reasonable basis for Tarragon to use such method. Thus, at projects such as One Hudson Park, Tarragon recognized revenue despite the fact that relatively small deposits of 10% or less were put down on the units with no reasonable

expectation that full payment would be made and without conducting adequate due diligence that the prospective purchaser had the means to complete the proposed purchase.

87.    Moreover, the ratification of EITF 06-8 in November 2006 further highlighted the fact that Tarragon was not taking appropriate steps to evaluate the adequacy of the prospective purchasers' continuing investment to conclude that the sales price was collectible. The uncollectibility of the sales price and the need to collect additional deposits from prospective purchasers was not a mere possibility, but was highly likely because the small deposits collected were insufficient to demonstrate a commitment to pay the full purchase price.

**Tarragon's Restatement and Write-offs Are an Admission of Falsity**

88.    The fact that Tarragon has restated its fiscal 2004 through third quarter 2006 financial statements and has admitted that such financial statements should no longer be relied upon is an admission that the financial statements originally issued were false and that the overstatement of income was material. Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced by Tarragon was to correct for material errors in its previously issued financial statements. *See* APB No. 20, ¶¶7-13. Moreover, SFAS No. 154, *Accounting Changes and Error Corrections*, states: "Any error in the financial statements of a prior period discovered subsequent to their issuance shall be reported as a prior-period adjustment by restating the prior-period financial statements." SFAS No. 154, ¶25. Thus, GAAP provides that financial statements should be restated in order to correct an error in previously issued financial statements. Tarragon's restatement is due to an error. Thus, the restatement is an admission by Tarragon that its previously issued financial results and its public statements regarding those results were false.

89.    In addition, Tarragon was ultimately required to record total allowances of more than $25 million with respect to previously recognized revenue under the percentage-of-

completion method with respect to One Hudson Park. Thus, Defendants failure to make appropriate determinations regarding collectibility resulted in the improper inflation of Tarragon's revenue during the Class Period.

**Tarragon's Financial Statements Violated Fundamental Concepts of GAAP**

90. Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a) The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

(b) The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

(c) The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

(d) The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

- 46 -

(e)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

91.     Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## LOSS CAUSATION/ECONOMIC LOSS

92.    By misrepresenting Tarragon's financial statements, the defendants presented a misleading picture of the Company's business and prospects. Thus, instead of truthfully disclosing during the Class Period that Tarragon's business was not as healthy as represented, Tarragon falsely reported its financial results and its actual business prospects going forward.

93.    These claims of profitability caused and maintained the artificial inflation in Tarragon's stock price throughout the Class Period and until the truth was revealed to the market.

94.    The Tarragon Defendants and Grant Thornton's false and misleading statements had the intended effect and caused Tarragon stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $26.76 per share.

95.    Then, on August 9, 2006, Tarragon postponed its earnings release due to issues with its accounting, causing its stock to decline from above $11 per share to less than $10 per share. In July 2007, as adverse information concerning the viability of the Company's One Hudson Park project and the resulting impact on Tarragon's financial statements and financial viability began to leak to the investing public, Tarragon's stock price began a steep descent.

96.    On August 9, 2007, at noon Eastern Time, the Tarragon Defendants were forced to publicly disclose that Tarragon would be required to take property impairment charges and other write-downs and that due to serious liquidity issues there was substantial doubt about the Company's ability to continue as a going concern, causing its stock to drop $1.88 per share.

97.    As a direct result of these admissions and the public revelations regarding the truth about Tarragon's overstatement of income and its actual business prospects going forward, Tarragon's stock price plummeted on August 9, 2007 to $0.94 per share, a one-day decline of $1.88 per share or approximately 67%. This decline was in addition to the nearly $2 per share drop in August 2006 and the $4 per share drop in July 2007. These drops removed the inflation

from Tarragon's stock price, causing real economic loss to investors who had purchased the
stock during the Class Period.

## ADDITIONAL ALLEGATIONS CONCERNING SCIENTER

98.    The Tarragon Defendants were motivated to misrepresent the true financial
condition and state of affairs because they were using Tarragon common stock as currency to
acquire assets and reduce debt, having issued more than 5 million shares for those purposes
during the Class Period (*see* ¶¶ 25, 31 and 46, above). In addition, the Tarragon Defendants
were motivated to misrepresent the financial statements of Tarragon in order to assure
compliance with various financial covenants contained in loan agreements to which Tarragon
was a party.

99.    The Individual Defendants were further motivated to misrepresent the Company's
true financial condition and state of affairs because a material factor considered in awarding their
annual bonuses was the market price of Tarragon common stock.

