**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
————————————————————x
                    :     **Electronically Filed**
                    :
                    :     07 Civ. 7972 (PKC)
                    :
In re TARRAGON CORPORATION    :
SECURITIES LITIGATION         :
                    :
                    :
                    :
                    :
                    :
————————————————————x

# MEMORANDUM OF LAW IN SUPPORT OF
# GRANT THORNTON LLP'S MOTION
# <u>TO DISMISS THE AMENDED COMPLAINT</u>

WINSTON & STRAWN LLP
200 Park Avenue
New York, New York  10166
(212) 294-6700

35 West Wacker Drive
Chicago, Illinois  60601
(312) 558-5600

*Attorneys for Defendant*
*Grant Thornton LLP*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT ............................................................................1

BACKGROUND ...................................................................................................3

    A.    Tarragon's involvement in the volatile real estate business ................................3

    B.    Plaintiffs' claims against Grant Thornton ............................................4

        1.    Restatement to consolidate the results of the Ansonia partnership..........6
        2.    Restatement of Tarragon's statements of cash flows..............................7
        3.    Revenue recognition method ................................................................8

POINT ONE

    Plaintiffs have failed to plead fraud with particularity under Rule 9(b)
    and the PSLRA .............................................................................9

POINT TWO

    Plaintiffs' claim against Grant Thornton fails because they do not
    allege facts that support a strong inference of scienter ....................................12

        A.    The fact that Tarragon's original financial statements did not
               consolidate Ansonia under FIN 46(R) does not support a
               strong inference of scienter on Grant Thornton's part..........................13

        B.    The fact that Tarragon restated its cash flows does not
               support a strong inference of scienter ....................................................15

        C.    The fact that Tarragon used percentage-of-completion accounting
               for certain projects does not support a strong inference of scienter .......16

        D.    Plaintiffs have failed to allege any inference of scienter,
               much less an inference that is cogent and at least as
               compelling as any opposing inference ....................................................17

POINT THREE

    Plaintiffs have failed to plead loss causation .................................................17

**Page**

    A.    Plaintiffs fail to allege that Grant Thornton's audit
opinions artificially inflated the price of Tarragon stock....................................18

    B.    Plaintiffs fail to allege that the price of their stock declined because of
any fact effectively "concealed" by the 2004 and 2005 audit opinions..............19

          1.    Plaintiffs do not and cannot allege that any facts concealed by
the 2004 and 2005 audit opinions caused the "steep descent"
of Tarragon stock in 2007.......................................................................19

          2.    The Ansonia restatements did not cause Plaintiffs' losses.....................21

          3.    The cash flow restatement did not cause Plaintiffs' losses....................23

          4.    The revenue recognition issue did not cause Plaintiffs' losses..............24

CONCLUSION.................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ATSI Communications, Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) ..................9, 12

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ................................................................18

*Chill v. Gen. Elec. Co.*, 101 F.3d 263 (2d Cir. 1996) ......................................................12, 16, 17

*Deephaven Private Placement Trading, Ltd. v. Grant Thornton LLP*,
    454 F.3d 1168 (10th Cir. 2006) ...................................................................................9, 10

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) .......................................2, 17, 18, 20

*F.D.I.C. v. Nat'l Union Fire Ins. of Pittsburgh*, 146 F.Supp.2d 541 (D.N.J. 2001),
    *aff'd*, 57 Fed. Appx. 965, 2003 WL 262502 (3d Cir. Feb. 6, 2003) .........................................3

*Funke v. Life Fin. Corp.*, 237 F. Supp. 2d 458 (S.D.N.Y. 2002) ....................................................15

*Ganino v. Citizens Utils. Co.*, 228 F.3d 154 (2d Cir. 2000) ............................................................3

*In re AOL Time Warner Sec. Litig.*, 503 F. Supp. 2d 666 (S.D.N.Y. 2007) ..................................22

*In re Bayou Hedge Fund Litig.*, Nos. 06-MDL-1755 and 06-CV-2943 (CM),
    2007 WL 2319127 (S.D.N.Y. July 31, 2007) ..........................................................................13

*In re Carter Wallace, Inc. Sec. Litig.*, 220 F.3d 36 (2d Cir. 2000) ..............................................12

*In re Omnicom Group, Inc. Securities Litig.*, No. 02 Civ. 4483 (WHP),
    2008 WL 243788 (S.D.N.Y. Jan. 29, 2008) ...........................................................................22

*Joffee v. Lehman Bros., Inc.*, 410 F. Supp. 2d 187 (S.D.N.Y. 2006),
    *aff'd*, 209 Fed. Appx. 80, 2006 WL 3780547 (2d Cir. Dec. 19, 2006) ............................22, 23

*Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007) ..............................................18

*Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005) .....................................17, 18, 20, 21

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000) ............................................................2, 13, 16, 17

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*,
    75 F.3d 801 (2d Cir. 1996) ...................................................................................................9

*SEC v. Price Waterhouse*, 797 F. Supp. 1217 (S.D.N.Y. 1992) ....................................................12

*SEC v. Tambone*, 473 F. Supp. 2d 162 (D. Mass. 2006) ...............................................................11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007) ..................................2, 12, 17


**STATUTES**

15 U.S.C. § 78u-4(b)(1) ........................................................................................................9

15 U.S.C. § 78u-4(b)(2) ......................................................................................................12

15 U.S.C. § 78u-4(b)(4) ......................................................................................................17

15 U.S.C. § 7214(g)(2) ........................................................................................................11

15 U.S.C. § 7215(b)(5)(A) ..................................................................................................11


**OTHER AUTHORITIES**

FASB Interpretation Number 46 (FIN 46(R)) ...............................................................5, 6, 14, 15

FASB Emerging Issues Task Force 06-8, *Applicability of a Buyer's Continuing
    Investment Under FASB Statement No. 66 for Sales of Condominiums* (EITF 06-8) .........8, 16

Fed. R. Evid. 201 ................................................................................................................3

Board of Governors of the Federal Reserve System, *Monetary Policy Report to the
    Congress* (Feb. 27, 2008)..............................................................................................3

Fed. R. Civ. P. 9(b) ............................................................................................................9

Ernst & Young LLP, *Financial Reporting Developments, FASB Interpretation No. 46,
    Consolidation of Variable Interest Entities* (February 2004). ...........................................13, 14

## PRELIMINARY STATEMENT

The complaint in this case provides no basis for a claim against Grant Thornton LLP ("Grant Thornton").  Plaintiffs lost money on their stock in Tarragon Corporation, a real estate developer that was caught up in the credit crisis of 2007.  In search of a fraud to make their losses actionable, they allege that Tarragon had been lying about its financial prospects for more than two years.  But while Plaintiffs have included auditor Grant Thornton on their list of defendants, they all but ignore it in their allegations.  Plaintiffs do not explain how Grant Thornton made any false statement at all—much less with scienter—and they cannot connect their losses to any facts that Grant Thornton supposedly concealed.  Thus they cannot even come close to meeting the strenuous pleading standards for a claim under Section 10(b).

