# EXHIBIT C



**PCAOB**

Public Company Accounting Oversight Board

1666 K Street, N.W.
Washington, DC 20006
Telephone: (202) 207-9100
Facsimile: (202) 862-8430
www.pcaobus.org

# Report on

# 2006 Inspection of Grant Thornton LLP

Issued by the

# Public Company Accounting Oversight Board

**June 28, 2007**

---

**THIS IS A PUBLIC VERSION OF A PCAOB INSPECTION REPORT**

**PORTIONS OF THE COMPLETE REPORT ARE OMITTED
FROM THIS DOCUMENT IN ORDER TO COMPLY WITH
SECTIONS 104(g)(2) AND 105(b)(5)(A)
OF THE SARBANES-OXLEY ACT OF 2002**

---

PCAOB RELEASE NO. 104-2007-088

PCAOB Release No. 104-2007-088



PCAOB
Public Company Accounting Oversight Board

## Preface to Reports Concerning Annually Inspected Firms

The Sarbanes-Oxley Act of 2002 requires the Public Company Accounting Oversight Board ("PCAOB" or "the Board") to conduct an annual inspection of each registered public accounting firm that regularly provides audit reports for more than 100 issuers. The Board's report on any such inspection includes this preface to provide context for information in the public portion of the report.

A Board inspection includes, among other things, a review of selected audits of financial statements and of internal control over financial reporting. If the Board inspection team identifies deficiencies in those audits, it alerts the firm to the deficiencies during the inspection process. Deficiencies that exceed a certain significance threshold are also summarized in the public portion of the Board's inspection report. The Board encourages readers to bear in mind two points concerning those reported deficiencies.

First, inclusion in an inspection report does not mean that the deficiency remained unaddressed after the inspection team brought it to the firm's attention. Under PCAOB standards, a firm must take appropriate action to assess the importance of the deficiency to the firm's present ability to support its previously expressed audit opinions. Depending upon the circumstances, compliance with these standards may require the firm to perform additional audit procedures, or to inform a client of the need for changes to its financial statements or reporting on internal control, or to take steps to prevent reliance on previously expressed audit opinions. A Board inspection does not typically include review of a firm's actions to address deficiencies identified in that inspection, but the Board expects that firms are attempting to take appropriate action, and firms frequently represent that they have taken, are taking, or will take, action. If, through subsequent inspections or other processes, the Board determines that the firm failed to take appropriate action, that failure may be grounds for a Board disciplinary sanction.

Second, the Board cautions against drawing conclusions about the comparative merits of the annually inspected firms based on the number of reported deficiencies in any given year. The total number of audits reviewed is a small portion of the total audits performed by these firms, and the frequency of deficiencies identified does not necessarily represent the frequency of deficiencies throughout the firm's practice. Moreover, if the Board discovers a potential weakness during an inspection, the Board may revise its inspection plan to target additional audits that may be affected by that weakness, and this may increase the number of deficiencies reported for that firm in



that year. Such weaknesses may emerge in varying degrees at different firms in different years.

During 2006, the Board's inspection process focused on how efficiently the annually inspected U.S. firms performed audits in the second year of implementation of Auditing Standard No. 2, *An Audit of Internal Control over Financial Reporting Performed in Conjunction with an Audit of Financial Statements* ("AS No. 2"). As described in Appendix B to this report, the inspection process occurred at three levels: (1) meetings with senior firm leadership, (2) national office inspection procedures, and (3) inspection procedures for audits of accelerated filers. In general, the Board's inspection teams observed that the firms achieved increased efficiencies as compared to the first year of implementation of AS No. 2. Nonetheless, the Board's inspection teams believed that, in many of these engagements, there were additional opportunities for the auditors to achieve efficiencies in the implementation of AS No. 2. Those observations have been discussed with the firms, and the Board expects that those discussions are contributing to changes to methodology, additional firm training and guidance, and more rigorous discussions with issuers about ways in which firms and issuers can work together to make audits more efficient.

PCAOB Release No. 104-2007-088


Public Company Accounting Oversight Board

---

### Notes Concerning this Report

1. Portions of this report may describe deficiencies or potential deficiencies in the systems, policies, procedures, practices, or conduct of the firm that is the subject of this report. The express inclusion of certain deficiencies and potential deficiencies, however, should not be construed to support any negative inference that any other aspect of the firm's systems, policies, procedures, practices, or conduct is approved or condoned by the Board or judged by the Board to comply with laws, rules, and professional standards.

2. Any references in this report to violations or potential violations of law, rules, or professional standards should be understood in the supervisory context in which this report was prepared. Any such references are not a result of an adversarial adjudicative process and do not constitute conclusive findings of fact or of violations for purposes of imposing legal liability. Similarly, any description herein of a firm's cooperation in addressing issues constructively should not be construed, and is not construed by the Board, as an admission, for purposes of potential legal liability, of any violation.

