UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                                                  :   07 Civ. 7972 (PKC)
                                                                  :
In re TARRAGON CORPORATION                                        :
SECURITIES LITIGATION                                             :   Oral Argument Requested
                                                                  :
------------------------------------------------------------------X


**THE TARRAGON DEFENDANTS' REPLY MEMORANDUM OF LAW
IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS
THE AMENDED CLASS ACTION COMPLAINT**



Eliot Lauer
Theresa A. Foudy
Daniel R. Marcus
Joshua Brook
**CURTIS, MALLET-PREVOST,
  COLT & MOSLE LLP**
101 Park Avenue
New York, New York 10178-0061
(212) 696-6000

*Attorneys for Defendants Tarragon Corporation,
William S. Friedman, Robert P. Rothenberg, Erin
Davis Pickens, and Beachwold Partners, L.P.*

# TABLE OF CONTENTS

Page #

PRELIMINARY REPLY STATEMENT ..................................................................................... 1

ARGUMENT ................................................................................................................................. 2

    I. PLAINTIFF MISCHARACTERIZES TELLABS ............................................................ 2

    II. THE COMPLAINT FAILS TO PLEAD FRAUD WITH PARTICULARITY ................. 2

        A. The Ansonia Restatement ............................................................................... 3

        B. Revenue Recognition ..................................................................................... 3

        C. July 2007 Statements ...................................................................................... 4

    III. NO MOTIVE TO COMMIT FRAUD ............................................................................. 5

        A. Friedman's Ownership of Tarragon Stock ..................................................... 5

        B. Using Stock as Currency to Acquire Assets and Retire Debt ........................ 6

        C. Desire to Maintain Compliance with Debt Covenants ................................... 7

        D. Bonus Compensation ...................................................................................... 8

    IV. NO FACTS SUPPORT A CLAIM OF RECKLESSNESS .............................................. 8

    V. THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 20(a) ............. 10

CONCLUSION ........................................................................................................................... 10

# TABLE OF AUTHORITIES

Page #

**Cases**

Acito v. IMCERA Group, Inc.,
    47 F.3d 47 (2d Cir. 1995) .................................................................................................. 3

Caiafa v. Sea Containers Ltd.,
    525 F. Supp. 2d 398 (S.D.N.Y. 2007) ............................................................................... 9

Cromer Fin. Ltd. v. Berger,
    137 F. Supp. 2d 452 (S.D.N.Y. 2001) ............................................................................. 10

Decker v. Massey-Ferguson, Ltd.,
    681 F.2d 111 (2d Cir. 1982) .............................................................................................. 4

Emergent Capital Inv. Management, LLC v. Stonepath Group, Inc.,
    343 F.3d 189 (2d Cir. 2003) .............................................................................................. 5

In re BISYS Sec. Litig.,
    397 F. Supp. 2d 430 (S.D.N.Y. 2005) ............................................................................... 2

In re MSC Indus. Direct Co.,
    283 F. Supp. 2d 838 (E.D.N.Y. 2003) .............................................................................. 3

In re Salomon Analyst Level 3 Litig.,
    350 F. Supp. 2d 455 (S.D.N.Y. 2004) ............................................................................... 5

In re U.S. Aggregates, Inc. Sec. Litig.,
    235 F. Supp. 2d 1063 (N.D. Cal. 2002) ............................................................................ 8

In re WorldCom, Inc. Sec. Litig.,
    294 F. Supp. 2d 392 (S.D.N.Y. 2003) ........................................................................... 5, 6

Kalin v. Xanboo, Inc.,
    526 F. Supp. 2d 392 (S.D.N.Y. 2007) ............................................................................. 10

Kalnit v. Eichler,
    264 F.3d 131 (2d Cir. 2001) .............................................................................................. 5

Novak v. Kosaks,
    216 F.3d 300 (2d Cir. 2000) ................................................................................................ 8, 9

Pecarsky v. Galaxiworld.com, Ltd.,
    249 F.3d 167 (2d Cir. 2001) ...................................................................................................... 9

SEC v. Collins & Aikman Corp.,
    524 F. Supp. 2d 477 (S.D.N.Y. 2007) ....................................................................................... 2