100.    Defendants Friedman and Beachwold were also motivated to misrepresent the
Company's true financial condition and state of affairs because a substantial portion of their
wealth was tied up in Tarragon common stock which was used as collateral for personal loans
and, indeed, when the price of Tarragon common stock began to decline precipitously, the
lenders began to sell Tarragon stock in order to meet the margin calls.

101.    Defendants Friedman and Pickens scienter is also shown by their own statements.
They each repeatedly signed sworn statements that, among other things, stated that: they had
designed or caused to be designed controls and procedures that provided reasonable assurance
that the financial statements were prepared in accordance with GAAP; that the financial
statements and other financial information fairly presented the financial condition, results of

operation and cash flows of Tarragon; and that the disclosure controls and procedures that they

had put in place ensured that material information regarding Tarragon was made known to them.

Thus, the sworn statements of Friedman and Pickens demonstrate their knowledge of Tarragon's

financial condition at all relevant times.

102.     In addition, Defendant Grant Thornton's statements that it had conducted in audits

of Tarragon's financial statements in accordance with GAAS were false.  As was reported by

*Bloomberg* on July 17, 2007:

> The official mission of the auditing profession's watchdog is "to protect the
> interests of investors."  In practice, what it really protects best are the dirty secrets
> of the accounting firms and their corporate audit clients.
>
> Created in 2002 by the Sarbanes-Oxley Act, the Public Company
> Accounting Oversight Board inspects the firms that audit companies with U.S.-
> traded securities.  In its brief history, the board has identified scores of companies
> where outside auditors have done lousy jobs checking the books.  Investors crave
> that kind of knowledge.
>
> In its reports to the public, though, the board doesn't name the companies.
> So last month, for instance, when the board released its annual inspection report
> on Grant Thornton LLP, the sixth-largest U.S. accounting firm by revenue, one of
> the audits it criticized was at a company identified only as "Issuer A."
> Transparency, this isn't.
>
> The report said Grant Thornton failed "to obtain sufficient competent
> evidential matter to support its audit opinion" and "failed to identify" an
> accounting violation "that it should have identified and addressed before issuing
> its audit report."
>
> In a response letter, the firm complained about the harsh wording and said it
> actually had identified the problem.  The violation: Issuer A, which restated its
> financials last year, had left off its balance sheet a certain 90 percent-owned
> partnership, the rest of which was owned mainly by company insiders.
>
> What's Missing
>
> Here's what the report left out: Issuer A is Tarragon Corp., a New York-
> based real-estate developer awash in Florida condominiums.  Last year's
> restatement slashed 2005 net income 39 percent to $88.5 million.  And Grant
> Thornton remains its auditor.  Faced with those facts, some investors during proxy

season almost certainly would vote to fire the auditor and perhaps even withhold votes from directors who sit on the company's audit committee.

## RELIANCE: APPLICABILITY OF FRAUD ON THE MARKET PRESUMPTION

103.   At all relevant times, the market for Tarragon's common stock was an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the prices of the Company's securities. Throughout the Class Period:

(a)   Tarragon's stock met the requirements for listing, and was listed and actively traded on the NMS, a highly efficient and automated market;

(b)   As a regulated issuer, Tarragon filed periodic public reports with the SEC and the NMS;

(c)   Tarragon regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   Securities analysts and the business press followed and published research reports regarding Tarragon that were publicly available to investors; and

(e)   The market price of Tarragon securities reacted promptly to the dissemination of public information regarding the Company.

104.   As a result of the misconduct alleged herein (including defendants' misstatements and omissions), the market for Tarragon securities was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies.

- 51 -

## INAPPLICABILITY OF SAFE HARBOR FOR FORWARD LOOKING STATEMENTS

105.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking when made, and there were no meaningful cautionary statements identifying facts that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. In addition, to the extent any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and defendants failed to update those statements which later became inaccurate.

### COUNT I

#### For Violation of §10(b) of the 1934 Act and Rule 10b-5
#### Against All Defendants (Except Beachwold)

106.    Plaintiff incorporates by reference all the allegations set forth above.

107.    During the Class Period, defendants (except Beachwold) disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Defendants' false and misleading statements and omissions were

- 52 -

made with scienter and were intended to and did deceive the investing public, artificially inflate

and maintain the market for and market price of the Company's securities, and cause plaintiff

and the other members of the Class to purchase Tarragon securities at artificially inflated prices.

108.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they,

individually, and in concert, directly and indirectly, by the use and means of instrumentalities of

interstate commerce, the mails and the facilities of a national securities exchange:

        (a)    employed devices, schemes and artifices to defraud;

        (b)    made untrue statements of material facts or omitted to state material facts

necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading; or

        (c)    engaged in acts, practices and a course of business that operated as a fraud

or deceit upon plaintiff and others similarly situated in connection with their purchases of

Tarragon common stock during the Class Period.