First and foremost, Plaintiffs do not allege that Grant Thornton made any statement that was false or misleading.  Plaintiffs' claim against Grant Thornton is based on its audit opinion letters on Tarragon's year-end financial statements for 2004 and 2005.  But Plaintiffs do not contend that Grant Thornton held a different opinion at that time than the ones it expressed in those letters.  Nor do they allege facts to contradict the opinions' stated basis—namely, that Grant Thornton had conducted audits in accordance with generally accepted auditing standards ("GAAS").  Plaintiffs do not cite a single GAAS standard, and they do not identify any step that Grant Thornton failed to take in its audits.  In short, Plaintiffs have not pleaded any false statement with particularity.  On that basis alone, the claim should be dismissed.

Given their inability to allege falsity, it is no surprise that Plaintiffs also cannot allege that Grant Thornton knew or should have known of any falsity.  In an auditor case, a plaintiff must plead facts that support a strong inference that the auditor either knew its opinion letters were false or was so reckless that the court may assume "an actual intent to aid in the fraud being

perpetrated." *Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir. 2000) (citations omitted). As the Supreme Court recently announced, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2504-05 (2007). Plaintiffs have not alleged ***any*** facts about Grant Thornton's knowledge or conduct, much less facts that support a strong inference of scienter. This too is fatal to their claim.

Plaintiffs have also failed to plead loss causation. Under *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 342 (2005), Plaintiffs must plead that they purchased their stock at an artificially inflated price and then lost money when the "relevant truth" emerged and caused the price to decline. Here, the allegations fail at every step. Plaintiffs do not allege that the 2004 or 2005 audited financial statements (or Grant Thornton's audit opinions on those statements) had any inflationary impact on Tarragon's stock price. In fact, the only "inflation" Plaintiffs identify followed a press release by Tarragon—two months before the first relevant audit opinion by Grant Thornton. Am. Compl. ¶ 21, attached as Ex. A to Decl. of Jennifer L. Malin ("Malin Decl."). At the other end of the class period, Plaintiffs contend that the "steep descent" in the stock price beginning in July 2007 was triggered by "adverse information concerning the viability" of one particular construction project—a project that Plaintiffs do not tie to the 2004 and 2005 audited financial statements at all. *Id.* ¶ 95. And to the extent there was any error in those financial statements, it was corrected no later than April 2, 2007, when Tarragon restated its previous financial statements to recategorize cash flow, announced it might have to change its revenue recognition practices, and disclosed that there had been weaknesses in its internal controls. That announcement had no impact on the stock price and came months ***before*** the

price's "steep descent."[1]  Plaintiffs' inability to establish loss causation is an independent basis for dismissal.

## BACKGROUND

### A.     *Tarragon's involvement in the volatile real estate business*

Tarragon operates two distinct businesses:  a homebuilding and real estate development business, and a real estate service business.  Am. Compl. ¶ 2.  Its homebuilding business focuses on developing, renovating, building, and marketing homes in high-density, urban locations.  *Id*. Its projects have included luxury apartment and townhome developments and master planned communities in a variety of locations, including Florida and the Northeast.  Throughout the relevant period, Tarragon's stock traded on the National Market System.  *Id*. ¶ 7.

Like many other companies in the real estate business, Tarragon found itself in the wrong industry at the wrong time in July 2007, when the real estate credit markets evaporated almost overnight.[2]  At that time, banks virtually stopped making commercial and multi-family real estate loans, and even some of the most sophisticated players fell victim to the market's freeze. Tarragon's decline coincided with these events.  According to Plaintiffs, "[i]n July 2007, as adverse information concerning the viability of the Company's One Hudson Park project and the resulting impact on Tarragon's financial statements and financial viability began to leak to the investing public, Tarragon's stock price began a steep descent."  *Id*. ¶ 95.  In the month of July,

---

[1]  On a motion to dismiss, the court may take judicial notice of "well-publicized stock prices" without converting the motion to dismiss into a motion for summary judgment.  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 n.8 (2d Cir. 2000).  To that end, we have provided the Court with a report of Tarragon's stock prices during the relevant period.  *See* Ex. B to Malin Decl., Tarragon Corporation's Closing Stock Prices ("Stock Prices").

[2]  The Court may take judicial notice of the decline of the real estate credit market in 2007. *See* Ex. I to Malin Decl., Board of Governors of the Federal Reserve System, *Monetary Policy Report to the Congress*, submitted pursuant to section 2B of the Federal Reserve Act (Feb. 27, 2008) at 1, 23-25, 37-38 (describing steep drop of credit market in July-August 2007), available at http://www.federalreserve.gov/boarddocs/hh/2008/february/FullReport.pdf; *see also* Fed. R. Evid. 201(b); *F.D.I.C. v. Nat'l Union Fire Ins. of Pittsburgh*, 146 F. Supp. 2d 541, 544 n.5 (D.N.J. 2001) (taking "judicial notice of the fact that the late 1980's and early 1990's was a time in history when the bottom fell out of the real estate market"), *aff'd*, 57 Fed. Appx. 965, 2003 WL 262502, at *1 (3d Cir. Feb. 6, 2003).

Tarragon's stock price slid from a high of $9.05 to $4.05.  *See* Ex. B, Stock Prices.  Unable to obtain and modify its financing, Tarragon was forced to record over $125 million in impairment charges.  Am. Compl. ¶¶ 60-61.  On August 9, 2007, the day Tarragon announced the impairment charge as well as its credit difficulties, Tarragon's stock continued its fall, dropping from $2.82 to $0.94 per share.  *Id*. ¶ 62.

## B.     *Plaintiffs' claims against Grant Thornton*

Plaintiffs brought this suit on behalf of a putative class of those who purchased or otherwise acquired the common stock of Tarragon between January 5, 2005 and August 9, 2007.  *Id*. ¶ 1.  The complaint purports to assert a single claim against Grant Thornton under Section 10(b) of the 1934 Act.  The class period was triggered by a press release by Tarragon that affirmed its 2004 guidance and released a positive earnings forecast for 2005.  *Id*. ¶ 20.  After that announcement, Tarragon's stock price "jumped" 22% from the previous day's close, to $14.59.  *Id*. ¶ 21.  Grant Thornton did not make any statement as part of that press release.