3. Board inspections encompass, among other things, whether the firm has failed to identify departures from U.S. Generally Accepted Accounting Principles ("GAAP") or Securities and Exchange Commission ("SEC" or "Commission") disclosure requirements in its audits of financial statements. This report's descriptions of any such auditing failures necessarily involve descriptions of the related GAAP or disclosure departures. The Board, however, has no authority to prescribe the form or content of an issuer's financial statements. That authority, and the authority to make binding determinations concerning an issuer's compliance with GAAP or Commission disclosure requirements, rests with the Commission. Any description, in this report, of perceived departures from GAAP or Commission disclosure requirements should not be understood as an indication that the Commission has considered or made any determination regarding these issues unless otherwise expressly stated.

PCAOB Release No. 104-2007-088



**PCAOB**
Public Company Accounting Oversight Board

## 2006 INSPECTION OF GRANT THORNTON LLP

In 2006, the Board conducted an inspection of Grant Thornton LLP ("Grant" or "the Firm"). The Board is today issuing this report of that inspection in accordance with the requirements of the Sarbanes-Oxley Act of 2002 ("the Act").

The Board is making portions of the report publicly available. Specifically, the Board is releasing to the public Part I of the report, Appendix B, and portions of Appendix C. Appendix B provides an overview of the inspection process. Appendix C includes the Firm's comments, if any, on a draft of the report.[1]

The Board has elsewhere described in detail its approach to making inspection-related information publicly available consistent with legal restrictions.[2] A substantial portion of the Board's criticisms of a firm (specifically criticisms of the firm's quality control system), and the Board's dialogue with the firm about those criticisms, occurs out of public view, unless the firm fails to make progress to the Board's satisfaction in addressing those criticisms. In addition, the Board generally does not disclose otherwise nonpublic information, learned through inspections, about the firm or its clients. Accordingly, information in those categories generally does not appear in the publicly available portion of an inspection report.

---

[1] The Board does not make public any of a firm's comments that address a nonpublic portion of the report. In addition, pursuant to section 104(f) of the Act, 15 U.S.C. § 7214(f), and PCAOB Rule 4007(b), if a firm requests, and the Board grants, confidential treatment for any of the firm's comments on a draft report, the Board does not include those comments in the final report at all. The Board routinely grants confidential treatment, if requested, for any portion of a firm's response that addresses any point in the draft that the Board omits from, or any inaccurate statement in the draft that the Board corrects in, the final report.

[2] See Statement Concerning the Issuance of Inspection Reports, PCAOB Release No. 104-2004-001 (August 26, 2004).



PCAOB Release No. 104-2007-088
Inspection of Grant Thornton LLP
June 28, 2007
Page 2

Public Company Accounting Oversight Board

## PART I

## INSPECTION PROCEDURES AND CERTAIN OBSERVATIONS

Members of the Board's inspection staff ("the inspection team") performed an inspection of the Firm from May 2006 through January 2007. The inspection team performed field work at the Firm's National Office and at 13 of its approximately 49 U.S. practice offices.

Board inspections are designed to identify and address weaknesses and deficiencies related to how a firm conducts audits.[3] To achieve that goal, Board inspections include reviews of certain aspects of selected audits performed by the firm and reviews of other matters related to the firm's quality control system. Appendix B to this report provides a description of the steps the inspection team took with respect to the review of audits of financial statements and of internal control over financial reporting and the review of eight functional areas related to quality control.

In the course of reviewing aspects of selected audits, an inspection may identify ways in which a particular audit is deficient, including failures by the firm to identify, or to address appropriately, respects in which an issuer's financial statements do not present fairly the financial position, results of operations, or cash flows of the issuer in conformity with GAAP.[4] It is not the purpose of an inspection, however, to review all of a firm's audits or to identify every respect in which a reviewed audit is deficient. Accordingly, a Board inspection report should not be understood to provide any assurance that the firm's audits, or its issuer clients' financial statements or reporting on internal control, are free of any deficiencies not specifically described in an inspection report.

---

[3]    This focus necessarily carries through to reports on inspections and, accordingly, Board inspection reports are not intended to serve as balanced report cards or overall rating tools.

[4]    When the Board becomes aware that an issuer's financial statements appear not to present fairly, in a material respect, the financial position, results of operations, or cash flows of the issuer in conformity with GAAP, the Board's practice is to report that information to the SEC, which has jurisdiction to determine proper accounting in issuers' financial statements.



PCAOB Release No. 104-2007-088
Inspection of Grant Thornton LLP
June 28, 2007
Page 3

A.    Review of Audit Engagements

The scope of the inspection procedures performed included reviews of aspects of selected audits of financial statements and of internal control over financial reporting performed by the Firm. Those audits and aspects were selected according to the Board's criteria, and the Firm was not allowed an opportunity to limit or influence the selection process. In most cases, the review of the audit of an accelerated filer included a review of aspects of both the Firm's audit of financial statements and its audit of internal control over financial reporting ("ICFR").

In reviewing the audits, the inspection team identified matters that it considered to be audit deficiencies.[5] Those deficiencies included failures by the Firm to identify or appropriately address errors in the issuer's application of GAAP, including, in some cases, errors that appeared likely to be material to the issuer's financial statements. In addition, the deficiencies included failures by the Firm to perform, or to perform sufficiently, certain necessary audit procedures.