Stevelman v. Alias Research Inc.,
    174 F.3d 79 (2d Cir. 1999) ........................................................................................................ 3

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
    127 S. Ct. 2499 (2007) ............................................................................................................... 2

Wilson v. Bernstock,
    195 F. Supp. 2d 619 (D.N.J. 2002) ............................................................................................ 8

Zangrillo v. Fashion Inst. of Tech.,
    601 F. Supp. 1346 (S.D.N.Y. 1985) .......................................................................................... 2

**Statute**

15 U.S.C. § 78u-4(b)(1)-(3)(A) ........................................................................................................ 1

**Other Authorities**

Jeff Sommer, "Stocks Tumble to Worst Week in Several Years," *New York Times,* July 29, 2007,
    available at http://www.nytimes.com/2007/07/29/business/yourmoney/29data.html?fta=y# ............. 5

Reuters, FACTBOX – Writedowns and Losses at Major Global Banks, November 14, 1007, available
    at http://www.reuters.com/article/bondsNews/idUSN1246466020071114 .......................................... 9

Tarragon Corp. 10-Q for First Quarter of 2007 at 37 available at
    http://www.sec.gov/Archives/edgar/data/1038217/000095013407011259/d46449e10vq.htm ........... 5

**PRELIMINARY REPLY STATEMENT**

Plaintiff's Amended Complaint ("AC") fails to put forth facts to support any claim that the 2006 Ansonia restatement was the product of fraud, rather than a mistake in accounting judgment – approved by independent auditors – in the application of a new accounting rule. Likewise, the AC fails to plead facts that would establish that Tarragon's failure to recognize earlier the impairment and liquidity issues disclosed in its August 9, 2007 announcement arose from anything more than the reality that such issues were not known before that time.

Plaintiff's opposition underscores the fact that the AC relies on nothing more than Tarragon's own public disclosures – not of a fraud, but of one accounting error (the Ansonia restatement) and the unsurprising effects upon a homebuilder of an unprecedented crisis in the real estate and credit markets. As with the AC, nothing in Plaintiff's opposition raises the "strong inference" of fraud required by the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(1)-(3)(A) (the "PSLRA").

To compensate for the lack of evidence of fraud, Plaintiff attempts to manufacture a "motive" to commit fraud by mischaracterizing Tarragon's bonus compensation program and two relatively insignificant transactions in which Tarragon engaged, as well as pointing out that Defendant Friedman, Tarragon's CEO, owned stock on margin. None of these allegations – either separately or together – is of sufficient weight to raise a strong inference of scienter, in particular when weighed against the facts that: (1) Tarragon was *purchasing* significant amounts of stock during the Class Period; (2) two defendants – COO Rothenberg and CFO Pickens – sold no stock but were, on the contrary, increasing their ownership interest in Tarragon; and (3) Friedman also increased his holdings by spending $800,000 to purchase shares as late in the Class Period as July 25, 2007 – just two weeks before the August 9, 2007 announcement that closes the Class Period. Since Plaintiff has failed to set forth facts from which to infer scienter, the AC should be dismissed.

# ARGUMENT

## I. PLAINTIFF MISCHARACTERIZES *TELLABS*

Plaintiff's reliance on Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499 (2007), is misplaced. The Court's prescription that courts must decide "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter" did not, as Plaintiff contends, lower the bar for pleading securities fraud. Pl. Opp. at 9. On the contrary, Tellabs heightened the pleading requirement, by holding that a court "must consider plausible nonculpable explanations for the defendant's conduct." 127 S. Ct. at 2504-05; see also SEC v. Collins & Aikman Corp., 524 F. Supp. 2d 477, 493 (S.D.N.Y. 2007) (Tellabs imposes "heightened standards" for pleading scienter).

A motion to dismiss should be denied *only* where "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. Legally deficient allegations, whether considered individually or cumulatively, do not state a claim for relief. See In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 449 (S.D.N.Y. 2005).