109.    Defendants were individually and collectively responsible for making the

statements and omissions alleged herein, by virtue of having prepared, approved, signed and/or

disseminated documents which contained untrue statements of material fact and/or omitted facts

necessary to make the statements therein not misleading and/or making direct statements to the

investing public on the conference calls and announcements detailed herein.

110.    During the Class Period, the Individual Defendants occupied executive-level

positions at Tarragon and were privy to non-public information concerning the Company. Each

of them knew or recklessly disregarded the adverse facts specified herein and omitted to disclose

those facts.

111.    As described herein, Defendants made the false statements and omissions knowingly and intentionally, or in such an extremely reckless manner as to constitute willful deceit and fraud upon plaintiff and other members of the Class who purchased Tarragon securities during the Class Period.  Throughout the Class Period, defendants had a duty to disclose new, material information that came to their attention, which rendered their prior statements to the market materially false and misleading.  There is a substantial likelihood that the disclosure of these omitted facts would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available about the prospects of the Company.

112.    Defendants' false statements and omissions were made in connection with the purchase or sale of the Company's securities.

113.    In ignorance of the false and misleading nature of defendants' statements and/or upon the integrity of the market price for Tarragon securities, plaintiff and the other members of the Class purchased Tarragon securities at artificially inflated prices during the Class Period. But for the fraud, they would not have purchased the securities at artificially inflated prices.

114.    The market price for Tarragon securities declined materially upon the public disclosure of the facts that had previously been misrepresented or omitted by the defendants, as described above.

115.    Plaintiff and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of Tarragon securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

116.    This claim was brought within two years after discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

- 54 -

117.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to plaintiff and the other members of the Class, each of whom has been damaged as a result of such violation.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against Defendants Friedman and Beachwold

118.    Plaintiff incorporates by reference all the allegations set forth above.

119.    This Claim is brought pursuant to Section 20(a) of the Exchange Act against defendants Friedman and Beachwold on behalf of plaintiff and the other members of the Class who purchased Tarragon securities during the Class Period.

120.    As alleged herein, Tarragon is liable to plaintiff and the other members of the Class who purchased Tarragon securities based on the materially false and misleading statements and omissions set forth above, pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

121.    Defendants Friedman and Beachwold acted as controlling persons of Tarragon within the meaning of §20(a) of the 1934 Act, and were culpable participants in the actions alleged above. By reason of Friedman's positions with the Company, and his ownership and the ownership by Beachwold and other members of Friedman's family of Tarragon stock, defendants Friedman and Beachwold had the power and authority to cause Tarragon to engage in the wrongful conduct complained of herein. By reason of such conduct, these defendants are liable pursuant to §20(a) of the 1934 Act to the plaintiff and the other members of the Class, each of whom has been damaged as result of the actions detailed herein.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3);

B.      Awarding plaintiff and the other members of the Class compensatory damages, including pre-judgment and post-judgment interest;

C.      Awarding plaintiff and the Class reasonable attorneys' fees, experts' fees, and other costs and expenses; and

D.      Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


DATED:  January 18, 2008                  **ABRAHAM, FRUCHTER & TWERSKY, LLP**

Jeffrey S. Abraham (JA-2946)
Lawrence D. Levit (LL-9507)
One Penn Plaza, Suite 2805
New York, New York 10119
Telephone: (212) 279-5050
Facsimile: (212) 279-3655

*Attorneys for Lead Plaintiff*

Jeffrey S. Abraham (JA-2946)
Lawrence D. Levit (LL-9507)
**ABRAHAM, FRUCHTER & TWERSKY, LLP**
One Penn Plaza, Suite 2805
New York, New York 10119
Tel: (212) 279-5050
Fax: (212) 279-3655

**Attorneys for Lead Plaintiff**

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

————————————————————X
                        :
                        :

IN RE TARRAGON CORPORATION   :     Civil Action No. 07-7972 (PKC)
SECURITIES LITIGATION          :
                        :     ECF Case
                        :
                        :
                        :
————————————————————X

## CERTIFICATE OF SERVICE

The undersigned certifies that the following statement is true under penalty of perjury:

I am a member of the Bars of the State of New York and the United States District Court for the Southern District of New York. I am an attorney with the firm of Abraham, Fruchter & Twersky, LLP, attorneys for Plaintiff in this action. I am over the age of 18 and not a party to this action. I hereby certify under penalty of perjury that on January 18, 2008 I caused the attached AMENDED CLASS ACTION COMPLAINT as well as the AMENDED SUMMONS to be served by postage pre-paid First Class US Mail on the following:

Eliot Lauer, Esq.
Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, New York 10178

*Attorneys for Defendants William S. Friedman,*
*Robert P. Rothenberg and Erin Davis Pickins*

Jeffrey S. Abraham

- 2 -