Plaintiffs' complaint consists mostly of a recitation of press releases and SEC filings by Tarragon, all under the heading "Defendants' False and Misleading Statements and Other Relevant Events Occurring During the Class Period."  *Id*. ¶¶ 20-63.  That recitation refers to only two statements by Grant Thornton:  its audit opinion letters on Tarragon's year-end financial statements for 2004 and 2005.  *Id*. ¶¶ 24, 37.[3]  At the end of the recitation, Plaintiffs list what they call "true facts . . . known by defendants but concealed from the investing public during the class period."  *Id*. ¶ 63.  They make no effort, however, to tie these alleged "true facts" to any particular statement by any particular defendant.

---

[3]   Although Grant Thornton also issued audit opinions on Tarragon's 2006 year-end financial statements, Plaintiffs have not sued based on those opinions and do not include them in their list of allegedly false statements.

Several of these "true facts" cannot even arguably be linked to Grant Thornton's audit opinions on the 2004 and 2005 financial statements. For example, Plaintiffs allege that the Company "failed to timely take property impairment charges and other write-downs." *Id*. ¶ 63(c). Yet Plaintiffs do not contend that the charges and write-downs Tarragon took in August 2007 should have been evident in previous years—and certainly not back in 2004 and 2005, the only years relevant to Grant Thornton in this case. Similarly, Plaintiffs do not contend that back in 2004 and 2005 Tarragon was already experiencing "liquidity issues due to inability to obtain loan modifications and additional financing," its "ability to continue as a going concern" was in doubt, or it "would not be able to remain in full compliance . . . with certain covenants." *Id*. ¶ 63(e)-(f). Even Plaintiffs agree that these facts did not emerge until after the real estate credit market began to deteriorate. *Id*. (linking each of these "true facts" to the deterioration in the credit market); *see also id.* ¶ 63(g) (final "true fact" about Tarragon's ability to make projections is expressly limited to statements made by Tarragon itself in July 2007).

Grant Thornton assumes for purposes of this motion that Plaintiffs' claims against it rest on the remaining three supposedly "true" facts: (1) Tarragon's alleged failure to properly consolidate the operations of its affiliate, Ansonia Apartments, L.P. ("Ansonia"), with its operations in accordance with FASB Interpretation Number 46 (revised December 31, 2003) Consolidation of Variable Interest Entities ("FIN 46(R)"); (2) Tarragon's alleged failure to properly categorize its cash flows; and (3) Tarragon's recognition of revenue from its sales of condominiums in certain development projects using the "percentage of completion" method, when it allegedly did not have a reasonable basis to use such a method. *Id*. ¶¶ 63(a)-(b), 63(d). The factual allegations underlying each of those claims are discussed below.

5

1.    *Restatement to consolidate the results of the Ansonia partnership*

In August 2006, Tarragon announced that in consultation with its auditors, it had determined that its previous financial statements needed to be restated to reflect the consolidation of its own results with the results of the Ansonia partnership, of which it owned a significant percentage. *Id*. ¶ 72. FIN 46(R), enacted in December 2003, requires that a company determine if an investment entity should be consolidated by analyzing whether its equity investments are "variable interest entities" and whether the company is the primary beneficiary of the entity. *Id*. ¶¶ 73, 74. Each step of the determination involves multiple factors and inquiries. Ex. C to Malin Decl., FIN 46(R) ¶¶ 5, 14-15. Plaintiffs allege that Tarragon should have consolidated Ansonia because Tarragon had an almost 90% general partnership interest in the entity and "the remaining limited partnership interest in Ansonia was primarily held by individuals related to Tarragon as officers and/or directors of the Company." Am. Compl. ¶ 78.

Plaintiffs do not allege, however, that Grant Thornton or anyone else was aware of the need to consolidate during the 2004 and 2005 audits. In other words, they allege only that with Grant Thornton's help, Tarragon revisited an accounting judgment about consolidation, promptly disclosed the change to the public, and restated its financial statements accordingly. Ansonia's financial results themselves were no surprise to the market; even before the consolidation and restatement, Tarragon's financial statements disclosed Ansonia's financial results, as well as the fact that Tarragon and related parties controlled it and had a substantial interest in it. Ex. D to Malin Decl., 2005 Form 10-K at 83-87, filed March 16, 2006.

The issue regarding Ansonia first surfaced publicly on August 9, 2006, when Tarragon announced that it was reviewing its financial statements for the years 2004 and 2005 to determine whether it may need to consolidate the results of Ansonia's operations with the results

6

of the Company's operations in accordance with FIN 46(R). Am. Compl. ¶¶ 40-41. On that day, Tarragon's stock declined from $11.97 to $10.30. *See* Ex. B, Stock Prices & *supra* n.1; *see also* Am. Compl. ¶¶ 41, 95. On August 23, 2006, Tarragon filed its Form 8-K, announcing that it would restate its financial statements for the years 2004 and 2005 to consolidate Ansonia's operations with the Company's operations in accordance with FIN 46(R). Am. Compl. ¶ 42. Tarragon's stock price remained virtually unaffected by the August 23, 2006 disclosure, closing only 31 cents lower than the previous day's closing price of $9.57 per share. Ex. B, Stock Prices. By late November, however, Tarragon's stock price had recovered all the ground it lost in August, rising to above $12 per share. *Id.*

### 2.    *Restatement of Tarragon's statements of cash flows*

On April 2, 2007, Tarragon restated its previous financial statements once again, this time to reclassify certain cash flow items among operating, investing, and financial activities. Am. Compl. ¶ 50. These restatements changed only the categories into which these cash flows were reported and not the total net change in cash. Ex. E to Malin Decl., April 2, 2007 Form 8-K at 2; Ex. F to Malin Decl., 2006 Form 10-K at 117 ("[t]he restatement does not affect the net change in cash for either of the years ended December 31, 2005 and 2004 and has no impact on our consolidated balance sheet, consolidated statements of income and related earnings per share amounts or consolidated statements of stockholders' equity"). Plaintiffs do not contend that the cash flow issue was evident to Tarragon or to its auditors when its previous financial statements were filed. Thus again, Plaintiffs contend only that Tarragon revisited an accounting judgment and corrected that judgment during the class period.