In some cases, the conclusion that the Firm failed to perform a procedure may be based on the absence of documentation and the absence of persuasive other evidence, even if the Firm claims to have performed the procedure. PCAOB Auditing Standard No. 3, *Audit Documentation* ("AS No. 3") provides that, in various circumstances including PCAOB inspections, a firm that has not adequately documented that it performed a procedure, obtained evidence, or reached an appropriate conclusion must demonstrate with persuasive other evidence that it did so, and that oral assertions and explanations alone do not constitute persuasive other evidence.[6] For purposes of the inspection, an observation that the Firm did not perform a procedure, obtain evidence, or reach an appropriate conclusion may be based on the absence of such documentation and the absence of persuasive other evidence.

---

[5]    The discussion in this report of any deficiency observed in a particular audit reflects information reported to the Board by the inspection team and does not reflect any determination by the Board as to whether the Firm has engaged in any conduct for which it could be sanctioned through the Board's disciplinary process.

[6]    <u>See</u> AS No. 3, paragraph 9; Appendix A to AS No. 3, paragraph A28.



When audit deficiencies are identified after the date of the audit report, PCAOB standards require a firm to take appropriate actions to assess the importance of the deficiencies to the firm's present ability to support its previously expressed opinions,[7] and failure to take such actions could be a basis for Board disciplinary sanctions. In response to the inspection team's identification of deficiencies, the Firm, in some cases, performed additional procedures or supplemented its work papers, and in some instances, follow-up between the Firm and the issuer led to a change in the issuer's accounting or disclosure practices or led to representations related to prospective changes.[8]

In some cases, the deficiencies identified were of such significance that it appeared to the inspection team that the Firm, at the time it issued its audit report, had not obtained sufficient competent evidential matter to support its opinion on the issuer's financial statements. The deficiencies that reached this degree of significance are described below, on an audit-by-audit basis.

Issuer A

In this audit, the Firm failed in the following respects to obtain sufficient competent evidential matter to support its audit opinion –

- The Firm failed to identify a departure from GAAP that it should have identified and addressed before issuing its audit report. The issuer failed to consolidate a limited partnership in which it had a general partnership interest

---

[7]  See AU 390, *Consideration of Omitted Procedures After the Report Date*, AU 561, *Subsequent Discovery of Facts Existing at the Date of the Auditor's Report* (both included among the PCAOB's interim auditing standards, pursuant to PCAOB Rule 3200T), and PCAOB Auditing Standard No. 2, *An Audit of Internal Control Over Financial Reporting Performed in Conjunction With an Audit of Financial Statements* ("AS No. 2"), ¶ 197.

[8]  The Board inspection process generally did not include review of such additional procedures or documentation, or of such revised accounting, although future Board inspections of the Firm may, as appropriate, include further review of any of these matters.



of almost 90 percent and the remaining limited partnership interest was held primarily by individuals who were directly or indirectly related to the issuer.[9/]

- The Firm failed to perform sufficient audit procedures with respect to the issuer's contract cost accounting. The primary procedures for testing the budget and the estimated project completion costs, which are key inputs into the determination of the amounts of revenue and profit to be recognized, consisted of an analytical procedure on gross margin and an analytical procedure on the comparison of the project's budget to the actual costs plus estimated costs to complete. The analytical procedures, however, did not meet the requirements for substantive analytical procedures as the Firm did not obtain corroboration of management's explanations for unexpected differences.

Issuer B

In the issuer's computation of the rental income to be recognized on a straight-line basis over the terms of its leases (as required by Statement of Financial Accounting Standards ("SFAS") No. 13, *Accounting for Leases*), the issuer excluded some or all of the future rental payments for certain leases, including some leases for which the lessees' rental payments were current. While the Firm tested whether the issuer complied with its own policy, the Firm failed to evaluate the basis for the issuer's policy, including whether the policy was consistent with the issuer's historical experience with the particular types of lessees in question.

Issuer C

In this audit, the Firm failed in the following respects to obtain sufficient competent evidential matter to support its audit opinion –

- The Firm failed to identify a departure from GAAP that it should have identified and addressed before issuing its audit report. SFAS No. 143, *Accounting for Asset Retirement Obligations* ("SFAS No. 143") requires recognition of a liability for an Asset Retirement Obligation ("ARO") in the period in which it is incurred. In calculating its ARO, the issuer excluded

---

[9/]    The issuer has restated its financial statements related to this matter.



certain percentages of its oil and gas wells that it assumed would be sold, with the obligation being assumed by the purchaser. SFAS No. 143 contemplates that an ARO should be recorded regardless of whether there is a possibility that the asset will be sold.

• The issuer records revenue from drilling wells using the percentage-of-completion method based on total estimated cost plus a percentage mark-up. There was no evidence in the audit documentation, and no persuasive other evidence, that the Firm had tested the budget used to estimate total costs. In addition, the Firm failed to test the percentages that the issuer had used to recognize revenue for those wells for which drilling had not been completed.