## II. THE COMPLAINT FAILS TO PLEAD FRAUD WITH PARTICULARITY

Plaintiff has apparently abandoned his claims regarding (1) Tarragon's cash flow restatement, and (2) Tarragon's alleged failure to timely take impairment charges and disclose liquidity issues. Plaintiff's failure even to address these points in his opposition constitutes a concession that the claims are without merit. See Zangrillo v. Fashion Inst. of Tech., 601 F. Supp. 1346, 1352 (S.D.N.Y. 1985).[1]

As a result, Plaintiff's opposition relies solely upon: (1) the 2006 Ansonia restatement; (2) his allegation that Tarragon's use of the percentage-of-completion method to recognize revenue

---

[1] Plaintiff himself has conceded as much with regard to the cash flow restatement. See Pl. Mem. of Law in Opp. to Grant Thornton LLP's Mot. to Dismiss Am. Compl. at 13 n.6 ("Plaintiff concedes [that the cash flow restatement was not the cause of any damages] as it was not his intention to allege loss causation stemming from that restatement since the complaint does not allege that this particular disclosure of falsity in the Company's prior public statements had any identifiable impact on the price of Tarragon's stock.").

was improper; and (3) his contention that Tarragon's July 2007 statements were overly optimistic. None satisfies the pleading requirements of Rule 9(b) and the PSLRA.

### A.  The Ansonia Restatement

The fact that a company restates financial data based on the discovery of an accounting error is, in and of itself, insufficient to state a claim for securities fraud. See Stevelman v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir. 1999); In re MSC Indus. Direct Co., 283 F. Supp. 2d 838, 849 (E.D.N.Y. 2003). In attempting to turn the failure to consolidate Ansonia into a fraud, Plaintiff argues that Tarragon's ownership of 89% of Ansonia, and COO Rothenberg's ownership of part of Ansonia, made it self-evident that Ansonia had to be consolidated. See Pl. Opp. at 18-19. The consolidation of variable interest entities under FIN 46(R), which became effective in 2004, is a technical accounting matter and the original accounting treatment not to consolidate Ansonia was approved by Tarragon's outside auditor, Grant Thornton LLP ("Grant Thornton"). All the facts on which Plaintiff now relies to show scienter were disclosed in the original financial statements themselves. See Decl. of Daniel Marcus dated Apr. 4, 2008 ("Marcus Decl."), Ex. C at 84. Plaintiff puts forth no facts that would give rise to the required "strong inference" that the restatement was the result of a fraud.

### B.  Revenue Recognition

To satisfy Rule 9(b) and the PSLRA, a complaint must "explain why the statements were fraudulent." Acito v. IMCERA Group, Inc., 47 F.3d 47, 51 (2d Cir. 1995). Here, while the AC identifies financial statements, it does not explain why those statements were fraudulent with respect to revenue recognition. See MSC, 283 F. Supp. 2d at 846.

First, the allegations of improper revenue recognition are vague. Other than noting in his brief that the use of the percentage-of-completion method resulted in an additional $22.2 million in revenue and gross profit of $6.5 million from the One Hudson Park Development in the second quarter of 2006 (Pl. Opp. at 5), Plaintiff does not identify the amount of any alleged effect in any of the other

-3-

financial periods, show the amounts to be material, or explain what the proper amount or method of recognition of revenue should have been. Such allegations are insufficiently particular to support a securities fraud claim. See, e.g., Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 116 (2d Cir. 1982) (allegations that company failed to write down value of obsolete facilities did not sufficiently plead fraud where plaintiff did not allege amounts at which facilities were carried or should have been carried on books).

Second, the AC fails to plead even a single fact to support the conclusory allegation that Tarragon was unjustified in recognizing revenue on One Hudson Park and other properties. See Def. Mem. at 12-13. In response, Plaintiff merely cites to his own conclusory AC allegations (Pl. Opp. at 10-11) and argues that the PCAOB report on Grant Thornton "casts doubt" upon or "criticized" Tarragon's use of the percentage-of-completion method. This is incorrect. Though critical of Grant Thornton's analytic procedures with respect to cost accounting, the PCAOB did not in any way state that Tarragon had improperly recognized revenue. See Aff. of Jeffrey S. Abraham, Ex. C at 4-5. In particular, the report stated merely that Grant Thornton should have obtained corroboration of management's explanations for the unexpected differences in cost accounting. The report did not say that those unexpected differences were indicative of fraud, nor did the report criticize Tarragon's revenue recognition at all.