The announcement of this restatement had no impact on Tarragon's stock price. On the business day before the announcement, Tarragon's stock closed at $10.37 per share. Ex. B,

Stock Prices.  On the day of the announcement, Tarragon's stock closed at $10.48 per share. *Id*.

### 3.    *Revenue recognition method*

Finally, Plaintiffs allege that Tarragon improperly inflated its earnings by recognizing revenue from its sales of condominiums using the "percentage of completion" method.  Am. Compl. ¶¶ 45, 49, 52, 54, 86-87.  Thus Plaintiffs claim that Tarragon recognized revenue on condominium sales in certain developments even though it supposedly should have known that the deposits it had collected from buyers would not be sufficient to ensure their commitment.  *Id*. ¶ 86.  According to Plaintiffs, the November 2006 ratification of FASB Emerging Issues Task Force 06-8, *Applicability of a Buyer's Continuing Investment Under FASB Statement No. 66 for Sales of Condominiums* ("EITF 06-8"), underscored the fact that Tarragon was not taking the appropriate steps to conclude that purchasers were fully committed.  *Id*. ¶ 87.

Plaintiffs do not allege whether or to what extent the previous audited financial statements were impacted by this allegedly improper recognition of revenue.  Indeed, for the One Hudson Park project—the project that allegedly triggered Tarragon's "steep descent" in price in July 2007 (Am. Compl. ¶ 95)—the percentage-of-completion method was apparently not in use until mid-2006.  *Id*. ¶ 45.  Thus Grant Thornton's audit opinions for 2004 and 2005 could not possibly have concealed a problem with the revenue recognition for One Hudson Park.

Tarragon never saw a need to restate its financial statements based on its use of the percentage-of-completion method.  Its 2006 annual report, however, reported on the ratification of EITF 06-8 and indicated that Tarragon "may be required, in some cases, to collect additional deposits from the buyer in order to recognize revenue under the percentage of completion method."  *Id*. ¶ 52.  This disclosure did not impact the stock price.  As noted above, Tarragon's stock price remained virtually unchanged when this 10-K was filed.  Ex. B, Stock Prices.

## POINT ONE

**Plaintiffs have failed to plead fraud with particularity under Rule 9(b) and the PSLRA.**

To plead a claim under Section 10(b), Plaintiffs must identify each allegedly misleading statement and explain ***why*** it is misleading. *See* Fed. R. Civ. P. 9(b); PSLRA, 15 U.S.C. § 78u-4(b)(1). Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Plaintiffs cannot meet this standard if they do not allege "circumstances to support their allegation that the allegedly false statements . . . were false at the time made." *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812-13 (2d Cir. 1996) (affirming dismissal). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Communications, Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

Plaintiffs have not met this burden. Once again, their claim is based only on Grant Thornton's audit opinion letters on Tarragon's 2004 and 2005 year-end financial statements, explaining that its audits were performed in accordance with applicable auditing standards and that, in Grant Thornton's opinion, the financial statements presented fairly, in all material respects, Tarragon's financial position in conformity with generally accepted accounting principles ("GAAP"). Am. Compl. ¶¶ 24, 37. These opinions are separate from the financial statements themselves, and Plaintiffs must allege that they were false and misleading in their own right. *Deephaven Private Placement Trading, Ltd. v. Grant Thornton LLP*, 454 F.3d 1168, 1174 (10th Cir. 2006) (auditors do not, "by virtue of auditing a company's financial statements, somehow make, own, or adopt the assertions contained therein"). Accordingly, the fact that the financial statements themselves were later restated does not prove that the audit opinions were false and misleading. *Id.* at 1176 ("Simply alleging, as Investors do, that GAAP violations in

1999 financial statements rendered [the audit] opinion materially false or misleading is inadequate"). Plaintiffs must allege either that Grant Thornton actually held a different opinion at that time than the ones it expressed or that the opinions were false in terms of their "stated basis"—namely, their representation that they were based on audits that complied with GAAS. *Id*. There is no allegation here about what Grant Thornton actually knew or believed. Accordingly, whether and how these opinion letters were false turns on whether and how Grant Thornton's audits failed to comply with applicable auditing standards. *Id*. at 1176-77.

Plaintiffs do not cite a single auditing standard anywhere in their complaint, much less explain how Grant Thornton's audits failed to comply with it. Although Tarragon's financial statements were ultimately restated, Plaintiffs do not allege that either the Ansonia issue or the categorization of cash flows reflected a particular inadequacy in Grant Thornton's audits. In fact—as discussed in detail below—the Ansonia issue involved complex and subjective accounting judgments about which reasonable professionals could disagree. *See infra* Point II.A. And the cash flow issue—about which Plaintiffs say almost nothing—had to do with how the information was organized and not with the ultimate reported change in cash position for the year. *See infra* Point II.B.

Plaintiffs cannot avoid their pleading burden by relying on hearsay and speculation. The only time they mention Grant Thornton's audit work is in a single paragraph that quotes a July 2007 Bloomberg web commentary on a report by the Public Corporation Accounting Oversight Board ("PCAOB") following a routine investigation of Grant Thornton. Am. Compl. ¶ 102. The Bloomberg columnist speculated that certain comments in the PCAOB's report, which had been redacted for public release in accordance with Sarbanes-Oxley's confidentiality requirements, referred to the Ansonia consolidation issue at Tarragon. *Id*. The PCAOB's actual report,

however—which identifies the Grant Thornton client at issue—is privileged and confidential as a matter of statute and cannot be used in this litigation.  *See* 15 U.S.C. §§ 7214(g)(2), 7215(b)(5)(A) ("all documents and information prepared or received by . . . the Board . . . in connection with an investigation . . . shall be confidential and privileged as an evidentiary matter (and shall not be subject to civil discovery or other legal process . . .")).  And, according to the PCAOB itself, an investigative report does not establish the existence of a violation of professional standards.  *See* PCAOB Release No. 104-2004-001 at 7-9, attached as Ex. G to Malin Decl. (PCAOB itself "emphasizes that an inspection report's descriptions of departures from professional standards are not a result of an adversarial adjudicative process and do not constitute conclusive findings of fact or of violations for purposes of imposing legal liability").