• The Firm failed to adequately test the prices used in the calculation of the issuer's estimate of accrued production revenue, as the Firm relied on a system-generated report that was not tested.

• The Firm relied on an untested system-generated report for the quarterly production amounts used in the calculation of depletion.

• The issuer consolidated a limited partnership[10] that has a different fiscal year end from the issuer. The Firm failed to test the amounts included in the issuer's consolidated financial statements related to this limited partnership in the following respects:

  • The Firm did not perform sufficient procedures to test revenues and certain expenses. The Firm assessed control risk at the maximum. It did not substantively test certain assertions related to revenues and certain expenses since the analytical procedures it used did not meet the requirements for substantive analytical procedures as the Firm did not set an expectation that was precise enough to provide the desired level of assurance that differences that may be potential material misstatements, individually or when aggregated, would be identified for investigation. Further the Firm used the prior year's balances as a basis for its expectations for the analytical procedures, despite the fact that significant changes had occurred in the limited partnership's business since then. In

---

[10]    Issuer D



**PCAOB**

Public Company Accounting Oversight Board

addition, the Firm did not obtain corroboration of management's explanations for the unexpected differences.

- The Firm failed to test the effectiveness of the limited partnership's cash flow hedges as of the issuer's year end in order to determine the issuer's compliance with SFAS No. 133, *Accounting for Derivative Instruments and Hedging Activities.*

- The Firm's testing of the issuer's proportionate share of the limited partnerships' gas and oil production revenues was not sufficient. While the Firm recalculated the issuer's share of revenues received, it did not trace the gross cash receipts used in the calculation to source documentation, nor did it test the issuer's system-generated report that was used to calculate the proportionate share for completeness and accuracy.

Issuer D

In this audit, the Firm failed in the following respects to obtain sufficient competent evidential matter to support its audit opinion –

- The Firm failed to identify and address the issuer's failure, contrary to the provisions of Codification of Commission Staff Accounting Bulletins, Topic 2.A.6, *Debt Issue Costs,* to expense over the appropriate period certain financing costs that it incurred that were related to a temporary increase in its credit facility.

- The Firm did not perform sufficient procedures to test revenues and certain expenses. The Firm assessed control risk at the maximum. It did not substantively test certain assertions related to revenues and certain expenses since the analytical procedures it used did not meet the requirements for substantive analytical procedures as the Firm did not set an expectation that was precise enough to provide the desired level of assurance that differences that may be potential material misstatements, individually or when aggregated, would be identified for investigation. Further the Firm used the prior year's balances as a basis for its expectations for the analytical procedures, despite the fact that significant changes had occurred in the



**PCAOB**
Public Company Accounting Oversight Board

PCAOB Release No. 104-2007-088
Inspection of Grant Thornton LLP
June 28, 2007
Page 8

issuer's business since then. In addition, the Firm did not obtain corroboration of management's explanations for the unexpected differences.

- The issuer used an outside valuation specialist to value, among other items, the identifiable intangible assets that were acquired in a significant business combination. There was no evidence in the audit documentation, and no persuasive other evidence, that the Firm had tested the underlying financial information and projections that the issuer had provided to the valuation specialist.

- There was no evidence in the audit documentation, and no persuasive other evidence, that the Firm had evaluated the reasonableness of the forecasted data that management had used in calculating incentive compensation.

Issuer E

In this audit, the Firm failed in the following respects to obtain sufficient competent evidential matter to support its audit opinion –

- The Firm failed to appropriately evaluate whether certain entities should have been consolidated in accordance with FASB Interpretation 46(R), *Consolidation of Variable Interest Entities - An Interpretation of ARB No. 51*. Although the Firm evaluated certain hypothetical structures, it did not evaluate the entities' actual structures, nor did it compare the actual structures to the hypothetical structures and assess the effect of any deviations on the accounting treatment.

- There was no evidence in the audit documentation, and no persuasive other evidence, that the Firm had evaluated whether the issuer complied with SFAS No. 144, *Accounting for the Impairment or Disposal of Long-Lived Assets* ("SFAS No. 144") in classifying certain properties as held for sale and the results of operations from those properties as discontinued operations. In addition, the Firm did not test whether the carrying value of the held-for-sale assets was determined in accordance with SFAS No. 144.

- The Firm did not perform adequate substantive procedures related to revenue and expenses for certain real estate activities. The Firm relied on analytical



**PCAOB**

Public Company Accounting Oversight Board

procedures to test these amounts, but the Firm's procedures did not meet the requirements for substantive analytical procedures because the Firm did not investigate certain unexpected variances and did not obtain corroboration of management's explanation of another unexpected variance.

Issuer F

In this audit, the Firm failed to adequately test the existence of loans receivable –

- The Firm restricted its confirmation of loans receivable to those that exceeded a certain amount that the Firm determined, taking into account its assessment of control risk of low. Beyond tests of controls, the Firm's only procedures for testing the existence of the remaining, smaller loans receivable, which represented a significant percentage of the loans receivable balance, were the analytical procedures performed on the entire loan portfolio. The Firm's analytical procedures regarding the entire loan portfolio did not meet the requirements for substantive analytical procedures, as the Firm did not set an expectation that was precise enough to provide the desired level of assurance that differences that may be potential material misstatements, individually or when aggregated, would be identified for investigation. Further, the Firm did not obtain corroboration of management's explanations for unexpected differences.