### C. July 2007 Statements

Nor does Plaintiff allege facts to support his conclusory allegation that Tarragon had no reasonable basis to support the forward-looking statements contained in the Company's July 2007 press releases. See Def. Mem. at 13-14. In opposition, Plaintiff argues that, because Tarragon later announced that it was not in compliance with its debt covenants as of June 30, 2007, Defendants must have known that fact before making the July statements and fraudulently omitted it. See Pl. Opp. at 11. However, the Company's non-compliance with its subordinated debt covenants had already been

-4-

disclosed in its May 11, 2007 10-Q – well before the July statements.[2] Also, as shown in the Company's August 9, 2007 announcement and its 10-Q for the second quarter of 2007, the Company's non-compliance with other debt covenants as of June 30, 2007 was not known in July 2007 because it was the result of having recorded impairment charges *after* the August 9, 2007 announcement.

Moreover, the change in Tarragon's outlook between the July announcements and the August 9, 2007 announcement is not surprising given the timing. By August 2007, the American economy began to feel the full effects of what has become known as the "subprime mortgage crisis."[3] The subprime crisis had a huge impact on Tarragon and others in the residential real estate industry – an industry that was already in the midst of a significant slowdown.[4] Plaintiff has alleged nothing that would show Tarragon's July 2007 statements to be without a reasonable basis *at the time they were made*.

### III. NO MOTIVE TO COMMIT FRAUD

#### A. Friedman's Ownership of Tarragon Stock

The fact that an executive owns stock is insufficient to raise an inference of scienter. See Kalnit v. Eichler, 264 F.3d 131, 141 (2d Cir. 2001). Rather, a plaintiff must allege that the executive sold shares when the price was inflated. See Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 198 (2d Cir. 2003). In this case, none of the Individual Defendants sold shares. In his opposition, Plaintiff relies on the unique case of In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 392 (S.D.N.Y. 2003) to argue that Friedman's stock ownership raises an inference of scienter, because he owned the stock on margin. See Pl. Opp. at 13-14. However, the facts here come nowhere near the singular factual scenario presented by WorldCom.

---

[2] See Tarragon Corp. 10-Q for First Quarter of 2007 at 37 available at http://www.sec.gov/Archives/edgar/data/1038217/000095013407011259/d46449e10vq.htm.
[3] See Jeff Sommer, "Stocks Tumble to Worst Week in Several Years," *New York Times*, July 29, 2007, available at http://www.nytimes.com/2007/07/29/business/yourmoney/29data.html?fta=y#.
[4] The Court may take judicial notice of the facts surrounding the subprime crisis and its impact on financial markets. See In re Salomon Analyst Level 3 Litig., 350 F. Supp. 2d 455, 462 n.2 (S.D.N.Y. 2004).

In WorldCom, the issuer had acknowledged perpetrating a massive fraud of $3.8 billion. 294 F. Supp. 2d at 400. As the court noted, the financial pressures facing the executive in that case were "unique." Id. at 416. CEO Bernard J. Ebbers had taken out *over $900 million* in personal loans secured by company stock, and the corporation itself had taken over the loans to avoid the forced sale of Ebbers' stock. See id. at 402. He faced margin pressure for two years of the three-year fraud.

Here, Plaintiff has failed to allege any facts regarding the amount of the margin loans, or the percentage of Friedman's personal wealth accounted for, aside from one vague statement that Friedman's wealth was "entwined" with the Company. See Pl. Opp. at 14. Friedman faced margin calls only during the last three days of the Class Period (from August 7-9, 2007), when Tarragon stock fell precipitously. There is no evidence that Friedman faced any margin pressure at all before the very end of the Class Period. On the contrary, just two weeks earlier, on July 25, 2007, Friedman increased his ownership by spending $800,000 to buy additional stock. Moreover, the other two individual defendants, COO Rothenberg and CFO Pickens, sold no shares during the Class Period and, in fact, substantially increased their holdings.[5] See Marcus Decl. Ex. O.