Of course, the Bloomberg report is hearsay within hearsay.  And in any case, a Bloomberg commentator's speculation about the contents of the report cannot be used either to short-circuit the statutory privilege or to satisfy Plaintiffs' strenuous pleading burden.  *See SEC v. Tambone*, 473 F. Supp. 2d 162, 166-67 (D. Mass. 2006) (dismissing complaint for failure to plead securities fraud with particularity, because, *inter alia*, the only alleged source of proof of the falsity attributed to the defendants was found in emails that defendants claimed were subject to the attorney-client privilege and were thus inadmissible).  Even if it could be used here, this web commentary is vague and provides no factual support for any suggestion that Grant Thornton's audits failed to comply with GAAS.  Plaintiffs' failure to allege how Grant Thornton's opinion letters were false is, by itself, a sufficient ground for dismissal.

**POINT TWO**

**Plaintiffs' claim against Grant Thornton fails because they
do not allege facts that support a strong inference of scienter.**

To plead scienter in a Section 10(b) case, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In the Second Circuit, a "plaintiff may satisfy this requirement by alleging facts … constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99. As the Supreme Court recently explained, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs*, 127 S. Ct. at 2509. "To qualify as 'strong' within the intendment of § 21 D(b)(2), . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id*. at 2504-05.

Mere allegations that the audited financial statements were not in compliance with GAAP (or even than the audits fell short of GAAS), "without corresponding fraudulent intent," are not sufficient to state a securities fraud claim under Section 10(b). *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996). For recklessness to suffice in a claim against an auditor, the plaintiff's focus must be on the alleged conduct or knowledge *by the auditor*, and that conduct must be "highly unreasonable," representing "an extreme departure from the standards of ordinary care." *Id*. at 269; *see In re Carter Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39-40 (2d Cir. 2000). Plaintiffs must allege actions or omissions by the auditor that "were so deficient that the audit amounted to no audit at all" or "were such that no reasonable [auditor] would have made the same decisions if confronted with the same facts." *SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992). The auditor's conduct must "approximate an actual intent to aid in the

fraud being perpetrated by the audited company." *Rothman*, 220 F.3d at 98.  Moreover, under

*Tellabs*, such an inference of recklessness must be more than plausible or reasonable; it must be

at least as compelling as any opposing inference.  *See In re Bayou Hedge Fund Litig.*, Nos. 06-

MDL-1755 and 06-CV-2943 (CM), 2007 WL 2319127, at *8 (S.D.N.Y. July 31, 2007) (*Tellabs*

standard applies to allegations of recklessness).

Plaintiffs' allegations fall far short of this standard.  At most, Plaintiffs allege that

Tarragon's financial statements contained three accounting errors.  But Plaintiffs do not allege

any facts concerning Grant Thornton's audits or its knowledge of these issues at the time of the

audit opinions.  As explained below, Plaintiffs have failed to allege facts to create any inference

of recklessness, much less a cogent and compelling one.

### A.    The fact that Tarragon's original financial statements did not consolidate Ansonia under FIN 46(R) does not support a strong inference of scienter on Grant Thornton's part.

Plaintiffs claim Tarragon inflated its revenue for 2004 and 2005 by failing to consolidate

Ansonia's results in accordance with FIN 46(R), and that Tarragon's August 2006 restatement

shows that Ansonia should have been consolidated in those years.  Am. Compl. ¶ 72.  But their

complaint is completely devoid of facts showing that Grant Thornton's 2004 and 2005 audits

were substandard in respect to Ansonia, or that Grant Thornton believed or should have known at

the time it gave its audit opinions that Ansonia should have been consolidated but went along

with Tarragon's treatment nevertheless.

FIN 46(R) is a complex accounting standard, and its enactment in 2003 represented a

change in the treatment of investment partnerships.  One auditing firm has described it as "one of

the most complex standards issued to date by the FASB."  Ernst & Young LLP, *Financial*

*Reporting Developments, FASB Interpretation No. 46, Consolidation of Variable Interest*

*Entities* (February 2004).[4]  FIN 46(R) requires that a company determine whether its investment

entity is a "variable interest entity," as that term is defined in the standard itself, and then assess

whether the company is the "primary beneficiary" of that entity.  Am. Compl. ¶¶ 73-74; Ex. C,

FIN 46(R) ¶¶ 5, 14-15.  Both of the these inquiries involve multiple factors that require

qualitative analyses and substantial judgment calls.  The "variable interest entity" test, for

example, includes examination of the following factors (which have additional sub-factors or

inquiries):

- whether the equity investment at risk is not sufficient to permit the entity to finance
  its own activities without additional subordinated financial support from the investors
  (Ex. C, FIN 46(R) at ¶ 5(a));

- whether the equity investors lack one of the essential characteristics of a controlling
  financial interest  (*id.* at ¶ 5(b)); and

- whether the equity investors have voting rights that are not proportionate to their
  economic interests, and the activities of the entity involve or are conducted on behalf
  of an investor with a disproportionately small voting interest (*id.* at ¶ 5(c)).

Accordingly, the decision to consolidate Ansonia under this standard was one on which

reasonable professionals could disagree. Ex. C, FIN 46(R).  In fact, when the FASB adopted FIN

46(R), two of the seven FASB members expressed their concern that it was likely to be applied

differently by similarly situated companies.  *See* Ex. C, FIN 46(R) at 18.  In a dissenting

statement, FASB members Batavick and Seidman cautioned:

> The Board is aware that different approaches exist that result in different
> conclusions about whether an entity is a variable interest entity and also whether
> the reporting entity is the primary beneficiary.  Mr. Batavick and Ms. Seidman
> find it troubling that entities with the same contractual structures could reach
> different conclusions about whether the entity is a variable interest entity and who
> should consolidate it.  [*Id.*]

---

[4]  *See* http://www.securitization.net/pdf/ey_fin46consolidation_Feb04.pdf (excerpts attached as Ex. H to Malin
Decl.).

Plaintiffs have not alleged any facts that would show that the decision not to consolidate Ansonia in 2004 and 2005 was anything but a good-faith professional judgment in applying this complex and, in some respects, subjective standard.  In claiming that Ansonia met this standard, Plaintiffs allege only that Tarragon had a general partnership interest of approximately 90% and that "the remaining limited partnership interest in Ansonia was held primarily by individuals who were directly or indirectly related to Tarragon as officers and/or directors of the Company." Am. Compl. ¶ 78.  Under FIN 46(R), however, neither of these factors is dispositive.  *See* Ex. C, FIN 46(R) ¶¶ 5, 14-15.