- There was no evidence in the audit documentation, and no persuasive other evidence, that the Firm had performed adequate tests of controls related to the existence of loans receivable to support its control risk assessment of low. Testing the access controls over the loan system was a significant component of the Firm's testing to support a control risk assessment of low. There was, however, no evidence in the audit documentation, and no persuasive other evidence, that the Firm had tested whether access to the loan system was limited to appropriate personnel based on their department and job responsibilities and whether the access of "super-users" was appropriate, controlled, and monitored.

Issuer G

The issuer designs and manufactures standard and custom equipment. The Firm's work papers indicate that certain accounts receivable balances existed because



**PCAOB**
Public Company Accounting Oversight Board

the customers were withholding a portion of the invoiced amount until the equipment was installed and the customer had accepted it, and any training had occurred. There was no evidence in the audit documentation, and no persuasive other evidence, that the Firm had adequately assessed the effects of these matters in determining whether the issuer's timing of the recognition of revenue with respect to the related sales transactions was appropriate.

Issuer H

The Firm failed to address appropriately a departure from financial reporting requirements before issuing its audit report. The issuer included a significant gain on the sale of an asset in selling and administrative expenses. The only disclosure of this item was in the statement of cash flows. Since the sale was a significant, material non-recurring event, the issuer should have disclosed the gain on the face of the income statement or in the notes to the financial statements, as required by Regulation S-X, Rule 5-03 and SFAS No. 144.

B.    Review of Quality Control System

In addition to evaluating the quality of the audit work performed on specific audits, the inspection included review of certain of the Firm's practices, policies, and procedures related to audit quality. This review addressed practices, policies, and procedures concerning audit performance and the following eight functional areas (1) tone at the top; (2) practices for partner evaluation, compensation, admission, assignment of responsibilities, and disciplinary actions; (3) independence implications of non-audit services; business ventures, alliances, and arrangements; personal financial interests; and commissions and contingent fees; (4) practices for client acceptance and retention; (5) practices for consultations on accounting, auditing, and SEC matters; (6) the Firm's internal inspection program; (7) practices for establishment and communication of audit policies, procedures, and methodologies, including training; and (8) the supervision by U.S. audit engagement teams of the work performed by foreign affiliates on foreign operations of U.S. issuer audit clients. Any defects in, or criticisms of, the Firm's quality control system are discussed in the nonpublic portion of this report and will remain nonpublic unless the Firm fails to address them to the Board's satisfaction within 12 months of the date of this report.

END OF PART I



PCAOB Release No. 104-2007-088
Inspection of Grant Thornton LLP
June 28, 2007
Page 11

PART II, PART III, AND APPENDIX A OF THIS REPORT ARE NONPUBLIC
AND ARE OMITTED FROM THIS PUBLIC DOCUMENT



**PCAOB**
Public Company Accounting Oversight Board

PCAOB Release No. 104-2007-088
Inspection of Grant Thornton LLP
June 28, 2007
Page B–1

## APPENDIX B

## THE INSPECTION PROCESS

The inspection process was designed and performed to provide a basis for assessing the degree of compliance of the Firm with applicable requirements and standards related to auditing issuers. This process included reviews of components of selected issuer audit engagements completed by the Firm. These reviews were intended both to identify deficiencies, if any, in the conduct of those audits and to determine whether the results of those audits indicated deficiencies in the design or operation of the Firm's system of quality control over audits. In addition, the inspection included reviews of the design of, and in some cases the application of, policies and procedures related to certain functional areas of the Firm that could be expected to influence audit quality.

1.    Review of Selected Audit Engagements

The inspection team reviewed aspects of selected audits performed by the Firm. The inspection team chose the engagements according to the Board's criteria. The Firm was not allowed an opportunity to limit or influence the engagement selection process or any other aspect of the review.

For each audit engagement selected, the inspection team reviewed the issuer's financial statements and certain SEC filings. The inspection team selected certain higher-risk areas for review and, at the practice offices, inspected the engagement team's work papers and interviewed engagement personnel regarding those areas. The areas subject to review included, but were not limited to, revenues, reserves or estimated liabilities, derivatives, valuation of intangible assets, business acquisitions, income taxes, consideration of fraud, related party transactions, supervision of work performed by foreign affiliates, and assessment of risk by the audit team. The inspection team also analyzed potential adjustments to the issuer's financial statements that had been identified during the audit but not recorded in the financial statements. For certain selected engagements, the inspection team reviewed written communications between the Firm and the issuer's audit committee. With respect to certain engagements, the inspection team also interviewed the chairperson of the issuer's audit committee.