### B.      Using Stock as Currency to Acquire Assets and Retire Debt

Although stock used to purchase acquisitions may, in certain circumstances, raise an inference of scienter, only a sustained program of growth through acquisitions financed by inflated equities is sufficient to do so. See Def. Mem. at 16. Here, Plaintiff cites only three transactions as evidence of this so-called "program." See Pl. Opp. at 15-16. In the first, Tarragon's purchase of 30% of Fenwick Terrace Apartments LLC, Tarragon did not even use its shares as consideration. Rather, the shares were used as security for a $967,000 promissory note, at a time when the Company's market capitalization was $550 million.

---

[5] Pickens increased her holdings from 21,020 shares in January 2005 to 39,499 shares at the end of the Class Period. See Marcus Decl. Ex. M (Form 4's). Rothenberg increased his holdings from 22,155 shares in January 2005 to 58,825 in January 2007. See id. Ex. N (Form 4's).

In the second transaction, the issuance of stock to Rohdie LLC resulted from a conversion of Rohdie's shares by a choice made not by Tarragon, but by Robert C. Rohdie, President and CEO of Tarragon Development Corporation, a major subsidiary of Tarragon. The number of shares converted was determined by an agreement that had been concluded in 2000. See Def. Mem. at 17. Plaintiff's argument that Tarragon still had an incentive to commit fraud in order to make conversion more attractive to Rohdie is implausible. Rohdie himself was a senior executive and director, who would certainly have been aware if the Company's stock price was based on false sales data. Indeed, he was CEO of the Company's homebuilding division, in which the alleged improper revenue recognition took place.

Finally, the fact that the Company retired debt by converting secured notes into stock is insufficient to raise a strong inference of scienter. Plaintiff has not pled that Tarragon's desire to reduce its debt burden was any different than any other company's desire to reduce debt and, therefore, does not raise any inference of scienter. See Def. Memo at 17-18 (citing cases).

### C.  Desire to Maintain Compliance with Debt Covenants

Plaintiff argues that a desire to maintain compliance with debt covenants can be a sufficient motive for fraud where there is a "particularly urgent or desperate need to avoid default" and argues that Tarragon's end-of-class period defaults allegedly show such a need. See Pl. Opp. at 17. However, Plaintiff concedes that he has pled no particular facts as to how Tarragon's alleged misrepresentations affected any given debt covenants. For example, it is nonsensical that the Ansonia restatement, announced in August 2006, had any relation to defaults in debt covenants announced one year later in August 2007. Plaintiff alleges nothing to take this case out of the general rule that a

conclusory assertion of a company's desire to maintain compliance with debt covenants is common to all corporations and thus insufficient to establish scienter. See Def. Mem. at 18 (citing cases).[6]

### D.  Bonus Compensation

Plaintiff misleadingly asserts that Tarragon executives' bonuses were based on stock price. In fact, the proxy statement on which Plaintiff purports to rely states as follows:

> [annual bonus pool to be] equal to 8% of estimated net pre-tax profits earned or to be earned by Tarragon on all development projects, payable in cash and stock appreciation rights equal in potential value to 25% of the cash bonus awarded, based on our stock price on the date of grant.

Abraham Aff. Ex. H at 19.[7] According to this formula, the bonus pool is fixed at 8% of pre-tax profits. The bonus is unaffected by the price of Tarragon stock. A fraudulent inflation of the stock value would not affect the bonus amounts; it would merely result in payment of *fewer* appreciation rights as the stock component of the bonus. Moreover, Plaintiff does not dispute, because he cannot, that Second Circuit law is clear that generalized allegations that executives are motivated to commit fraud to increase their compensation are insufficient to plead scienter. See Def. Mem. at 19.

### IV.  NO FACTS SUPPORT A CLAIM OF RECKLESSNESS

Recklessness is conduct that is "highly unreasonable and which represents an extreme departure from the standards of ordinary care." Novak v. Kosaks, 216 F.3d 300, 308 (2d Cir. 2000). Nothing Defendants are alleged to have done remotely approaches this standard.

---

[6] Plaintiff's reliance on In re U.S. Aggregates, Inc. Sec. Litig., 235 F. Supp. 2d 1063, 1072 (N.D. Cal. 2002), is misplaced. In that case, the complaint identified specific debt covenants that would have been violated but for the fraudulent conduct, as well as confidential witnesses who corroborated the fraud. His reliance on dicta from Wilson v. Bernstock, 195 F. Supp. 2d 619, 637 (D.N.J. 2002), is also unavailing because the court there, in granting a motion to dismiss, noted that a generalized assertion of a need to maintain compliance with debt covenants does not support scienter.