Moreover, the fact that FIN 46(R) was only adopted in December 2003 and was not a long-standing, well recognized rule at the time of the 2004 and 2005 audits also weighs against a strong inference of recklessness.  *See Funke v. Life Fin. Corp.*, 237 F. Supp. 2d 458, 468 (S.D.N.Y. 2002) (dismissing § 10b claim for failure to allege scienter in connection with alleged accounting violation in part because "the accounting principle on which plaintiffs rely was not a long-standing, well-recognized rule").  And as discussed above, Plaintiffs cannot satisfy their pleading burden by relying on the speculation of a Bloomberg commentator about the contents of a PCAOB report that is privileged and inadmissible by operation of statute.  *See* Am. Compl. ¶ 102; *supra* Point One.

> **B.     The fact that Tarragon restated its cash flows does not support a strong inference of scienter.**

Plaintiffs' allegations about the restatement of cash flows do not come any closer to supporting a strong inference of Grant Thornton's scienter.  As noted above, Plaintiffs allege that Tarragon did not properly classify its cash inflows and outflows into operating, investing, or financing activities in accordance with FASB SFAS No. 95.  Am. Compl. ¶¶ 81-83.  Tarragon later restated its financial statements to correct this problem (*id*. ¶ 50)—with no effect on the

market price of its stock (*see infra* Point III).  Plaintiffs do not allege that these recategorizations

had any impact on Tarragon's overall financial reporting or the investing public.  In fact, as

Tarragon's SEC filings made clear, these restatements changed only the categories into which

these cash flows were listed and not the total net change in cash,  Ex. E, April 2, 2007 Form 8-K

at 2.  And in any event, an allegation that a particular accounting treatment did not comply with

GAAP and had to be changed is not, by itself, sufficient to support a strong inference of scienter.

*Chill*, 101 F.3d at 270.  With respect to the cash flow issue, Plaintiffs have not even attempted to

allege any facts that show that Grant Thornton's audits were so insufficient that they

"approximate an actual intent to aid in [a] fraud being perpetrated by the audited company."

*Rothman*, 220 F.3d at 98 (citations omitted).

> **C.**    **The fact that Tarragon used percentage-of-completion accounting for certain projects does not support a strong inference of scienter.**

Plaintiffs also have set forth no facts to support an inference of Grant Thornton's scienter

with regard to Tarragon's supposedly improper use of the "percentage of completion" method

for recognizing revenue from condominium sales for certain development projects.  Am. Compl.

¶¶ 86-87, 43-45, 47-49, 51-52, 54, 56.  Indeed, it is difficult to tell from the complaint exactly

how Plaintiffs believe Tarragon's revenue recognition was in error.

Plaintiffs have not alleged any facts showing whether or how Grant Thornton was

reckless or even negligent in its audits of this aspect of Tarragon's financial statements.  In fact,

because EITF 06-8 was not ratified until November 2006, well after Grant Thornton gave its

2004 and 2005 audit opinions, Tarragon's use of the percentage-of-completion method under

that standard could not have been an issue in either of the audits relevant to this case.  Similarly,

the 2004 and 2005 audits could not have addressed the use of this method for One Hudson Park,

which apparently did not begin using it until mid-2006.  Am. Compl. ¶ 45.  Thus Plaintiffs'

allegations about this issue do not come close to the strong inference of scienter required to support their claim against Grant Thornton.

> ### D. Plaintiffs have failed to allege any inference of scienter, much less an inference that is cogent and at least as compelling as any opposing inference.

Finally, looking at Plaintiffs' allegations as a whole, the Court must consider plausible, non-fraudulent inferences from these alleged facts. *See Tellabs*, 127 S. Ct. at 2504-05. It is not only plausible but extremely likely that the accounting "errors" Plaintiffs allege were the result of good faith judgments in applying complex accounting principles—some of which were later revisited, changed, and promptly disclosed to the market. Such general allegations of accounting "errors," "without corresponding fraudulent intent," do not suffice to state a securities fraud claim. *Rothman*, 220 F.3d at 98; *Chill*, 101 F.3d at 270. Plaintiffs have therefore fallen far short of the requirement that they plead facts sufficient to support an inference of scienter that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 127 S. Ct. at 2504-05.

## POINT THREE

### Plaintiffs have failed to plead loss causation.

Even if they could meet the elements of falsity and scienter, Plaintiffs would still "have the burden of proving that the act or omission of the defendant . . . caused the loss for which [they] seek to recover damages." 15 U.S.C. § 78u-4(b)(4). Plaintiffs must specifically plead "a causal connection between the material misrepresentation and the loss" they allegedly suffered. *Dura*, 544 U.S. at 342. In so doing, the complaint "must allege facts that support an inference that [defendant's conduct] concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent fraud." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005) (affirming dismissal of

17

securities fraud claim for failure to plead loss causation); *see also Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007) (complaint must allege sufficient facts to make the claim at least "plausible").  Plaintiffs must assert that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell*, 396 F.3d at 173; *see also Dura*, 544 U.S. at 347 (plaintiffs must allege that the "share price fell significantly after the truth became known").  This requirement reflects the fact that the securities laws serve to protect against those economic losses that misrepresentations actually cause, not "to provide investors with broad insurance" against market losses.  544 U.S. at 345.

Plaintiffs' allegations against Grant Thornton fall far short of this burden.  While Plaintiffs have focused on the "steep descent" in Tarragon stock in July and August 2007 (*see* Am. Compl. ¶¶ 92-97 (allegations regarding "loss causation")), they do not and cannot plead that their losses were caused by any fact concealed by Grant Thornton's audit opinions on Tarragon's financial statements for 2004 and 2005.

### A.    Plaintiffs fail to allege that Grant Thornton's audit opinions artificially inflated the price of Tarragon stock.

In the first place, Plaintiffs do not allege that Grant Thornton's audit opinions had any positive or inflationary impact on the stock price.  *See* Am. Compl. ¶¶ 24, 37.  As the Supreme Court has made clear, loss causation in a stock case requires a connection between the alleged misrepresentation and both price inflation ***and*** price decline.  *Dura*, 544 U.S. at 342.  Moreover, in a case involving an outside auditor, a plaintiff must allege that any losses were caused by the auditor's alleged misrepresentation, separate and apart from misrepresentations allegedly made by any other defendant.  *See Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 158 (2d Cir. 2007) (considering whether an auditor caused a plaintiff's loss separately from the question of whether an issuer caused the loss).