PCAOB Release No. 104-2007-088
Inspection of Grant Thornton LLP
June 28, 2007
Page B–2

When the inspection team identified a potential issue, it discussed the issue with members of the engagement team.  If the inspection team was unable to resolve the issue through this discussion and any review of additional work papers or other documentation, the inspection team issued a comment form on the matter and the Firm provided a written response to the comment form.  In certain instances, if the inspection team was unable to resolve the issue through these processes, the inspection team requested that the engagement team consult with the Firm's National Office.  In many cases, this process resulted in resolution of the matter, either because the Firm agreed with the position the inspection team had taken and the Firm or the issuer took steps in light of the significance of the error to remedy the exception, or because the Firm was able to provide additional information that effectively addressed the inspection team's concerns.

2.    Efficiency of Implementation of AS No. 2

The inspection team reviewed aspects of the Firm's approach to the implementation of AS No. 2 in light of the provisions of that standard and related Board statements.[11/]  Specifically, inspectors evaluated the Firm's approach to (1) integrating the audit of ICFR with the audit of the financial statements; (2) using a top-down approach to the audit; (3) using a risk-based approach; and (4) using the work of others.

The inspection procedures in this area began with the inspection team, along with senior staff in the Board's Division of Registration and Inspections and Office of the Chief Auditor, meeting with members of the Firm's leadership to hear the Firm's perspective on whether and how it had achieved efficiencies in ICFR audits.  The inspection team then reviewed the Firm's methodology, tools, and training to determine if those methodology, tools, and training were designed to effectively achieve appropriate efficiencies.  This evaluation was followed by a review of aspects of specific ICFR audits.  For each audit of an accelerated filer that was the subject of an engagement review, the inspection team assessed the efficiency of the ICFR audit with respect to at least one of the four aspects identified above.  The inspection team then met with members of the Firm's leadership to discuss observations from the specific

---

[11/]    See PCAOB Release No. 2005-009, *Policy Statement Regarding Implementation of [AS No. 2]* (May 16, 2005); PCAOB Release No. 2005-023, *Report on the Initial Implementation of [AS No. 2]* (Nov. 30, 2005); see also Staff Questions and Answers, *Auditing Internal Control Over Financial Reporting* (May 16, 2005).



**Public Company Accounting Oversight Board**

engagement reviews and to provide other feedback relating to the Firm's methodology, tools, and training. The feedback was provided during the course of the inspection field work to facilitate the Firm's ability to use that feedback in ongoing and future ICFR audits.

3.    Review of Eight Functional Areas

The inspection team conducted the review of the eight functional areas both to identify possible defects in the Firm's system of quality control and, where applicable, to update the Board's knowledge of the Firm's policies and procedures in the functional areas. A more detailed description of the scope with respect to each of the eight functional areas follows.

a.    Review of Partner Evaluation, Compensation, Admission, Assignment of Responsibilities, and Disciplinary Actions

The inspection team reviewed the Firm's policies and procedures related to partner evaluation, partner compensation, nomination and admission of new partners, assignment of responsibilities, disciplinary actions, and termination of partners. The objective of the inspection procedures was to assess whether the design of these processes, as documented and communicated, could be expected to encourage an appropriate emphasis on audit quality and technical competence, as compared to marketing or other activities of the Firm.

The inspection team interviewed members of the Firm's leadership in its National Office, as well as members of leadership and audit partners in practice offices, regarding these topics. In addition, the inspection team analyzed schedules provided by the Firm that detailed information on each partner, including the partner's office location, recent evaluation history, and compensation history. The inspection team also reviewed a sample of partners' personnel files, including files of newly admitted partners, partners who resigned or took early retirement, and partners who received bonus compensation.

b.    Review of Independence Policies

The objectives of the inspection procedures in this area included evaluating the Firm's policies and procedures relating to its compliance with independence requirements with respect to the provision of non-audit services to issuer audit clients;



Firm participation in business ventures, alliances, and arrangements; commissions and contingent fee arrangements; personal financial interests and the relationships of Firm professionals with issuer audit clients; and the provision of non-audit services related to issuer audit clients' compliance with Section 404 of the Act.   To accomplish these objectives, the inspection team reviewed the Firm's policies, procedures, guidance, and training materials pertaining to these independence matters.   The inspection team also reviewed the Firm's internal inspection program as it relates to monitoring compliance with the Firm's independence policies and procedures; tested the Firm's independence consultation process; and reviewed information concerning the Firm's existing business ventures, alliances, and arrangements, as well as the Firm's process for establishing such enterprises.   The inspection team also interviewed numerous National Office and practice office personnel regarding the Firm's independence policies, practices, and procedures.

At the practice offices, the inspection team selected a sample from the engagements it reviewed and, for that sample, reviewed relevant information to identify any non-audit services performed for the issuer, including whether any of the services involved commissions or contingent fee arrangements; to determine whether the fees for the services provided were classified appropriately in the issuer's proxy statement; and to determine whether the issuer was involved in any business ventures, alliances, or arrangements with the issuer.   In addition, for the sample, the inspection team read and evaluated the most recent letter pursuant to Independence Standards Board Standard No. 1, *Independence Discussions with Audit Committees*.

c.     Review of Client Acceptance and Retention Policies

The objectives of the inspection procedures in this area were to evaluate whether the Firm's client acceptance and retention policies and procedures reasonably assure that it is not associated with issuers whose management lacks integrity, that it undertakes only engagements within its professional competence, and that it appropriately considers the risks involved in accepting and retaining clients in the particular circumstances.   Toward those objectives, the inspection team reviewed the Firm's policies, procedures, and forms related to client acceptance and continuance; evaluated documentation related to new clients and to clients that had recently changed auditors from the Firm; and interviewed members of the Firm's leadership.