[7] Plaintiff selectively quotes this document by leaving out the words "earned or to be earned by Tarragon on all development projects, payable in cash and stock appreciation rights equal in potential value to 25% of the cash bonus awarded" and "on the date of grant." See Pl. Opp. at 17.

First, the accounting treatment of Ansonia was discussed with and approved by Grant Thornton. Reliance on the accounting conclusions of licensed outside accountants is, as a matter of law, not reckless.[8] See Pecarsky v. Galaxiworld.com, Ltd., 249 F.3d 167, 174 (2d Cir. 2001).

Second, Plaintiff's generalized reliance on Defendants' duties and knowledge as corporate officers fails to show scienter absent specific allegations of particular information that came into their possession that contradicted their public statements. See Novak, 216 F.3d at 311-12.

Third, the mere size of the impairment charges does not raise an inference of scienter because there is no evidence that the charges were untimely. See Caiafa v. Sea Containers Ltd., 525 F. Supp. 2d 398, 413-14 (S.D.N.Y. 2007). The impairment charges resulted from the rapid deterioration in the real estate and credit markets in July 2007. See Part II(C), supra. Further, the size of the impairment was not inconsistent with the magnitude of write-downs being taken by others on real estate investments at that time.[9]

Fourth, Plaintiff's argument that, because the One Hudson Park development was "important" to the Company, "it is reasonable to infer that the Individual Defendants knew that persons making deposits on units had not demonstrated sufficient financial commitment to proceed with their purchases" (Pl. Opp. at 20-21) lacks any foundation whatsoever. Plaintiff puts forth no facts showing that the buyers' deposits were insufficient to justify revenue recognition. Nor does Plaintiff offer facts to support the absurd contention that, because this project was important, the Defendants somehow knew that a subsequent cataclysm in the real estate and credit markets would later cause purchasers to

---

[8] Plaintiff's assertion that the PCAOB "harshly criticized" Grant Thornton is incorrect. Pl. Opp. at 19. The PCAOB did not find that Grant Thornton had acted recklessly or with fraudulent intent. See Abraham Aff. Ex. C. Plaintiff's claim that the PCOAB found the Company's explanations of cost accounting variances to be "inadequate" is also incorrect. Pl. Opp. at 20. The PCAOB merely found that Grant Thornton did not perform sufficient procedures to corroborate management's explanation of the variance between project budgets and actual costs. The Board did not find that the explanations themselves were in any way insufficient. See Abraham Aff. Ex. C.

[9] See Reuters, FACTBOX – Writedowns and Losses at Major Global Banks, November 14, 2007, available at http://www.reuters.com/article/bondsNews/idUSN1246466020071114.

default. Indeed, the defaults did not begin until July 2007. See Marcus Decl. Ex. G (10-Q for the Third Quarter, 2007).

## V. THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 20(a)

Plaintiff's bald statement that the culpable participation requirement can be adequately pled simply by pleading primary violation and control is incorrect. See Pl. Opp. at 24. Courts in this district have required that complaints allege facts to show "culpable participation." See, e.g., Kalin v. Xanboo, Inc., 526 F. Supp. 2d 392, 406 (S.D.N.Y. 2007); Cromer Fin. Ltd. v. Berger, 137 F. Supp. 2d 452, 484 (S.D.N.Y. 2001). Not only has Plaintiff failed to plead a primary violation by any defendant, he pleads no participation whatsoever by Beachwold in any conduct.

### CONCLUSION

Taken together, Plaintiff's allegations fail to raise *any* inference – let alone the statutorily required *strong* inference – of intent to commit fraud by Tarragon or any of the individual defendants. The AC should be dismissed.

Dated:   New York, New York
         June 6, 2008

Respectfully submitted,

CURTIS, MALLET-PREVOST, COLT &
MOSLE LLP

By: _____
Eliot Lauer
Theresa A. Foudy
Daniel R. Marcus
Joshua Brook
101 Park Avenue
New York, New York 10178-0061
(212) 696-6000

*Attorneys for the Tarragon Defendants*