Plaintiffs' only specific allegations about the stock price going *up* relate to an announcement by the Company itself on January 5, 2005, two months before Grant Thornton issued the first relevant audit opinion.  Am. Compl. ¶ 21.  Thus while Plaintiffs aver generally that statements by *all* defendants "caused Tarragon stock to trade at artificially inflated levels during the Class Period" (s*ee id*. ¶ 94), the only specific allegation they make has to do with a statement by Tarragon alone.  If Grant Thornton's audit opinions did not cause any price inflation, they cannot possibly have caused any loss.  This alone is a sufficient basis for dismissing the claim against Grant Thornton.

**B.      Plaintiffs fail to allege that the price of their stock declined because of any fact effectively "concealed" by the 2004 and 2005 audit opinions.**

Even if Plaintiffs could link Grant Thornton to some artificial inflation, they cannot tie the stock decline in 2007 to any information that should have been disclosed by Grant Thornton back in 2004 and 2005—the only years to which Grant Thornton's alleged misstatements relate.  Plaintiffs admit that the "steep descent" in the stock price that began in July 2007 was the result of events in 2007—when the real estate market as a whole was deteriorating.  And more specifically, Plaintiffs cannot establish loss causation based on any of the specific accounting errors they allege.

**1.      Plaintiffs do not and cannot allege that any facts concealed by the 2004 and 2005 audit opinions caused the "steep descent" of Tarragon stock in 2007.**

Plaintiffs contend that Tarragon's stock price began its "steep descent" in July 2007, when adverse information concerning the viability of One Hudson Park, an ongoing construction project, "began to leak to the investing public."  Am. Compl. ¶ 95.  And they acknowledge that the stock price drop that marks the end of the class period followed announcements by the Company relating to the deterioration of the homebuilding industry and real estate credit markets

and its impact on Tarragon's liquidity. *Id*. ¶¶ 60-62, 95-97. Plaintiffs have not alleged that those announcements revealed any "relevant truth" that dated back to 2004 and 2005 and was concealed by Grant Thornton's audit opinions. To the contrary, Plaintiffs' allegations make clear that the problems with Tarragon's liquidity, debt covenants, and projections all emerged in 2007. *Id*. ¶¶ 60-67. And while Plaintiffs do make vague allegations of a problem with the method of revenue recognition for the One Hudson Park project, Tarragon did not begin using that particular method for One Hudson Park until mid-2006—after the last alleged misstatement by Grant Thornton in this case. *Id*. ¶ 45.

The fact that the decline in Tarragon's stock price coincided with a marketwide decline effectively heightens Plaintiffs' pleading burden. As the Second Circuit explained in *Lentell*:

> [W]hen the plaintiffs' loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases," and a plaintiff's claim fails when "it has not adequately plead[ed] facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events."

396 F.3d at 174 (quoting *First Nat'l Bank v. Gelt Funding Corp*., 27 F.3d 763, 772 (2d Cir. 1994)). In *Lentell*, the Court upheld the dismissal of claims against an investment bank for issuing misleading research reports regarding securities of companies whose stock prices declined when the internet bubble burst because the plaintiffs failed to allege "facts sufficient to support an inference that it was defendant's fraud – rather than other salient factors – that proximately caused plaintiff's loss." 396 F.3d at 177; *see also Dura*, 544 U.S. at 343 (because of "the tangle of factors affecting price," the cause of price declines resulting in losses must be pleaded and proved).

The principle in *Lentell* squarely applies here. There is no dispute that the real estate credit market dropped sharply in mid-2007. Plaintiffs' own allegations prove this point. Am. Compl. ¶ 60 (quoting August 9, 2007 Tarragon Press Release) ("Tarragon is currently

20

experiencing liquidity issues caused by the sudden and rapid deterioration in the real estate credit markets"; "Tarragon's business had been adversely affected by the continuing and accelerated deterioration of the homebuilding industry in the markets in which Tarragon operates"); *see also id*. ¶¶ 61, 62, 95, 97.  Plaintiffs do not attempt to tie these disclosures—or the impact of market forces on Tarragon—to any weakness or "relevant truth" concealed by Tarragon's financial statements in previous years.  Thus Plaintiffs cannot plausibly contend that Grant Thornton's audit opinions "caused" them to suffer a decline in the price of their shares in 2007.

### 2.    The Ansonia restatement did not cause Plaintiffs' losses.

Perhaps recognizing the disconnect between their losses in 2007 and the audit opinions relating to 2004 and 2005, Plaintiffs also claim that the Ansonia restatement represented an early leak or "partial disclosure," causing a dip in Tarragon's stock price one year earlier.  *Id*. ¶¶ 40-41, 95.  On August 9, 2006, Tarragon issued a press release stating:

> Tarragon . . . today announced that it is reviewing its earlier determination that it was required to treat Ansonia Apartments, LP (Ansonia) as an unconsolidated partnership for financial reporting purposes.  The review relates only to the interpretation of existing accounting literature and does not involve any new facts and circumstances.
>
> *            *            *
>
> . . . If the Company concludes that it is required to consolidate Ansonia, the Company will be required to restate certain prior period financial statements.  There would be no impact on income or revenue for the homebuilding division.

*Id*. ¶ 40.  Plaintiffs further allege that following this announcement, Tarragon's stock declined "from above $11 per share to less than $10 per share."  *Id*. ¶¶ 41, 95.

As an initial matter, this announcement did not disclose a fraud.  At best, it suggested the possibility that Tarragon *might* restate prior financial statements.  While loss causation may be established where the market reacts negatively to a corrective disclosure regarding the falsity of a prior statement, there is no "corrective disclosure" if the market does not become aware of the

statement's falsity.  *Lentell*, 396 F.3d at 175 n.4 (analyst's downgrade of stock, which negatively impacted the stock price, was not a corrective disclosure because it did not reveal to the market the falsity of the earlier rating); *see also In re AOL Time Warner Sec. Litig.*, 503 F. Supp. 2d 666, 679-80 (S.D.N.Y. 2007) (while each disclosure "notes some concern about [defendant's] accounting, none of them 'amount[s] to a corrective disclosure. . . because they do not reveal to the market the falsity of the prior' [firm's] opinion") (quoting *Lentell*, 396 F.3d at 175 n.4).