At the practice offices, the inspection team selected a sample from the engagements it reviewed and, for that sample, evaluated whether the client acceptance



or continuance documentation was completed and approved in accordance with Firm policies; interviewed the audit partners and managers on these engagements concerning the reasons for accepting the issuer as a client or continuing to serve the issuer, the approval process, and whether specific risk mitigation steps were performed and documented in response to any identified risks; and assessed whether the audit planning documentation incorporated the specific actions, if any, contemplated in response to any identified risks.

     d.     Review of Practices for Consultations

The objective of the inspection procedures in this area was to assess the Firm's compliance with professional requirements regarding consultations on accounting, auditing, and SEC matters. Toward this objective, the inspection team gained an understanding of and evaluated the Firm's policies and procedures relating to its consultation process. The inspection team also reviewed a sample of consultations that occurred during the inspection period to evaluate the effectiveness of the Firm's consultation process, the Firm's compliance with its policies and procedures, whether the conclusions were in accordance with professional standards, and whether the engagement teams acted in accordance with the conclusions.

     e.     Review of Internal Inspection Program

The objectives of the inspection procedures in this area were to evaluate the effectiveness of the Firm's annual internal inspection program in enhancing audit quality, as well as to assess the Firm's compliance with the quality control standards adopted by the Board. To meet those objectives, the inspection team reviewed policies, procedures, guidance, and forms related to the Firm's internal inspection program, documentation of the results of the current year's inspection program, and steps the Firm took in response to those results. The inspection team also interviewed the Firm's leadership concerning the process and effectiveness of its internal inspection program.

The inspection team reviewed and tested the conduct of the internal inspection program by performing reviews of certain engagements on which the Firm had conducted internal inspections. These procedures included evaluating the qualifications of the Firm's inspectors, reading the inspectors' comments, and interviewing both area leadership and selected audit personnel concerning the internal inspection program. In addition, for a sample of engagements, the inspection team reviewed documentation of the internal inspectors' review, reviewed certain aspects of the audit work papers, and



discussed with the Firm any significant differences in the results of the inspection team's review and those of the Firm's internal inspectors.

> f.    Review of Practices for Establishment and Communication of Audit Policies, Procedures, and Methodologies, Including Training

The objectives of the inspection procedures in this area were to update the inspection team's understanding of the Firm's processes for establishing and communicating audit policies, procedures, and methodologies, including training; to evaluate whether the design of these processes could be expected to promote audit quality and enhance compliance; and to evaluate changes in audit policies that the Firm had made since the Board's most recent inspection of the Firm.

Toward those objectives, the inspection team reviewed documentation relating to the Firm's method for developing policies and procedures, as well as internal guidance and/or training materials distributed to audit personnel with respect to recent changes in requirements and with respect to selected specific areas. The inspection team also evaluated the effectiveness of the design of the Firm's processes for monitoring developments that could affect the Firm's audit policies, procedures, and methodologies.

> g.    Review of Policies Related to Foreign Affiliates

The objective of the inspection procedures in this area was to evaluate the processes the Firm uses to ensure that the audit work that its foreign affiliates perform on the foreign operations of U.S. issuers is effective and in accordance with standards established by the Board. The inspection team did not inspect the audit work of foreign affiliates; rather, the inspection procedures in this area were limited to the supervision and control exercised by the U.S. engagement team over such work.

To accomplish this objective, the inspection team reviewed the Firm's policies and procedures related to its supervision and control of work performed by foreign affiliates on the foreign operations of U.S. issuer clients; analyzed audit guidance related to planning and administering multi-location engagements; and reviewed available information relating to the most recent foreign affiliated firms' internal inspections. In addition, the inspection team interviewed members of the Firm's leadership with responsibility for oversight of the work performed by foreign affiliates on foreign operations of U.S. issuer clients. Finally, with respect to a sample of the



Public Company Accounting Oversight Board

engagements reviewed, the inspection team reviewed the U.S. engagement team's supervision and control procedures concerning the audit work that the Firm's foreign affiliates performed.

h.     Review of Tone at the Top

The objective of the review of the Firm's "tone at the top" was to assess whether actions and communications by the Firm's leadership demonstrate a commitment to audit quality and compliance with the Act, the rules of the Board, the rules of the SEC, and PCAOB standards in connection with the Firm's performance of audits, issuance of audit reports, and related matters involving issuers.  Toward that end, the inspection team reviewed and analyzed information at the Firm's National Office.  Such information included the Firm's code of conduct; documents relating to measuring and monitoring audit quality; descriptions of the duties of, and relationships between and among, the Firm's staff and leadership; public company audit proposals; internal and external communications from management; and agendas and minutes of the Firm's board of directors.  In addition, the inspection team interviewed numerous members of the Firm's leadership team.