Here, the August 9, 2006 press release did not reveal any falsity in Tarragon's prior audited financial statements (much less in the audit opinions) and thus cannot be considered "corrective."  It was not until August 23, 2006, that Tarragon disclosed that the Company ***would*** consolidate Ansonia's operations with its own and would therefore restate its financial statements for the years 2004 and 2005.  Am. Compl. ¶ 42.  But Plaintiffs do not allege any significant market reaction to the disclosure on August 23.[5]

Further, the Ansonia consolidation itself did not reveal significant new information to the market.  Rather, it was primarily "a recharacterization of previously disclosed facts," which "cannot qualify as a corrective disclosure."  *See In re Omnicom Group, Inc. Securities Litig.*, No. 02 Civ. 4483 (WHP), 2008 WL 243788, at *6 (S.D.N.Y. Jan. 29, 2008) (citing *Teachers' Retirement Sys. of La. v. Hunte*r, 477 F.3d 162, 187 (4th Cir. 2007) (affirming dismissal of securities fraud action for, *inter alia*, failure to plead loss causation because corrective disclosure "disclose[d] nothing new, but merely attribute[d] an improper purpose to the previously disclosed facts")); *see also Joffee v. Lehman Bros., Inc.*, 410 F. Supp. 2d 187, 191 (S.D.N.Y. 2006) (dismissing securities fraud action where "each of the matters that Plaintiffs claim [Defendant] failed to disclose had, in fact, been disclosed to the market"), *aff'd*, 209 Fed. Appx.

---

[5]  Tarragon's closing stock price on August 22, 2006 was $9.57 per share, and on August 23, 2007, it was $9.26 per share.  *See* Ex. B, Stock Prices.

80, 2006 WL 3780547, at *1 (2d Cir. Dec. 19, 2006). Tarragon's 2005 Form 10-K, filed on

March 16, 2006, disclosed detailed financial information regarding Ansonia, including

information about the extent of Tarragon's involvement and control. Ex. D, 2005 Form 10-K at

83-87. Thus while the consolidation did reflect Tarragon's judgment (in consultation with Grant

Thornton) that the two entities' results should be combined under the new, complex standard,

Ansonia's unconsolidated results and its connection to Tarragon had already been disclosed.

Finally, the dip in stock price in August 2006 is entirely disconnected from the steep

descent in the price almost a year later. *See* Am. Compl. ¶¶ 95-97 (disingenuously suggesting a

connection between the two). In fact, by the end of November 2006, Tarragon's stock price had

regained all the ground it lost in August 2006 and then some, reaching higher than $12 a share.

Ex. B, Stock Prices. That further undermines any effort by Plaintiffs to link the losses they

ultimately suffered with any alleged misstatement relating to Ansonia in 2004 and 2005.

### 3.      The cash flow restatement did not cause Plaintiffs' losses.

Even if they could somehow prove that Grant Thornton knowingly or recklessly

concealed the alleged miscategorization of Tarragon's cash flows, that issue too did not cause

Plaintiffs any harm. As noted above, the restatement of Tarragon's cash flows related only to

how they were characterized among different activities—not to the Company's total net change

in cash for the period. Both Tarragon's April 2, 2007 Form 8-K and its 2006 Form 10-K (also

filed on April 2, 2007) made clear that the "restatement does not affect the net change in cash for

either of the years ended December 31, 2005 and 2004 and has no impact on [Tarragon's]

consolidated balance sheets, consolidated statements of income and related earnings per share

amounts or consolidated statements of stockholders' equity." Ex. E, April 2, 2007 Form 8-K at

2; Ex. F, 2006 Form 10-K at 117.

The cash flow issue was the subject of a complete corrective disclosure that had no impact at all on the stock price. *Id.* Further, Tarragon's 2006 Form 10-K—in Grant Thornton's audit opinion on management's assessment—also explained that the restatement of cash flows was made necessary in part because Tarragon did not maintain effective internal control over financial reporting for the years 2004 and 2005:

> The Company's financial and accounting organization was not adequate to support its financial reporting requirements. The financial and accounting organization is too dependent on a few key personnel. There is not a sufficient complement of personnel with an appropriate level of accounting experience and training in the application of generally accepted accounting principles consistent with the level and complexity of the Company's operations. This control deficiency contributed to the errors requiring the restatement of the Company's statements of cash flows for the years 2004 and 2005.

Ex. F, 2006 Form 10-K at 124. The section in Tarragon's 2006 Form 10K entitled "Management's Report on Internal Control over Financial Reporting" describes Tarragon's insufficient controls with even stronger language, explaining that the restatement "resulted" from the internal control deficiency. *Id.* at 123.

Thus with regard to both cash flow and internal controls, the 2006 Form 10-K disclosed all the "relevant truth"—without any resulting decline in the stock price. On the business day before the announcement, Tarragon's stock closed at $10.37 per share. Ex. B, Stock Prices. On the day of the announcement, Tarragon's stock closed at $10.48 per share. *Id.* The "steep descent" in stock price did not begin until several months later, following disclosures about the viability of the One Hudson Park project. Am. Compl. ¶ 95. Thus Plaintiffs cannot establish loss causation based on any error relating to Tarragon's cash flows.

### 4.    The revenue recognition issue did not cause Plaintiffs' losses.

Finally, Plaintiffs have not alleged any connection between their losses and the revenue recognition issue. As noted above, Tarragon did not begin using the "percentage-of-completion"

method on the One Hudson Park project until mid-2006, so this issue cannot be linked to the audited financial statements for 2004 or 2005.  Moreover, in April 2007, Tarragon disclosed that under the new standard, it might be required to collect additional deposits from buyers in order to recognize revenue using the percentage of completion method.  Am. Compl. ¶ 52.  That disclosure, like the cash flow disclosure on the same day, had no impact on the stock price.  Ex. B, Stock Prices.  Thus on this basis as well, Plaintiffs' losses in July and August 2007 cannot be linked to any supposedly false statement by Grant Thornton.

## **CONCLUSION**

For all these reasons, Plaintiffs have not come close to meeting the strenuous pleading requirements for a claim under Section 10(b).  Plaintiffs have not alleged a false statement with particularity, they have not pleaded facts sufficient to support a compelling inference of Grant Thornton's scienter, and they cannot link the stock losses they suffered in 2007 with the alleged misstatements by Grant Thornton in its audit opinions years earlier.  Grant Thornton therefore respectfully asks the Court to dismiss the claim against it with prejudice.

Dated: April 4, 2008
     New York, New York                 Respectfully submitted,

                                     WINSTON & STRAWN LLP

                                _____/s/_____
                                  Luke A. Connelly (LC-8462)
                                  Jennifer L. Malin (JM-6963)
                                  200 Park Avenue
                                  New York, New York  10166
                                  (212) 294-6700

                                  Bradley E. Lerman
                                  Linda T. Coberly
                                  35 West Wacker Drive
                                  Chicago, Illinois  60601
                                  (312) 558-5600
                                  *Attorneys for Grant Thornton LLP*