The inspection team conducted interviews at 11 of the Firm's practice offices to obtain perspectives on communications from the Firm's leadership relating to audit quality and tone at the top.  The inspection team interviewed members of the leadership at certain of these offices, as well as certain audit partners assigned to engagements that were reviewed.



**Public Company Accounting Oversight Board**

PCAOB Release No. 104-2007-088
Inspection of Grant Thornton LLP
June 28, 2007
Page C–1

## APPENDIX C

### RESPONSE OF THE FIRM TO DRAFT INSPECTION REPORT

Pursuant to section 104(f) of the Act, 15 U.S.C. § 7214(f), and PCAOB Rule 4007(a), the Firm provided a written response to a draft of this report.  Pursuant to section 104(f) of the Act and PCAOB Rule 4007(b), the Firm's response, minus any portion granted confidential treatment, is attached hereto and made part of this final inspection report.[12]

---

[12]    In any version of an inspection report that the Board makes publicly available, any portions of a firm's response that address nonpublic portions of the report are omitted.  In some cases, the result may be that none of a firm's response is made publicly available.

Grant Thornton ⚿

Accountants and Business Advisors

June 4, 2007

Mr. George H. Diacont
Director
Division of Registration and Inspections
Public Company Accounting Oversight Board
1666 K Street, N.W.
Washington, DC 20006

Re: Grant Thornton LLP Response to Part I of 2006 PCAOB Draft Report of Inspection

Dear Mr. Diacont:

We are pleased to provide our response to the Public Company Accounting Oversight Board's (the "PCAOB" or the "Board") draft report on the 2006 inspection of Grant Thornton LLP dated May 4, 2007. Our highest priority is to continuously improve our audit and quality control processes to ensure we conduct high-quality audits in an efficient manner. The PCAOB's inspections help us identify areas where we can improve these processes.

We respect and support the PCAOB inspection process. The issues raised reflect the fact that accounting and auditing standards are highly complex and as such there is a critical need to apply professional judgment when performing audit procedures and reaching conclusions on the extent of testing and appropriate documentation or the application of accounting principles. In many cases, the professional judgments of reasonable and highly competent people will differ. We have made every effort to cooperate fully, understand the inspection team's views and carefully consider their judgments.

We strongly disagree, however, with the use of overly broad comments such as "failed to identify," "failed to perform" and other such comments, since they do not adequately describe all of the relevant facts nor do they acknowledge the extent of the procedures that were, in fact, performed by the engagement teams. In certain cases we agreed to perform certain additional procedures or improve aspects of our audit documentation in order to supplement our audit procedures in response to the inspection comments. In some cases, we concluded that no additional actions were necessary.

We have also developed additional guidance and enhanced our training programs to address topics covered by the PCAOB's comments in prior years. Many of these improvements have been made over the past eighteen months, but due to the timing of the inspection process are not fully reflected in the 2006 inspection results.

We have the following additional comments regarding certain matters described in the report.

175 W. Jackson Boulevard
20th Floor
Chicago, IL 60604
T 312.856.0200
F 312.565.4719
W www.grantthornton.com

Grant Thornton LLP
US member of Grant Thornton International

## Grant Thornton

Mr. George H. Diacont
June 4, 2007
Page 2 of 2

**Issuer A**

With respect to the first comment on issuer A, the issuer has restated its financial statements. However, the manner in which the inspection team describes the issue fails to capture the extent and complexity of the professional judgments that were required under the relevant accounting literature which includes, but is not limited to, FIN 46R. The comments are also misleading in that they imply that the engagement team failed to identify the issue. This was not the case.

**Issuer B**

As previously communicated to the inspection team, the comment is factually incorrect. We have thoroughly evaluated the issuer's policy of recognizing rental income and the consistency of that policy with the issuer's historical experience. Therefore, no further action was deemed necessary.

**Issuers C, D, E, F and G**

We carefully considered the comments for each issuer and, as noted above, performed additional procedures where necessary or added documentation as appropriate. For each issuer we did not change our original conclusion or our report on the issuers' financial statements.

**Issuer H**

We carefully considered the comment regarding the disclosure of a gain on sale of assets. We communicated the inspection team's comment to management and the audit committee. The issuer has not changed the disclosures in its previously issued financial statements. We have not changed our original conclusion on this matter and we have not changed our report on the issuer's financial statements.

We believe that the actions described above fulfill our responsibilities under AU 390, *Consideration of Omitted Procedures after the Report Date* and AU 561 *Subsequent Discovery of Facts Existing at the Date of the Auditor's Report.*

As mentioned in our responses to the 2004 and 2005 Inspection Reports, we believe that the Board has obtained significant knowledge and understanding of each of the firm's audit methodologies, risk assessments, policies and procedures. We urge the Board to work closely with all of the firms to develop recommendations to establish the most effective approaches to auditing. We continue to be committed to working with the Board in such an effort.

Respectfully submitted,

*Grant Thornton LLP*